UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X
 RONALD WOOLF,

                     Plaintiff,                   Civil Case No: 16-cv-6953

  -against-                               **STATEMENT OF**

                                        **UNDISPUTED FACTS**
 BLOOMBERG L.P.,                    **SUBMITTED BY**
 ANDREW BOWYER, individually,      **PLAITNIFF PURSUANT**
 MELISSA STRADA, individually,       **TO LOCAL RULE 56.1**
 MATHEW ASMAN, individually,       **AND FRCP RULE 56**
 MICHAEL MORRIS, individually,
 JIM NIZIOLEK, individually, and

                  Defendants.
--------------------------------------------------------X

       Pursuant to Local Rule 56.1 and FRCP Rule 56, Plaintiff, Ronald Woolf, submit the

following Statement of Undisputed Facts in support of his partial motion for summary judgment.

1. Plaintiff, Ronald Woolf, has suffered from migraine and tension headaches since at least the

    year 2000, when he began treating with Dr. Michael Hutchinson, M.D., P.h.D., at the New

    York University School of Medicine.  See Melamed Aff. Exhibit A, Def. Prod. 001439 -

    001442.

2. Dr. Hutchinson treated Plaintiff Woolf on and off for a decade, and "since 2011 on a regular

    basis."  See Melamed Aff. Exhibit A, Def. Prod. 001439 - 001442.

3. In 2011, Dr. Hutchinson saw Plaintiff "approximately every three months to monitor his

    condition and perform injections to mitigate and control his migraine and tension

    headaches."  See Melamed Aff. Exhibit A, Def. Prod. 001439 - 001442.

4. Periodically, throughout 2011 to 2013, Plaintiff's migraine headaches would be intense

    enough that he would be incapacitated for a period of time, impairing his general life

activities, and preventing him from performing his work.  See Melamed Decl. Exhibit B, Def. Prod. 002241; Melamed Decl. Exhibit C, Def. Prod. 002270; Melamed Decl. Exhibit D, Def. Prod. 002609.

5.  On August 15, 2011, Plaintiff emailed his manager at Bloomberg, Steve Citrin, stating, "Steve, had a severe migraine this morning.  Medication is kicking in.  Expect I can make it in between 9:30 to 10:00 today.  Will let you know if anything changes.  Ron."  See Melamed Decl. Exhibit B, Def. Prod. 002241.

6.  On May 23, 2012, Plaintiff emailed his manager at Bloomberg, Steve Citrin, stating, "Steve, dealing with a migraine.  Will try to be in in (sic) between 10 and 11am today."  See Melamed Decl. Exhibit C, Def. Prod. 002270.

7.  On February 5, 2013, Plaintiff Woolf emailed his new manager, Andrew Bowyer, and CCed his manager Michael Morris, stating, "woke up with a migraine.  Medicine kicking in and should be in later this morning.  Andrew will do calls from home this morning then hope to head into work.  Ron."  See Melamed Decl. Exhibit D, Def. Prod. 002609.

8.  Beginning in February of 2013, Plaintiff began experiencing more frequent and complex migraines as a result of stress caused by work factors, including Defendant Bowyer nitpicking at Plaintiff's work, berating Plaintiff in public and generally verbally assaulting Plaintiff.  See Melamed Decl. Exhibit E, Pl. Depo. P. 164 – 167.

9.  Around March 15, 2013, Plaintiff met with Defendant Melissa Strada, an employee in Defendant's professional development department, and asked Strada for help in seeking out a transfer to a different position within Bloomberg as a reasonable accommodation for his medical condition.  See Melamed Decl. Exhibit F, Pl. Depo. P. 172 - 174.

10. Around March 19, 2013, Plaintiff left a handwritten letter on Defendant Strada's desk, underneath her computer keyboard, which reiterated Plaintiff's request for help in transferring positions, and stated, "Not only do I want to get a job in a new group, I NEED to find a new job and quickly.  The environment I am working in is effecting (sic) my health (have headaches everyday) and my motivation to work for these people has been completely destroyed.  Any assistance you can provide as a follow up to our conversation this past Friday would be greatly appreciated."  Plaintiff Woolf ended the letter, "I am willing to meet and discuss further anytime today in you are available."  See Melamed Decl. Exhibit G, Def. Prod. 379 – 380.  See also See Melamed Decl. Exhibit H, Pl. Depo. P. 159 – 164.

