Plaintiff's EXHIBIT H

Page 1

1

2   UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

3   Case No. 16-cv-6953(PKC)

- - - - - - - - - - - - - - - - - - - - -x

4

RONALD WOOLF,

5

Plaintiff,

6

-against-

7

BLOOMBERG L.P.,

8   ANDREW BOWYER, individually,

MELISSA STRADA, individually,

9   MATHEW ASMAN, individually,

MICHAEL MORRIS, individually, and

10  JIM NIZIOLEK, individually,

11               Defendants.

12  - - - - - - - - - - - - - - - - - - - -x

13               September 25, 2017

9:35 a.m.

14

15

16            Videotaped Deposition of

17  RONALD WOOLF, taken by Defendant, pursuant

18  to Notice, held at the offices of

19  EPSTEIN BECKER & GREEN PC, 250 Park

20  Avenue, New York, New York, before

21  Sharon Lengel, a Registered Professional

22  Reporter, Certified Realtime Reporter, and

23  Notary Public of the State of New York.

24

25            *       *       *

1                    WOOLF

2    can go forward and give truthful testimony

3    this afternoon.

4         A.    Yes.

5         Q.    All right.  So I want to, then,

6    go back to something we were talking about

7    before the lunch break, which was your

8    communication with Melissa Strada.

9              MR. GARLAND:  Let's mark as

10        Exhibit RW20 a handwritten two-page

11        note from the plaintiff to Ms. Strada

12        with the Woolf production numbers 58

13        and 59.

14             (Exhibit RW20, A handwritten

15        note, Bates WOOLF000058, was hereby

16        marked for identification, as of this

17        date.)

18        Q.    You have in front of you what's

19    been marked as Exhibit RW20.

20             Is that a --

21        A.    Yes.

22        Q.    -- handwritten note that you

23    wrote to Melissa Strada?

24        A.    Yes, it is.

25        Q.    Did you give it to her on or

1                    WOOLF

2     about March 19, 2013, at 12:30 p.m.?

3          A.     I put it under her keyboard.

4     She was out to lunch, I believe, at

5     12:30 p.m.

6          Q.     On March 19th --

7          A.     On March 19th.

8          Q.     Again, remember, please let me

9     finish my question before you begin your

10    answer.

11         A.     Apologies.

12         Q.     So you left it in her office on

13    March 19, 2013, at around 12:30 p.m.

14         A.     That is correct.

15         Q.     When did you write it?

16         A.     Probably an hour before.

17         Q.     Where were you when you wrote

18    it?

19         A.     At my desk.

20         Q.     At Bloomberg?

21         A.     Yes.

22         Q.     731 Lexington?

23         A.     Yes.

24         Q.     So if we look at the handwritten

25    note, the second paragraph -- well, let's

```
1                    WOOLF
2     start with the first paragraph.  You wrote
3     as follows:  "I have just about of enough
4     of what is obviously an intentional and
5     concerted effort to discredit my work."
6              Is what follows in this
7     handwritten note your summary of the
8     intentional and concerted effort to
9     discredit your work?
10        A.     Could I read it?
11        Q.     Please.
12        A.     (Witness perusing document.)
13               Right.  So I wrote this, and I
14    urgently wanted to speak to her following
15    up the conversation I had with her --
16        Q.     Let me repeat the question for
17    you.
18        A.     Okay.
19        Q.     Is what follows the first
20    paragraph in RW20 a summary or a statement
21    of what you were referring to in the first
22    paragraph when you wrote about an
23    intentional and concerted to discredit
24    your work?
25        A.     Yes, it is.
```

Page 162

```
1                    WOOLF
2      Q.    All right.  So then let's look
3  at that second paragraph, and on that
4  second paragraph, second line, there's a
5  reference to IB, capital "I," capital "B."
6            What does that refer to?
7      A.    That's internal messaging, or I
8  think it's Instant Bloomberg.  I think it
9  stands for Instant Bloomberg.  But it's
10 like a chat session on your computer.
11     Q.    Then on the third line of that
12 second paragraph, you refer to "a very
13 senior colleague."
14           Who was that?
15     A.    Susan Lasovick.
16     Q.    Spell her last name, please.
17     A.    L-A-S-O-V-I-C-K.
18     Q.    Then in the second -- on the
19 second page, there's a reference to a CFA
20 reimbursement request.
21           What does CFA stand for?
22     A.    Certified financial analyst.
23     Q.    So you left this note with
24 Ms. Strada.
25           Did you get a response from her?
```

Page 163

```
1              WOOLF
2      A.    Yes.
3      Q.    In what form was the response?
4      A.    I believe we had a second
5  conversation and also an email exchange.
6      Q.    And when did the second
7  conversation take place?
8      A.    I don't recall the dates.
9      Q.    Approximately when in relation
10  to your --
11      A.    Within --
12      Q.    Please let me finish.
13            When in relation to your
14  dropping off RW20 by her keyboard did the
15  second conversation take place?
16      A.    I think it happened within -- I
17  think it happened within that day, if not
18  early morning the next day.
19      Q.    Was it in person or over the
20  phone?
21      A.    I believe that one was in
22  person.
23      Q.    Where did it take place?
24      A.    It would have been in a
25  conference room.
```

Page 164

```
 1                    WOOLF
 2        Q.    Who was present?
 3        A.    Me and Melissa Strada.
 4        Q.    Anyone else?
 5        A.    Not to my knowledge, no.  I
 6   don't remember anyone else.
 7        Q.    Did you take any notes of what
 8   was said?
 9        A.    No.
10        Q.    What did she say to you and what
11   did you say to her?
12        A.    Well, it was a followup to the
13   conversation on the previous Friday that
14   where I was complaining specifically about
15   what I considered a hostile work
16   environment, legitimate or delegitimate
17   characterizations of my work product, very
18   odd emails where I was criticized for
19   something very, very minor like reaching
20   out or making a phone call, instead of at
21   2:00, at 3:00, something of that nature.
22   And the stress was mounting.  And what --
23   what was the tipping point was that,
24   first, Andrew Bowyer didn't understand my
25   job.  So I had to educate him about how I
```