11. Around April 12, 2013, Plaintiff Woolf emailed Defendant Jim Niziolek, an employee in Defendant Bloomberg's Human Resources Department, and stated, "Hi Jim, Yesterday afternoon I came down with a severe migraine headache and was practically incapacitated.  I left work unable to get the copies done to give you.  I am at home today and about 85% recovered.  I expect to be at work on Monday and will deliver the copies to you on the 7th floor."  See Melamed Decl. Exhibit I, Def. Prod. 002755.

12. Around April 12, 2013, Plaintiff Woolf wrote an email to his supervisor, Defendant Morris, and Cced his supervisor Defendant Bowyer, stating, "Mike/Andrew: still suffering from severe migraine.  This happens very infrequently but I know i am looking at being down 24 to 36 hours.  Will not be in tomorrow but unless I am dead or have a stroke I will be on the First Data call tomorrow afternoon as that is extremely important and I have set the expectations we talked about so want to reinforce that on this call tomorrow.  Ron."  See Melamed Decl. Exhibit J, Def. Prod. 002753.

13. Around May 2, 2013, Plaintiff Woolf wrote to Defendant Bowyer via Bloomberg Internal Messenger, "Andrew, Heads up.  I have a doctor's appointment with my neurologist.  Trying to get my migraine headaches under control.  Probably between 3 and 3:30 as apt. is in the 30's East side."  See Melamed Decl. Exhibit K, Def. Prod. 002807.

14. Around May 7, 2013, Plaintiff wrote an email to Defendant Morris, stating, "Mike, feeling under the weather today.  Having pretty severe headache.  Requesting a P day.  usually these pass in 2 to 3 hours.  Will try to make it in this afternoon.  Ok?  Ron."  See Melamed Decl. Exhibit L, Def. Prod. 002808.

15. Around May 28, 2013, Plaintiff wrote a letter to Defendant Niziolek, detailing the progression of Plaintiff's migraines, and stating that his condition is "complex with potentially very serious health consequences."  See Melamed Decl. Exhibit M, Def. Prod. 001437 - 001438.

16. Plaintiff stated that his condition had doubled his risk for stroke, and that he would not be back to work until he was "cleared to return to work, and/or informed of conditions and remedies recommended by my doctor(s) to mitigate the pain and the chance of another serious migraine attack that impacts my vision and risk of stroke.  *I ask for your guidance* (emphasis added)."  See Melamed Decl. Exhibit M, Def. Prod. 001437.

17. Around May 30, 2013, Plaintiff emailed Defendant Niziolek a copy of a letter from Plaintiff's treating neurologist, Dr. Hutchinson.  See Melamed Aff. Exhibit A, Def. Prod. 001439 - 001442.

18. The letter stated that Dr. Hutchinson is Plaintiff's primary neurologist, and that he has treated Plaintiff for migraine headaches since 2000.  See Melamed Aff. Exhibit A, Def. Prod. 001439 - 001442.

19. Dr. Hutchinson stated, "during my last examination of Mr. Woolf on May 2nd 2013 his condition had deteriorated quite significantly and I recommended and prescribed additional medication while also administering the same injections that he normally receives."  See Melamed Decl. Exhibit N, Def. Prod. 001441.

20. Dr. Hutchinson explained that the single biggest risk for migraines is stress, and therefore Plaintiff Woolf is "at a significant risk for stroke or heart attack simply from the stress he is currently experiencing at work."  See Melamed Aff. Exhibit A, Def. Prod. 001439 - 001442.

21. Dr. Hutchinson therefore opined that, "a medical leave of absence, or intermittent medical leaves of absence, alone will not significantly mitigate this stress," and as Plaintiff's primary attending neurologist "I have strongly advised that Mr. Woolf do what is necessary to change his current work environment, as it is apparent that the primary trigger of these most recent, intense and frequent migraines involving neurological deficits, is emotional stress at work, which in the short-term has impacted his speech, sight, and ability to concentrate. However, more seriously, this also indicates a grave deterioration of his condition. Given his genetic disposition to heart disease based on family history, I would characterize Mr. Woolf's condition as serious, one that could in fact be life threatening if not properly treated and managed."  See Melamed Aff. Exhibit A, Def. Prod. 001439 - 001442.

22. Dr. Hutchinson concluded the letter by inviting the Defendants to, "[p]lease feel free to contact me with any questions.  Mr. Woolf has given me authorization to release his medical records to document and verify the above."  See Melamed Aff. Exhibit A, Def. Prod. 001439 - 001442.

23. Plaintiff's attorney emailed a copy of Dr. Hutchinson's letter to Defendant Matthew Asman, Employment Counsel for the Defendants, and specifically requested that he, and Bloomberg,

engage in the interactive dialogue to evaluate and facilitate a reasonable accommodation for Plaintiff.  See Melamed Decl. Exhibit O, Exhibit 1 from Defendant Asman's Deposition.

24. Defendant Asman responded to Plaintiff's attorney's letter, "Leonard, thank you for passing this along. I'm sorry to hear about your client's condition. We did, in fact, receive the information from your client earlier today. We are also well aware of our obligations under the Americans with Disabilities Act and will, of course, enter into the requisite interactive process with your client to determine whether we have sufficient medical information to assist his request."   See Melamed Decl. Exhibit N, Exhibit 1 from Defendant Asman's Deposition.

25. Defendants never once contacted Dr. Hutchinson. See Melamed Decl. Exhibit O, Niziolek Depo. P. 56 – 57.

26. Defendant Niziolek did not recall why he and Bloomberg did not contact Dr. Hutchinson, despite Dr. Hutchinson's explicit invitation to do so. See Melamed Decl. Exhibit O, Niziolek Depo. P. 56 – 57.

27. On May 31, 2013, Plaintiff had a conversation with Defendant Niziolek and told Niziolek that Plaintiff was specifically requesting, as a reasonable accommodation, that he be able to change his work environment, just as Dr. Hutchinson suggested.  See Melamed Decl. Exhibit P, Def. Prod. 00286.

28. Defendant Niziolek asked Plaintiff Woolf what he meant by that. See Melamed Decl. Exhibit P, Def. Prod. 00286.

29. Plaintiff explained that aside from transferring to other positions within Bloomberg, Plaintiff could simply do the exact same job he had been doing until then, without being managed by

Defendants Bowyer and Morris, who were exacerbating Plaintiff's medical condition.   See Melamed Decl. Exhibit P, Def. Prod. 00286.

30. Plaintiff explained that another employee, Eric Hernandez, gave him all of his work flow anyway, and that Plaintiff worked closely with another practice group, Bloomberg Industries. See Melamed Decl. Exhibit P, Def. Prod. 00286.

31. Defendant Niziolek asked Plaintiff who his supervisor would be. See Melamed Decl. Exhibit P, Def. Prod. 00286.

32. Plaintiff identified supervisors David Dwyer and Paul Sweeney as employees of Bloomberg who could supervise him, as he already worked closely with their business.  See Melamed Decl. Exhibit P, Def. Prod. 00286.

33. Plaintiff concluded by stating that he feels like he has a gun to his head every day, and that his migraines are exacerbated because of this stress that Defendants Bowyer and Morris put on him every day.  See Melamed Decl. Exhibit P, Def. Prod. 00286.

34. Plaintiff stated that his migraines could lead to a heart attack or death.  See Melamed Decl. Exhibit P, Def. Prod. 00286.

35. Defendant Niziolek concluded the meeting by stating that he would be back to Plaintiff if any further documentation was needed.  See Melamed Decl. Exhibit P, Def. Prod. 00286.

36. Around June 4, 2013, Defendant Niziolek sent Plaintiff an email, which included an attached letter.  See Melamed Decl. Exhibit Q, Def. Prod. 001479 – 001480.

37. In the letter, Defendant Niziolek stated, "Dear Ron, You recently requested a medical accommodation to transfer to another position outside your existing department.  In order for us to consider a request for this accommodation, we will need specific documentation from your health care provider describing the nature, severity and duration of your impairment, the

specific activities that your impairment limits, and the extent to which the impairment limits your ability to perform those activities.  We will also need information substantiating why you need the specific accommodation you are requesting.  Any such documentation should be forwarded to me immediately so that we may consider your request.  Upon receipt of this information, we will evaluate your request and determine whether the requested accommodation is necessary and/or possible, or whether some other accommodation may be more appropriate, if, in fact, your condition warrants consideration of an accommodation." See Melamed Decl. Exhibit Q, Def. Prod. 001479 – 001480.

38. During his deposition, Defendant Niziolek "I don't recall" to the question of what in Dr. Hutchinson's letter was insufficient.  See Melamed Decl. Exhibit O, Niziolek Depo. P. 56 – 57.

39. Around June 5, 2013, Plaintiff sent a response letter to Defendant Niziolek, which asked what exactly Defendant Niziolek needed more than the letter previously provided by Dr. Hutchinson.  See Melamed Decl. Exhibit S, Def. Prod. 001481- 001486.

40. Plaintiff Woolf addressed each and every line in Defendant Niziolek's letter and explained how all the information necessary to process Plaintiff's request had already been provided. See Melamed Decl. Exhibit S, Def. Prod. 001481- 001486.

41. Plaintiff pointed out that with respect to the "***nature, severity and duration of your impairment***" Dr. Hutchinson had stated, "He (Mr. Woolf) has complex, rather than simply migraines.  In other words, unlike many of those with migraine, he often has neurological deficits with his headaches, which in the short term has impacted his speech, sight and ability to concentrate.  However, more seriously, this also indicates a grave deterioration in his condition, which increases his risk of stroke, and/or cardiovascular event.  Given his genetic

disposition to heart disease based on family history, I would characterize Mr. Woolf's condition as serious, one that could in fact life threatening if not properly treated and managed." Dr. Hutchinson also noted he has been treating Plaintiff on a regular basis since 2011 to monitor, mitigate, and control my headaches. See Melamed Decl. Exhibit S, Def. Prod. 001481- 001486.

42. Woolf further explained, "[t]his is obviously an ongoing condition: something which he stated must be properly treated an ***managed***. There is no known cure for Migraine Disease, however Dr. Hutchinson offers his phone number and address to ask him an questions regarding my condition and I authorize this if there is need for additional clarity. See Melamed Decl. Exhibit S, Def. Prod. 001481- 001486.

43. With respect to the ***specific activities that his impairment limits and the extent to which the impairment limits his ability to perform these activities***, Plaintiff pointed to the portion of Dr. Hutchinson's letter that detailed Plaintiff's inability to work, the loss of vision, speech impairment, and inability to concentrate during migraines, as significantly impairing Plaintiff's ability to perform many life activities. See Melamed Decl. Exhibit S, Def. Prod. 001481- 001486.

44. With respect to ***information substantiating why Plaintiff needed the specific accommodation he was requesting***, Plaintiff again pointed Defendant Niziolek to Dr. Hutchinson's letter which stated, "It is my medical opinion that a medical leave of absence or intermittent medical leaves of absence, along will not significantly mitigate this stress. I have strongly advised that Mr. Woolf do what is necessary to change his current work environment, as it is apparent that the primary trigger of these most recent, intense and

frequent migraines involving neurological deficits, is emotional stress at work."   See Melamed Decl. Exhibit S, Def. Prod. 001481- 001486.

45. Plaintiff concluded, "Jim, given the very detailed and thorough explanation of my medical condition in the 1 and ½ page letter written by Dr. Hutchinson, I fail to see where your questions have not been answered.  Therefore, what is it specifically that you need to know that is not covered in this letter??"   See Melamed Decl. Exhibit S, Def. Prod. 001481- 001486.

46. Plaintiff Woolf also noted that his medical condition is considered a disability under the ADA, and detailed the specific legal requirements for employers in handling an employee's accommodation request under the law.  See Melamed Decl. Exhibit S, Def. Prod. 001481- 001486.

47. Plaintiff referred Defendant Niziolek to the "Job Accommodation Network (JAN) which is a service of the Office of Disability Employment Policy of the U.S. Department of Labor and specifically the Accommodation and Compliance Series" on the ADA Amendments Act of 2008.  See Melamed Decl. Exhibit S, Def. Prod. 001481- 001486.

48. Plaintiff concluded by saying, "Jim, given the above, I ask that the Bloomberg Organization now focus on providing me an accommodation, something that can be provided without an undue hardship, and/or whether there are other accommodations that can be considered.  I ask that this request be met as soon as possible.  I am open to having another discussion regarding this very important matter at any time.  Thank you for your attention to this matter. I look forward to your reply.  See Melamed Decl. Exhibit S, Def. Prod. 001481- 001486.

49. Around June 13, 2013, Plaintiff emailed Defendant Niziolek, stating, "I have met with Robin Conn in Professional Development to discuss opportunities abroad as well as best ways to

navigate PATH <GO> to find an appropriate open job opportunity within the firm. Hopefully, as we discussed, this will allow me to transfer from my current position and that the firm will consider this a reasonable accommodation to assist me in managing the debilitating migraines I now often experience at work." See Melamed Decl. Exhibit T, Def. Prod. 001541.

50. Defendant Niziolek responded on June 13, 2013, that he would need to see the specific jobs Plaintiff referred to in order to evaluate the request. See Melamed Decl. Exhibit U, Def. Prod. 001542.

51. On June 17, 2013, Plaintiff emailed Defendant Niziolek stating, "Hi Jim, I have thoroughly reviewed the job data base on PATH <GO> for jobs which I would have interest in doing and feel I am relatively qualified to perform AND which, would probably be a reasonable accommodation under the ADA.  9 are in Asia – Hong Kong, Singapore, Tokyo, and Mumbai.  2 are in NY., 1 in Washington D.C., 1 in San Francisco.  How do you suggest I go about requesting this transfer? Apply for all job openings at once?  Apply for the top 5?  Top 3?" See Melamed Decl. Exhibit V, Def. Prod. 001550.

52. After having a conversation with Defendant Niziolek around June 17, 2013, Plaintiff emailed Defendant Niziolek on June 24, 2013, and provided an 18 page response to his performance review (omitted) and indicated that he narrowed his request to 1 position in Singapore and 1 position in Hong Kong, and asked Defendant Niziolek to assess Plaintiff's accommodation request. See Melamed Decl. Exhibit W, Def. Prod. 001575, 001593 - 001594.

53. On July 2, 2013, Plaintiff emailed Defendant Niziolek stating, "I have not heard anything back regarding my request for a reasonable accommodation under the ADA. It is now over a month since the firm was first notified by my doctor about my condition and I have provided

you with the information that you requested that you requested to make a determination if either additional information was needed or if the HR could move forward with my request." Plaintiff again expressed the urgency of his request in light of his medical condition.  See Melamed Decl. Exhibit X, Def. Prod. 001642.

54. On July 2, 2013, Defendant Niziolek emailed Plaintiff about a meeting the two were set to have the next day.  Defendant Niziolek stated, "Ron, Tomorrow's meeting will focus solely on your response to your interim evaluation.  We will be in touch with you about your accommodation request at a later date.  Thanks, Jim."  See Melamed Decl. Exhibit Y, Def. Prod. 001643.

55. During his deposition, Defendant Niziolek admitted that in 2013 he chose to meet with Plaintiff only about his concerns with his interim performance evaluation, something he had no obligation under the law to do, before meeting with Plaintiff about his reasonable accommodation request, something he did in fact have an obligation under the law to do.  See Melamed Decl. Exhibit Z, Niziolek Depo. P. 118 – 120.

56. Around July 17, 2013, Plaintiff, filed a charge of discrimination with the EEOC and sent an email to Defendant Niziolek, along with a senior HR official, Alison Trellis, stating, "This email is to inform Bloomberg representatives that I filed a charge of discrimination against Bloomberg L.P.  This charge was files this afternoon in the NYC EEOC office (case/file number 520-2013-02597).  Bloomberg representatives will be receiving formal documents from the EEOC explaining the charges within the coming week."  See Melamed Decl. Exhibit AA, Def. Prod. 001688.

57. Around July 16, 2013, Plaintiff emailed Defendant Niziolek and Alison Trellis, with a second letter from Plaintiff's treating neurologist, Dr. Michael Hutchinson.  See Melamed Decl. Exhibit BB, Def. Prod. 001696 - 001697.

58. This letter reiterated Dr. Hutchinson's first letter, and stated, "it is my opinion that Mr. Woof must immediately be allowed to change his work environment.  Out of medical necessity, I strongly advise that accommodations be given to Mr. Woolf as soon as possible that will significantly lower his work stress as his work environment is obviously a major trigger to these more frequent and intense migraines.  Should you have any questions please do not hesitate to contact me directly at my office.  Mr. Woolf has given me authorization to disclose and discuss his ongoing treatment for this serious medical condition."  See Melamed Decl. Exhibit BB, Def. Prod. 001696 - 001697.

59. Despite Dr. Hutchinson again inviting Defendant Niziolek and Bloomberg to contact him directly, and despite Plaintiff having provided proper authorization for them to do so, Defendant Niziolek admitted in his deposition that he never contacted Dr. Hutchinson, and that he did not recall why.  See Melamed Decl. Exhibit O, Niziolek Depo. P. 56 – 57.

60. On July 17, 2013, Defendant Niziolek finally emailed Plaintiff stating, "Hello Ron.  I would like to speak with you about your accommodation request at this time."  See Melamed Decl. Exhibit CC, Def. Prod. 001700.

61. Around July 19, 2013, Plaintiff and Defendant Niziolek finally met about Plaintiff's accommodation request. See Melamed Decl. Exhibit DD, Def. Prod. 000268; See Melamed Decl. Exhibit EE, Pl. Prod. Exhibit 7, P. 17 – 25.

62. Defendant Niziolek told Plaintiff that Bloomberg had never questioned Plaintiff's medical condition, and has offered Plaintiff intermittent FMLA leave as an accommodation.  See

Melamed Decl. Exhibit DD, Def. Prod. 000268; See Melamed Decl. Exhibit EE, Pl. Prod. Exhibit 7, P. 17 – 25.

63. Defendant Niziolek told Plaintiff that any position within Bloomberg, including the positions Plaintiff had identified would provide Plaintiff with the same level of stress, so Bloomberg would not even consider or evaluate any of the specific requested transfer positions.   See Melamed Decl. Exhibit DD, Def. Prod. 000268; See Melamed Decl. Exhibit EE, Pl. Prod. Exhibit 7, P. 17 – 25.

64. Defendant Niziolek unilaterally told Plaintiff that intermittent FMLA leave would be sufficient to manage Plaintiff's condition, despite the fact that Plaintiff's treating neurologist specifically said that intermittent leave alone would not suffice.  See Melamed Decl. Exhibit DD, Def. Prod. 000268; See Melamed Decl. Exhibit GG, Pl. Prod. Exhibit 7, P. 17 – 25.

65. Defendant Niziolek did not provide Plaintiff with any next steps or otherwise offer guidance on furthering an interactive dialogue with Plaintiff.   See Melamed Decl. Exhibit DD, Def. Prod. 000268; See Melamed Decl. Exhibit EE, Pl. Prod. Exhibit 7, P. 17 – 25.

66. From that point forward, the Defendants never provided Plaintiff with any accommodation other than intermittent FMLA leave, and never engaged in an interactive dialogue with Plaintiff with respect to his numerous requests for a reasonable accommodation.   See Melamed Decl. Exhibit GG, Def. Prod. 002236 – 002237.

67. Throughout the remainder of Plaintiff's employment, Plaintiff continued to seek an appropriate reasonable accommodation to his medical condition, including on December 13, 2013, when Plaintiff emailed a third letter from his treating neurologist, Dr. Michael Hutchinson, to the Defendants.  See Melamed Decl. Exhibit FF, Def. Prod. 002170 - 002171.

68. Plaintiff explained that as part of an "ongoing efforts to seek an appropriate accommodation under the ADA for my ongoing medical condition … I ask that my request be recognized and that Bloomberg enter into a genuine interactive process with me that complies with the directives of ADA provisions."  See Melamed Decl. Exhibit FF, Def. Prod. 002170 - 002171.

69. The letter from Dr. Hutchinson said, "I continue to strongly recommend Mr. Woolf reduce his stress levels, particularly at work, as it is still very important as part of his ongoing medical care as explained in my previous letters dated May 29, 2013 and July 15, 2013."  See Melamed Decl. Exhibit FF, Def. Prod. 002170 - 002171.

70. Plaintiff never received a response to this letter.  See Melamed Decl. Exhibit GG, Def. Prod. 002234 – 002237.

71. On January 10, 2014, Plaintiff wrote an email to Defendants Niziolek, Morris and Bowyer, stating, "My requests for a written response to my questions, observations, and suggestions has never occurred.  To date, I have submitted …  three letters from my Neurologist, Dr. Michael Hutchinson, and a follow up office report on my medical condition from my cardiologist, after heart surgery, which is considered related to my debilitating Migraine Disease.  Migraine Disease is, of course, a condition which is recognized by the ADA as a disability for which an employer has a duty to provide a reasonable accommodation if properly documented and requested.  None of my submissions and requests however have resulted in any serious and genuine response or attempt to engage in a truly interactive response to satisfy my most major concern – a reasonable accommodation for my disability. In fact my last two submissions to Bloomberg Management – a letter from Dr. Hutchinson dated November 27, 2013 and an office visit note dated November 5, 2013 from my cardiologist were completely ignored eliciting no response whatsoever.  So, in conclusion, I

again ask Human Resources and Senior Management to abide by ADA directives and provisions.  I reiterate that I continue to seek a reasonable accommodation for my disability." See Melamed Decl. Exhibit GG, Def. Prod. 002234 – 002237.

72. Around March 30, 2016, the Equal Employment Opportunity Commission issued a determination on the merits of Plaintiff's claims.  See Melamed Decl. Exhibit HH, Plaintiff's Prod. Exhibit 2, P.   2 – 4.

73. The EEOC investigation revealed that the Defendants did not engage in good faith communication with Plaintiff concerning his request for a transfer as a reasonable accommodation.  See Melamed Decl. Exhibit HH, Plaintiff's Prod. Exhibit 2, P.   2 – 4.

74. The EEOC found that Defendant "made no attempt to understand or discuss the recommendations of Plaintiff Woolf's doctor and unilaterally determined that changing positions would not help manage [Plaintiff's] stress and/or migraines."  Rather, Defendant "determined that leave was a reasonable accommodation instead, despite [Plaintiff's] doctor stating that 'a medical leave of absence, or intermittent medical leaves of absence, alone will not significantly mitigate this stress' and 'it is critical to control his headaches, and the only way I can see of doing this at this time is to reduce his stress levels.'"  See Melamed Decl. Exhibit HH, Plaintiff's Prod. Exhibit 2, P.   2 – 4.

75. The EEOC focused on the fact that Plaintiff identified specific jobs he could transfer to, but Defendant "stymied the process."  See Melamed Decl. Exhibit HH, Plaintiff's Prod. Exhibit 2, P.   2 – 4.

76. Therefore, the EEOC determined that there is reasonable cause to believe that Defendant discriminated against the Plaintiff on account of his disability, by not engaging in an interactive process in good faith to determine if he could be moved to another position, which

is in violation of the American with Disabilities Act as amended.   See Melamed Decl.

Exhibit HH, Plaintiff's Prod. Exhibit 2, P.   2 – 4.

77. Bloomberg has over 19,000 employees, working in 192 locations around the world.   See

Melamed Decl. Exhibit II, Def. Responses to Plaintiff's First Set of Document Demands,

Response No. 28.


DATED:        New York, New York
              June 8, 2018

                                        DEREK SMITH LAW GROUP, PLLC
                                        *Attorneys for Plaintiff*
                                         By:   /s/ Abe Melamed_____
                                        Abraham Z. Melamed, Esq.
                                        1 Penn Plaza, Suite 4905
                                        New York, NY 10119
                                        (212) 587-0760