UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------
 RONALD WOOLF,

                          Plaintiff,                              Civil Case No: 16-cv-6953

    -against-

 BLOOMBERG L.P.,
 ANDREW BOWYER, individually,
 MELISSA STRADA, individually,
 MATHEW ASMAN, individually,
 MICHAEL MORRIS, individually,
 JIM NIZIOLEK, individually, and

                          Defendants.
----------------------------------------------------------X


## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF HIS PARTIAL MOTION FOR SUMMARY JUDGMENT

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES..............................................................................iv

PRELIMINARY STATEMENT.................................................................... 1

STATEMENT OF FACTS............................................................ 2

ARGUMENT.................................................................................. 10

    1- **<u>Plaintiff, who suffers from complex migraines with neurological deficits, which include loss of vision, speech and concentration, is a person with a disability under the meaning of the ADA, NYSHRL and NYCHRL.</u>** …………………………………………..11

    2- **<u>Defendant Bloomberg, a company with over 19,000 employees, working in 192 locations around the world, is an employer covered by the statute, and clearly had notice of Plaintiff's disability, as is demonstrated by numerous emails as well as the testimony in the record</u>**……… 14

    3- **<u>With a reasonable accommodation Plaintiff could perform the essential functions of his job, as is demonstrated by the three separate letters from Plaintiff's treating neurologist, Plaintiff's positive performance reviews, and the fact that the Defendants kept Plaintiff employed for nearly nine months after Plaintiff made his first request for a reasonable accommodation.</u>** ……….. 15

    4- **<u>Defendant Bloomberg refused to make such accommodations, and entirely failed to engage in any interactive dialogue with Plaintiff regarding his accommodation request.</u>** …………………………………18

CONCLUSION…………………………………………………………... 25

## <u>TABLE OF AUTHORITIES</u>

### <u>CASES</u>

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). …………………………….. 10

*Brady v. Wal-Mart Stores, Inc.,* 531 F.3d 127, 134 (2d Cir. 2008). …………………………..11

*Bragdon v. Abbott*, 524 U.S. 624 (1998). …………………………….………………….. 11, 13

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ……………………….………………10

*Chang v. MetroPlus Health Plan*, 2014 U.S. Dist. LEXIS 28313, 17

(S.D.N.Y. Mar. 4, 2014). ……………………………………….………… 2, 4, 5, 7, 8, 10, 14, 16

*Cruz v. Schriro*, 51 Misc. 3d 1203(A), 36 N.Y.S.3d 407 (N.Y. Sup. Ct. 2016)….. 18, 19, 24, 25

*D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998), *cert denied*,

524 U.S. 911(1998). …………………………….…………………………….………………10

*Dearden v. GlaxoSmithKline LLC*, No. 15 CIV. 7628, 2017 WL 4084049, at 13

(S.D.N.Y. Sept. 14, 2017) …………………….…………………………….……………...14

*Haight v. NYU Langone Med. Ctr.,* 2014 WL 2933190, 17, (S.D.N.Y.2014). ……….18, 19, 25

*Hernandez v. Int'l Shoppes, LLC*, 100 F. Supp. 3d 232, 252 (E.D.N.Y. 2015). ………..5, 15, 16

*Jacobsen v. New York City Health & Hosps. Corp.*, 22 N.Y.3d 824, 835,

11 N.E.3d 159, 167 (2014). …………………………….…………………………….15, 18, 19, 24

*Lenhoff v. Getty*, No. 97CIV.9458(LMM), 2000 WL 977900, at 7

(S.D.N.Y. July 17, 2000) …………………………….…………………….………………13

*Matsushita Elec. Indust. Co., Ltd. V. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)..……..11

*McBride v. BIC Consumer Prod. Mfg. Co.*, 583 F.3d 92, 96–97 (2d Cir. 2009)…………11, 15

*Morea v. Fanning*, No. 15 CIV. 2720 (PAE), 2017 WL 3393843, at 7

(S.D.N.Y. Aug. 4, 2017). …………………………….…………………………….11, 12, 13, 14

*Romanello,* 22 N.Y.3d at 885, 976 N.Y.S.2d 426, 998 N.E.2d 1050…………..12, 18, 19, 24

*Sheng v. M&TBank Corp.*, 848 F.3d 78, 86–87 (2d Cir. 2017)………………………..18, 23

*Thompson v. New York City Dep't of Prob.*, 348 F. App'x 643, 645 (2d Cir. 2009)..15, 17, 18

*Weixel v. Board of Educ. of City of N.Y.*, 287 F.3d 138, 147 (2d Cir. 2002)………………11

*Ying Jing Gan v. City of New York*, 996 F.2d 522, 532 (2d Cir. 1993)……………………10

## **STATUTES**

42 U.S. Code § 12111(5)(a) ………………………….…………………………….………...14

Fed. R. Civ. P. 56………………………….…………………………….………………1, 10

Plaintiff, Ronald Woolf, submits this Memorandum of Law, together with his Notice of Motion, Local Rule 56.1 Statement of Undisputed Material Facts ("56.1 Statement"), Declaration of Abraham Z. Melamed, dated June 8, 2018 ("Melamed Decl."), and all prior pleadings and proceedings herein, in support of his motion for partial summary judgment as to his claims for a failure to accommodate, dated June 8, 2018, pursuant to Federal Rule of Civil Procedure 56, together with such other and further relief as this Court may deem just and proper.

## PRELIMINARY STATEMENT

Plaintiff, who was employed by Defendant Bloomberg from June of 2011 to January of 2014, brings claims, *inter alia*, of disability discrimination, for Bloomberg's failure to provide a reasonable accommodation pursuant to the Americans with Disabilities Act of 1990 ("ADA") as amended, the Administrative Code of the City of New York and the laws of the State of New York.  Specifically, while the Defendants employed Plaintiff, he suffered from the medical condition of complex migraines with neurological deficits.  Plaintiff made numerous requests for a reasonable accommodation under the ADA and applicable state and city laws, and the Defendants entirely failed to engage in any real interactive dialogue with respect to Plaintiff's reasonable accommodation request, made no attempt to understand or discuss the recommendations of Plaintiff Woolf's treating neurologist, Dr. Michael Hutchinson, and even ignored Dr. Hutchinson's recommendations that intermittent FMLA leave alone was not sufficient to manage Plaintiff's medical condition.  Defendants instead unilaterally decided that the only accommodation they would provide Plaintiff was intermittent FMLA leave.  Despite the fact that Plaintiff identified specific jobs he could transfer to, and posed potential alternatives as a reasonable accommodation, the Defendants stymied the process, failed to assist Plaintiff in seeking a reasonable accommodation, and altogether failed to address the specific

1

accommodation requests Plaintiff made.   As such, Plaintiff is entitled to partial summary judgment with respect to his claims for a failure to provide him with a reasonable accommodation under the ADA, the NYSHRL and the NYCHRL.

## STATEMENT OF FACTS

Plaintiff, Ronald Woolf, has suffered from migraine and tension headaches since at least the year 2000, when he began treating with Dr. Michael Hutchinson, M.D., P.h.D., at the New York University School of Medicine.   Dr. Hutchinson treated Plaintiff Woolf on and off for a decade, and "since 2011 on a regular basis."   See Pl. 56.1 Statement ¶ 2.   At the time, just when Plaintiff began his employment with Defendant Bloomberg in 2011, Dr. Hutchinson saw Plaintiff "approximately every three months to monitor his condition and perform injections to mitigate and control his migraine and tension headaches."     See Pl. 56.1 Statement ¶ 3. Periodically, throughout 2011 to 2013, Plaintiff's migraine headaches would be intense enough that he was incapacitated for a period of time, impairing his general life activities, and preventing him from performing his work.   See Pl. 56.1 Statement ¶ 4.   For example, on August 15, 2011, Plaintiff emailed his manager at Bloomberg, Steve Citrin, stating, "Steve, had a severe migraine this morning.   Medication is kicking in.   Expect I can make it in between 9:30 to 10:00 today. Will let you know if anything changes.   Ron."   See Pl. 56.1 Statement ¶ 5.   On May 23, 2012, Plaintiff emailed Steve Citrin, stating, "Steve, dealing with a migraine.   Will try to be in in (sic) between 10 and 11am today."   See Pl. 56.1 Statement ¶ 6.   On February 5, 2013, Plaintiff emailed his new manager, Andrew Bowyer, and CCed manager Michael Morris, stating, "woke up with a migraine.   Medicine kicking in and should be in later this morning.   Andrew will do calls from home this morning then hope to head into work.   Ron."   See Pl. 56.1 Statement ¶ 7.

Beginning in February of 2013, Plaintiff began experiencing more frequent and complex migraines as a result of stress caused by work factors.  See Pl. 56.1 Statement ¶ 8.  Thus, around March 15, 2013, Plaintiff met with Defendant Melissa Strada in Defendant's professional development department, and asked Strada for help in seeking out a transfer to a different position within Bloomberg as a reasonable accommodation for his medical condition.  See Pl. 56.1 Statement ¶ 9.  Around March 19, 2013, Plaintiff left a handwritten letter on Defendant Strada's desk, underneath her computer keyboard, which reiterated Plaintiff's request for help in transferring positions, and stated, "Not only do I want to get a job in a new group, I NEED to find a new job and quickly.  The environment I am working in is effecting (sic) my health (have headaches everyday)...Any assistance you can provide as a follow up to our conversation this past Friday would be greatly appreciated…I am willing to meet and discuss further anytime today in you are available."  See Pl. 56.1 Statement ¶ 10.

Around April 12, 2013, Plaintiff Woolf emailed Defendant Jim Niziolek, an employee in Defendant Bloomberg's Human Resources Department, informing him that he had a severe migraine headache and was practically incapacitated.  See See Pl. 56.1 Statement ¶ 11.  Around April 12, 2013, Plaintiff Woolf wrote an email to his supervisor, Defendant Morris, and CCed his supervisor Defendant Bowyer, informing them that he was suffering from severe migraine which he expected would incapacitate him for 24 to 36 hours.  See Pl. 56.1 Statement ¶ 12. Around May 2, 2013, Plaintiff informed Defendant Bowyer via Bloomberg Internal Messenger that he had a doctors appointment with his neurologist in order to try and get his migraine headaches under control.  See Pl. 56.1 Statement ¶ 13.  Around May 7, 2013, Plaintiff wrote an email to Defendant Morris, informing him that he was suffering from a migraine headache, and requesting personal day.  See Pl. 56.1 Statement ¶ 14.

Around May 28, 2013, Plaintiff wrote a letter to Defendant Niziolek, detailing the progression of his migraines, and stating that his condition is "complex with potentially very serious health consequences."  See Pl. 56.1 Statement ¶ 15.  Plaintiff stated that he was unable to return to work until he was cleared and informed of conditions and accommodations recommended by his doctors to mitigate his migraines, which impacts his vision and risk of stroke.  Plaintiff wrote, "***I ask for your guidance*** (emphasis added)."   See Pl. 56.1 Statement ¶ 16.  Around May 30, 2013, Plaintiff emailed Defendant Niziolek a copy of a letter from Plaintiff's treating neurologist, Dr. Hutchinson.   The letter stated that, "during my last examination of Mr. Woolf on May 2nd 2013 his condition had deteriorated quite significantly and I recommended and prescribed additional medication while also administering the same injections that he normally receives."  Dr. Hutchinson explained that the single biggest risk for migraines is stress, and therefore Plaintiff Woolf is "at a significant risk for stroke or heart attack simply from the stress he is currently experiencing at work."  Dr. Hutchinson therefore opined that, "a medical leave of absence, or intermittent medical leaves of absence, alone will not significantly mitigate this stress," and as Plaintiff's primary attending neurologist "I have strongly advised that Mr. Woolf do what is necessary to change his current work environment, as it is apparent that the primary trigger of these most recent, intense and frequent migraines involving neurological deficits, is emotional stress at work, which in the short-term has impacted his speech, sight, and ability to concentrate.  Dr. Hutchinson characterized Plaintiff's condition as serious and potentially life threatening if not properly treated and managed.  Dr. Hutchinson concluded the letter by inviting the Defendants to, "[p]lease feel free to contact me with any questions.  Mr. Woolf has given me authorization to release his medical records to document and verify the above."  See Pl. 56.1 Statement ¶ 17 - 22.  Despite Dr. Hutchinson's specific invitation

for the Defendants to contact him directly to discuss Plaintiff's medical condition, the Defendants never once contacted Dr. Hutchinson. See Pl. 56.1 Statement ¶ 25.  In fact, when asked during his deposition why he never contacted Dr. Hutchinson, Defendant Niziolek's only response was "I do not recall."  See Pl. 56.1 Statement ¶ 26.  So as to ensure Bloomberg received his request for accommodation, Plaintiff's attorney emailed a copy of the letter to Bloomberg's employment counsel, Defendant Matthew Asman, and specifically requested that he, and Bloomberg, engage in an interactive dialogue to evaluate and facilitate a reasonable accommodation for Plaintiff.  See Pl. 56.1 Statement ¶ 23.  Defendant Asman acknowledged receipt of the letter and that Bloomberg was aware of its obligations under the ADA and will enter into the interactive process required by law.  See Pl. 56.1 Statement ¶ 24.

On May 31, 2013, Plaintiff spoke to Defendant Niziolek to specifically request, as a reasonable accommodation, that Plaintiff change his work environment, as Dr. Hutchinson suggested.  Plaintiff also requested, that aside from transferring to other positions within Bloomberg, Plaintiff could simply do the exact same job he had been doing, without being managed by Defendants Bowyer and Morris, who were exacerbating Plaintiff's medical condition.  Plaintiff explained that another employee, Eric Hernandez, gave him his work anyway, and Plaintiff worked closely with another practice group, Bloomberg Industries. Plaintiff identified supervisors David Dwyer and Paul Sweeney as potential new supervisors, as he already worked closely with their business.  Plaintiff stated that he feels like he has a gun to his head every day, and that his migraines are exacerbated because of the stress Defendants Bowyer and Morris put on him every day.  Defendant Niziolek stated that he would get back to Plaintiff if he needed any further documentation. See Pl. 56.1 Statement ¶ 27 – 35.

Around June 4, 2013, Defendant Niziolek emailed Plaintiff and included an attached letter in which Defendant Niziolek redundantly asked Plaintiff to provide him with the exact information Dr. Hutchinson had already provided in his May 30, 2013 letter.  See Pl. 56.1 Statement ¶ 36 - 37.  Perplexed by this, around June 5, 2013, Plaintiff sent a response letter to Defendant Niziolek, and addressed each and every line in Defendant Niziolek's letter and explained how all the information necessary to process Plaintiff's request had already been provided in Dr. Hutchinson's letter and asked what exactly more Defendant Niziolek needed, but Defendant Niziolek never responded.  See Pl. 56.1 Statement ¶ 39 - 48.  When asked in his deposition to identify what in Dr. Hutchinson's letter was insufficient, Defendant Niziolek could not recall. See Pl. 56.1 Statement ¶ 38.  Having addressed Defendant Niziolek's letter, which completely disregarded Dr. Hutchinson's letter, Plaintiff concluded by requesting that Bloomberg focus on providing him with the accommodation he requested, or assist him in finding alternative accommodations, as soon as possible, and indicated that he is open to having another discussion regarding his request at any time.  See Pl. 56.1 Statement ¶ 39 – 48.

Around June 13, 2013, Plaintiff emailed Defendant Niziolek, informing him that Plaintiff had begun the process of searching for a transfer position as a reasonable accommodation to assist Plaintiff in managing the debilitating migraines he now often experienced at work.  See Pl. 56.1 Statement ¶ 49.   Defendant Niziolek responded that he would need to see the specific jobs in order to evaluate the request.  See Pl. 56.1 Statement ¶ 50.  On June 17, 2013, Plaintiff emailed Defendant Niziolek and indicated that he had found many jobs he was relatively qualified to perform that could be a reasonable accommodation for Plaintiff, including 2 positions in New York, 1 position in Washington D.C, 1 position in San Fransisco and 9 positions in Asia, where Plaintiff had previously worked.  Plaintiff asked Defendant Niziolek

how to go about requesting such potential transfers as a reasonable accommodation.  See Pl. 56.1 Statement ¶ 51.  On June 24, 2013, Plaintiff emailed Defendant Niziolek that Plaintiff narrowed his search to a preference for 1 position in Singapore and 1 position in Hong Kong, and asked Defendant Niziolek to assess Plaintiff's accommodation request.  See Pl. 56.1 Statement ¶ 52.  Plaintiff did not hear back from Defendant Niziolek, so on July 2, 2013, Plaintiff emailed Defendant Niziolek stating that he had not heard anything regarding his request in over a month since Dr. Hutchinson's letter, and Plaintiff has provided Bloomberg with all information requested.  Plaintiff again expressed the urgency of his request in light of his medical condition. See Pl. 56.1 Statement ¶ 53.  On July 2, 2013, Defendant Niziolek emailed Plaintiff about a meeting the two were set to have the next day, and stated, "Ron, Tomorrow's meeting will focus solely on your response to your interim evaluation.  We will be in touch with you about your accommodation request at a later date."  See Pl. 56.1 Statement ¶ 54.  During his deposition, Defendant Niziolek admitted that he chose to meet with Plaintiff only about his response to his interim performance evaluation, something Niziolek had no obligation under the law to do, before meeting with Plaintiff about his reasonable accommodation request, something he in fact knew he had an obligation under the law to do.  See Pl. 56.1 Statement ¶ 55.

Around July 16, 2013, Plaintiff emailed Defendant Niziolek and a senior HR official, Alison Trellis, a second letter from Dr. Hutchinson, which reiterated the first letter, and stated, "it is my opinion that Mr. Woof must immediately be allowed to change his work environment. Out of medical necessity, I strongly advise that accommodations be given to Mr. Woolf as soon as possible that will significantly lower his work stress as his work environment is obviously a major trigger to these more frequent and intense migraines.  Should you have any questions please do not hesitate to contact me directly at my office.  Mr. Woolf has given me authorization

to disclose and discuss his ongoing treatment for this serious medical condition." See Pl. 56.1 Statement ¶ 57 – 58.   Again Defendant Niziolek admitted in his deposition that he never contacted Dr. Hutchinson, and that he did not recall why.  See Pl. 56.1 Statement ¶ 25, 59. Nearly four months after Plaintiff's first accommodation request to Defendant Strada, and six weeks after Dr. Hutchinson's letter and Plaintiff's emails had gone unanswered, around July 17, 2013, Plaintiff filed a charge of discrimination with the EEOC and sent an email to Defendant Niziolek and Alison Trellis, informing them that he filed a charge of discrimination against Bloomberg with the EEOC, and provided the charge number.  See Pl. 56.1 Statement ¶ 56.

On July 17, 2013, more than four months after Plaintiff's first request for a reasonable accommodation, and only after Plaintiff provided the Defendants with a second letter from Dr. Hutchinson and filed a charge of discrimination with the EEOC, Defendant Niziolek finally emailed Plaintiff and said that he would like to speak with Plaintiff about his accommodation request.  See Pl. 56.1 Statement ¶ 60.  Around July 19, 2013, Plaintiff and Defendant Niziolek met and Defendant Niziolek told Plaintiff that Bloomberg had never questioned Plaintiff's medical condition, but that any position within Bloomberg, including the positions Plaintiff had identified, would provide Plaintiff with the same level of stress, so Bloomberg would not even consider or evaluate any of the specific requested transfer positions, or Plaintiff's request to change supervisors.  Defendant Niziolek unilaterally told Plaintiff that intermittent FMLA leave was sufficient to manage Plaintiff's condition, despite the fact that Dr. Hutchinson specifically said that intermittent leave alone was not sufficient.   See Pl. 56.1 Statement ¶ 61 – 64. Defendant Niziolek did not provide Plaintiff with any next steps or otherwise offer guidance on furthering an interactive dialogue with Plaintiff.  See Pl. 56.1 Statement ¶ 65.  From that point forward, the Defendants never provided Plaintiff with any accommodation other than

intermittent FMLA leave, and never engaged in an interactive dialogue with Plaintiff with respect to his numerous requests for a reasonable accommodation.  See Pl. 56.1 Statement ¶ 66.

Throughout the remainder of Plaintiff's employment, Plaintiff continued to seek an appropriate reasonable accommodation to his medical condition.  For example, on December 13, 2013, Plaintiff emailed a third letter from his treating neurologist, Dr. Michael Hutchinson, to the Defendants.  Plaintiff asked, as part of an ongoing effort to seek an appropriate accommodation for his medical condition, that Bloomberg enter into a genuine interactive process with him.  Dr. Hutchinson's third letter reiterated, "I continue to strongly recommend Mr. Woolf reduce his stress levels, particularly at work, as it is still very important as part of his ongoing medical care as explained in my previous letters dated May 29, 2013 and July 15, 2013."  See Pl. 56.1 Statement ¶ 67 – 69.  Plaintiff never received a response to this letter.  See Pl. 56.1 Statement ¶ 70.  Finally, on January 10, 2014, Plaintiff wrote an email to Defendants Niziolek, Morris and Bowyer, stating that to date he had submitted three letters from Dr. Hutchinson, regarding his medical condition, and stating that none of his submissions and requests have resulted in any serious and genuine response or attempt to engage in a truly interactive dialogue regarding Plaintiff's requests, and, in fact, Plaintiff's last two submissions to Bloomberg Management – a letter from Dr. Hutchinson dated November 27, 2013 and an office visit note dated November 5, 2013 from Plaintiff's cardiologist, were completely ignored, eliciting no response whatsoever. Plaintiff concluded by again asking Human Resources and Senior Management to abide by ADA directives and provisions, and Plaintiff reiterated that he continues to seek a reasonable accommodation for his disability.  See Pl. 56.1 Statement ¶ 71.

Around March 30, 2016, the EEOC issued a determination on the merits of Plaintiff's charge, and determined there was reasonable cause to believe Defendants discriminated against

Plaintiff on account of his disability, in violation of the ADA. The EEOC found that the Defendants did not engage in good faith communication with Plaintiff concerning his request for a transfer as a reasonable accommodation, and that the Defendants, "made no attempt to understand or discuss the recommendations of Plaintiff Woolf's doctor and unilaterally determined that changing positions would not help manage [Plaintiff's] stress and/or migraines." Rather, Defendant "determined that leave was a reasonable accommodation instead, despite [Plaintiff's] doctor stating that 'a medical leave of absence, or intermittent medical leaves of absence, alone will not significantly mitigate this stress' and 'it is critical to control his headaches, and the only way I can see of doing this at this time is to reduce his stress levels.'" The EEOC focused on the fact that Plaintiff identified specific jobs he could transfer to, but Defendant "stymied the process." See Pl. 56.1 Statement ¶ 72 – 76.

## ARGUMENT

Summary judgment should be granted in favor of a moving party "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998). Once the moving party meets its initial burden, the nonmoving party must come forward with specific facts to show there is a genuine issue of material fact that must be resolved at trial. *Celotex*, 477 U.S. at 324; *Ying Jing Gan v. City of New York*, 996 F.2d 522, 532 (2d Cir. 1993). Although the Court must construe the facts in the light most favorable to the non-moving party, a "mere scintilla" of evidence is insufficient to meet a party's burden to establish a genuine issue of fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). Therefore, "[w]here the record taken as a whole could not lead a

rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indust. Co., Ltd. V. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)(citations omitted).

Discrimination in violation of the ADA includes, "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." *McBride v. BIC Consumer Prod. Mfg. Co.*, 583 F.3d 92, 96–97 (2d Cir. 2009); *see also Brady v. Wal-Mart Stores, Inc.,* 531 F.3d 127, 134 (2d Cir. 2008). A Plaintiff makes out a prima facie case of disability discrimination arising from a failure to accommodate by showing, 1- Plaintiff is a person with a disability under the meaning of the ADA, 2- an employer covered by the statute had notice of his disability, 3- with reasonable accommodation Plaintiff could perform the essential functions of his job, and 4- the employer has refused to make such accommodations. *McBride, supra,* 583 F.3d 92, 96–97.

**1-  Plaintiff, who suffers from complex migraines with neurological deficits, which include loss of vision, speech and concentration, is a person with a disability under the meaning of the ADA, NYSHRL and NYCHRL.**

In order "to determine whether a plaintiff's alleged impairment satisfies the disability prong of a *prima facie* case, the Second Circuit has applied the three step approach adopted in *Bragdon v. Abbott*, 524 U.S. 624 (1998). *See Weixel v. Board of Educ. of City of N.Y.*, 287 F.3d 138, 147 (2d Cir. 2002)." *Morea v. Fanning*, No. 15 CIV. 2720 (PAE), 2017 WL 3393843, at *7 (S.D.N.Y. Aug. 4, 2017). First, a Plaintiff "must 'show that she suffers from a physical or mental impairment,' and '[s]econd, the plaintiff must identify the activity claimed to be impaired and establish that it constitutes a 'major life activity,' and "[t]hird, the plaintiff must show that her impairment 'substantially limits 'the major life activity previously identified.'" *Id.* Significantly, in 2008, Congress passed the ADA Amendments Act ("ADAAA"), which

included, among disabilities, "'[a]n impairment that is episodic or in remission.'" *Morea, Supra,* 2017 WL 3393843, at 7.  The ADAAA was enacted for the express purpose of rejecting "'the reasoning of court decisions concluding that certain individuals with certain conditions—such as epilepsy or post-traumatic stress disorder—were not protected by the ADA because their conditions were episodic or intermittent.'" *Morea, Supra,* 2017 WL 3393843, at 7.  The ADAAA further provides that the limitations imposed by disabilities are to be considered "without the effects of mitigating measures, other than corrective eyewear." *Morea, Supra,* 2017 WL 3393843, at 7.  The Second Circuit has reiterated that a person is disabled within the meaning of the statute if that person has a "physical or mental impairment that substantially limits one or more major life activities, a record of such impairment, or is regarded as having such an impairment." *Morea, Supra,* 2017 WL 3393843, at 9.  Moreover, such major life activities include but are not limited to caring for oneself, performing manual tasks, seeing, eating, speaking, and breathing. *Id.*  Additionally, The New York City HRL is even more expansive than the ADA and New York State HRL.  Under the NYCHRL, the definition of "disability" does not include "reasonable accommodation" or the ability to perform a job in a reasonable manner, but rather it defines "disability" solely in terms of impairments. *See Romanello,* 22 N.Y.3d at 885, 976 N.Y.S.2d 426, 998 N.E.2d 1050.

In the present case, Plaintiff is a person with a disability under the meaning of the ADA, NYSHRL and NYC HRL.  As the letter from Dr. Michael Hutchinson stated, Plaintiff has suffered from migraine and tension headaches since at least the year 2000, and Dr. Hutchinson treated Plaintiff on and off for a decade, and "since 2011 on a regular basis."  See Pl. 56.1 Statement ¶ 1 - 2.  Moreover, periodically throughout 2011 to 2013, Plaintiff's migraine headaches would be intense enough that he would be incapacitated for a period of time,

impairing his general life activities, and preventing him from performing his work. See Pl. 56.1 Statement ¶ 4.  Beginning in February of 2013, Plaintiff began experiencing more frequent and complex migraines.  See Pl. 56.1 Statement ¶ 11 – 14.  As of May 2nd 2013 Plaintiff's was experiencing intense and frequent migraines involving neurological deficits, which in the short-term has impacted Plaintiff's speech, sight, and ability to concentrate, and more seriously, indicated a grave deterioration of Plaintiff's condition and was characterized as serious, and potentially life threatening if not properly treated and managed.  See Pl. 56.1 Statement ¶ 17 - 22. Here, Plaintiff, 1- clearly suffers from a physical or mental impairment, 2- Plaintiff, and his neurologist Dr. Hutchinson identified the activities claimed to be impaired, including complete incapacitation, an inability to work, loss of vision, loss of speech, and loss of concentration, all of which constitute "major life activities" (such major life activities include but are not limited to **_caring for oneself_**, **_performing manual tasks_**, **_seeing_**, hearing, eating, sleeping, walking, standing, sitting, reaching, lifting, bending, **_speaking_**, and breathing (emphasis added) *Morea, Supra,* 2017 WL 3393843, at 9), and 3- Plaintiff demonstrated that his impairment substantially limits the major life activities identified.  As such, Plaintiff is clearly a person with a disability under the meaning of the ADA, NYSHRL and NYCHRL.  *See Bragdon v. Abbott*, 524 U.S. 624 (1998); *Morea, Supra,* 2017 WL 3393843, at 7.  Moreover, Plaintiff's condition from 2011 to 2013 qualified as an impairment, despite the fact that it was episodic and/or in remission, as the limitations imposed by disabilities are to be considered "without the effects of mitigating measures, other than corrective eyewear," including, the medications and injections Plaintiff received (Pl. 56.1 Statement ¶ 1). *Morea, Supra,* 2017 WL 3393843, at 7.

Furthermore, this is not the type of case in which Plaintiff's **medical condition** was "work-related stress or anxiety" as in *Lenhoff v. Getty*, No. 97CIV.9458(LMM), 2000 WL

977900, at 7 (S.D.N.Y. July 17, 2000), *Dearden v. GlaxoSmithKline LLC*, No. 15 CIV. 7628, 2017 WL 4084049, at *13 (S.D.N.Y. Sept. 14, 2017) or *Chang v. MetroPlus Health Plan*, 2014 U.S. Dist. LEXIS 28313, at *17 (S.D.N.Y. Mar. 4, 2014).   Those cases involved medical conditions defined as "work-related stress or anxiety" or "job-induced stress" in which the impairments included "poor judgment, irresponsible behavior and poor impulse control" or "an inability to tolerate stressful situations," or "common personality traits such as poor judgment or a quick temper."   By clear contrast, in the present case, Plaintiff suffered from a recognized medical impairment under the ADA, complex migraines with neurological deficits, including loss of sight, speech and concentration.  *Morea, Supra,* 2017 WL 3393843, at 9.  Certainly under NYCHRL's definition of "disability" which is defined solely in terms of impairments, Plaintiff was a person with a disability under the law.

    2- **Defendant Bloomberg, a company with over 19,000 employees, working in 192 locations around the world, is an employer covered by the statute, and clearly had notice of Plaintiff's disability, as is demonstrated by numerous emails as well as the testimony in the record.**

42 U.S. Code § 12111(5)(a) defines an employer covered by the ADA as an employer with 15 or more employees.  It is clear that Bloomberg, a company with over 19,000 employees, working in 192 locations around the world, is an employer covered by the ADA, as well as the NYSHRL and NYCHRL.  See Pl. 56.1 Statement ¶ 77.  Furthermore, it is clear from the record that the Defendants had knowledge of Plaintiff's disability, beginning in August of 2011, when Plaintiff first emailed his supervisor, Steve Citrin.  See Pl. 56.1 Statement ¶ 5.  Certainly as Plaintiff continued to inform the Defendants of his disability, including the detailed letter from Dr. Hutchinson discussed *supra*, it is clear that the Defendants had knowledge of Plaintiff's disability.  See Pl. 56.1 Statement ¶ 1 – 24.

**3- <u>With a reasonable accommodation Plaintiff could perform the essential functions of his job, as is demonstrated by the three separate letters from Plaintiff's treating neurologist, and the fact that the Defendants maintained Plaintiff's employment for nearly nine months after Plaintiff made his first request for a reasonable accommodation.</u>**

A reasonable accommodation may include reassignment to a vacant position, though an ADA Plaintiff seeking an accommodation in the form of a transfer bears the burden of proving that a vacancy existed into which he might have been transferred. *Thompson v. New York City Dep't of Prob.*, 348 F. App'x 643, 645 (2d Cir. 2009).   The Plaintiff bears the initial burden of proving that an accommodation exists that would permit him to perform the essential job functions, and the burden of persuasion as to whether the accommodation is reasonable lies with the employer. *Id.*   The NYSHRL does not make use of the "essential functions" language present in the ADA, but "the inquiry into whether plaintiff can *perform in a reasonable manner the activities involved in the job sought* under the NYSHRL is the same as the inquiry into whether plaintiff is qualified to perform the essential functions of the job sought under the ADA." *Hernandez v. Int'l Shoppes, LLC*, 100 F. Supp. 3d 232, 252 (E.D.N.Y. 2015). Furthermore, the NYSHRL defines a reasonable accommodation as an accommodating action that does not unreasonably burden the employer from which the action is requested. *Jacobsen v. New York City Health & Hosps. Corp.*, 22 N.Y.3d 824, 835, 11 N.E.3d 159, 167 (2014).

As the record, including Plaintiff's requests and Dr. Hutchinson's letters, makes clear, with a reasonable accommodation Plaintiff could perform the essential functions of the job at issue. *McBride, supra,* 583 F.3d 92, 96–97.  Specifically, around March 15, 2013, Plaintiff met with Defendant Melissa Strada in Defendant's professional development department, and asked Strada for help in seeking out a transfer to a different position within Bloomberg as a reasonable accommodation for his medical condition.  See Pl. 56.1 Statement ¶ 9.  Plaintiff followed up

with a handwritten letter which reiterated Plaintiff's request for help in transferring positions, and stated that he was willing to meet and discuss further.  See Pl. 56.1 Statement ¶ 10.  Around May 28, 2013, Plaintiff wrote a letter to Defendant Niziolek, detailing the progression of his migraines, and stated that and that he was unable to return to work until he was cleared and informed of conditions and accommodations recommended by his doctors to mitigate his migraines, which impacts his vision and risk of stroke.  Plaintiff wrote, "***I ask for your guidance*** (emphasis added)."   See Pl. 56.1 Statement ¶ 15 – 16.  More critically, Dr. Hutchinson's May 30, 2013 letter clearly explained that the single biggest risk for migraines is stress, and therefore Plaintiff Woolf is "at a significant risk for stroke or heart attack simply from the stress he is currently experiencing at work."  Dr. Hutchinson opined that, "a medical leave of absence, or intermittent medical leaves of absence, alone will not significantly mitigate this stress," and as Plaintiff's primary attending neurologist "I have strongly advised that Mr. Woolf do what is necessary to change his current work environment, as it is apparent that the primary trigger of these most recent, intense and frequent migraines involving neurological deficits, is emotional stress at work, which in the short-term has impacted his speech, sight, and ability to concentrate."  See Pl. 56.1 Statement ¶ 17 – 22.  Thus, it is clear that with the reasonable accommodation of a transfer or a change in supervisors, i.e. a "change in work environment" Plaintiff could perform the essential functions of his job.

Plaintiff also made clear that such a request was completely reasonable in his May 31, 2013 conversation with Defendant Niziolek in which Plaintiff explained that Eric Hernandez, gave Plaintiff his work, Plaintiff worked closely with another practice group, Bloomberg Industries, and supervisors David Dwyer and Paul Sweeney could supervise Plaintiff, as he already worked closely with their business.  See Pl. 56.1 Statement ¶ 27 – 35.  Plaintiff also

emailed Defendant Niziolek, informing him that Plaintiff had begun the process of searching for a transfer position as a reasonable accommodation (See Pl. 56.1 Statement ¶ 49), and informed Defendant Niziolek that Plaintiff had identified 2 positions in New York, 1 position in Washington D.C, 1 position in San Fransisco and 9 positions in Asia, where Plaintiff had previously worked, as potential transfer positions, and asked Defendant Niziolek how to go about requesting such potential transfers as a reasonable accommodation.  See Pl. 56.1 Statement ¶ 51.  Plaintiff narrowed his search to a preference for 1 position in Singapore and 1 position in Hong Kong, in addition to the positions Plaintiff previously identified and Plaintiff's request that he maintain his existing position and simply switch supervisors.  See Pl. 56.1 Statement ¶ 52.

Thus, it is clear that with a reasonable accommodation, a transfer to another position within Bloomberg or to another supervisor, Plaintiff could perform the essential functions of the job at issue.  See *Thompson, supra*, 348 F. App'x 643, 645.  This is certainly the case under the NYSHRL, which does not make use of the "essential functions" language present in the ADA, but provides for an "inquiry into whether plaintiff can perform in a reasonable manner the activities involved in the job sought." *Hernande, supra*, 100 F. Supp. 3d 232, 252.  Moreover, to the extent that the Defendants attempt to assert that Plaintiff was unable to perform the essential functions of his job, such argument is belied by the fact that the Defendants maintained Plaintiff's employed for nearly nine months after his first accommodation request in March of 2013, and did not immediately terminate him.  As such, it is clear that with a reasonable accommodation Plaintiff could perform the essential functions of the job at issue.

Moreover, under the New York City HRL, which does not include "reasonable accommodation" or the ability to perform a job in a reasonable manner, but rather defines "disability" solely in terms of impairments, Plaintiff certainly satisfies this prong of the inquiry.

17

*Romanello, supra*, 22 N.Y.3d at 885.  This is particularly true because un-like the NYSHRL, the NYCHRL places the burden on the employer to show the unavailability of any safe and reasonable accommodation and to show that any proposed accommodation would place an undue hardship on its business (*Jacobsen, supra,* 22 N.Y.3d 824, 835), and even in the absence of a specific request by an employee, an employer has an independent, affirmative duty to investigate feasible accommodations.  *Cruz v. Schriro*, 51 Misc. 3d 1203(A), 36 N.Y.S.3d 407 (N.Y. Sup. Ct. 2016); *See also Haight v. NYU Langone Med. Ctr.,* 2014 WL 2933190, 17, (S.D.N.Y.2014). As the record demonstrates, Plaintiff consistently requested assistance in seeking out additional accommodations beyond those he specifically identified, and his requests went unanswered.

4-  **Defendant Bloomberg refused to make such accommodations, and entirely failed to engage in any interactive dialogue with Plaintiff regarding his accommodation request.**

The ADA "envisions an interactive process by which employers and employees work together to assess whether an employee's disability can be reasonably accommodated." *Thompson v. New York City Dep't of Prob.*, 348 F. App'x 643, 645 (2d Cir. 2009).  Although there is no independent claim under the ADA for failure to engage in an interactive process, an employer's failure to engage in a good faith interactive process can be introduced as evidence tending to show disability discrimination and that the employer has refused to make a reasonable accommodation.  *Sheng v. M&TBank Corp.*, 848 F.3d 78, 86–87 (2d Cir. 2017).  The primary inquiry is whether the employer's interactions with the employee reveal at least some deliberation upon the viability of the employee's request.  *Jacobsen, supra,* 22 N.Y.3d 824, 835. An employee's suggestion of a specific accommodation must prompt the employer to consider whether the burden imposed upon the employer's business would be reasonable, and the employer's response to the employee's request and any dialogue that follows about the impact of

the proposed accommodation on the employer's business inform the determination of whether a reasonable accommodation exists.   *Id.* at 835.   Thus, "where the employee seeks a specific accommodation for his or her disability, the employer must give individualized consideration to that request and may not arbitrarily reject the employee's proposal without further inquiry." *Id.*

Moreover, "the employer's failure to hold a constructive dialogue about the possibility of a reasonable accommodation may indicate that the employer has discriminated because of' an individual's disability within the meaning of the NYCHRL and it will pose "a formidable obstacle to the employer's attempt to prove that no reasonable accommodation existed for the employee's disability." *Cruz, supra*, 36 N.Y.S.3d 407.   As a first step in providing a reasonable accommodation, the NYCHRL requires an employer to "engage in a good faith interactive process that assesses the needs of the disabled individual and the reasonableness of the accommodation requested."   *Id.*   The interactive process then must continue until, if possible, an accommodation reasonable to the employee and employer is reached." *Id.*

Un-like the New York State HRL, the New York City HRL places the burden on the employer to show the unavailability of any safe and reasonable accommodation and to show that any proposed accommodation places an undue hardship on its business.   *Jacobsen, supra*, 22 N.Y.3d 824, *citing Romanello, supra*, 22 N.Y.3d at 885.   Furthermore, even in the absence of a specific request by an employee, an employer has an independent, affirmative duty to investigate feasible accommodations.   *Cruz, supra*, 36 N.Y.S.3d 407; *Haight, supra,* 2014 WL 2933190, 17.

As the record clearly demonstrates, the Defendants refused to make the accommodation Plaintiff specifically requested, failed to independently and affirmatively investigate other feasible accommodations, and entirely failed to engage in a meaningful interactive dialogue with Plaintiff with respect to his accommodation request.   On May 31, 2013, Plaintiff had a

conversation with Defendant Niziolek and specifically requested a transfer as a reasonable accommodation.  Defendant Niziolek told Plaintiff he would contact Plaintiff if any further documentation was needed.  See Pl. 56.1 Statement ¶ 27 – 35.  On June 4, 2013, Plaintiff also emailed Defendant Niziolek and reiterated his request, concluding, "I am open to having another discussion regarding this very important matter at any time."  See Pl. 56.1 Statement ¶ 39 – 48. Defendant Niziolek did not respond to Plaintiff's email, and when asked during his deposition to identify what in Dr. Hutchinson's letter was insufficient, Defendant Niziolek could not recall. See Pl. 56.1 Statement ¶ 38.  Moreover, Dr. Hutchinson's letter, which invited Defendants to contact him directly to discuss Plaintiff's medical condition, went completely ignored, Defendants never contacted Dr. Hutchinson (ee Pl. 56.1 Statement ¶ 25), and Defendant Niziolek's could not recall why he never contacted Dr. Hutchinson.  See Pl. 56.1 Statement ¶ 59.

Furthermore, on June 17, 2013, Plaintiff emailed Defendant Niziolek and indicated that he had found many jobs he was relatively qualified to perform that could be a reasonable accommodation for Plaintiff, including 2 positions in New York, 1 position in Washington D.C, 1 position in San Fransisco and 9 positions in Asia, where Plaintiff had previously worked. Plaintiff asked Defendant Niziolek how to go about requesting such potential transfers as a reasonable accommodation.  See Pl. 56.1 Statement ¶ 51.  On June 24, 2013, Plaintiff emailed Defendant Niziolek and narrowed his search to a preference for 1 position in Singapore and 1 position in Hong Kong.  See Pl. 56.1 Statement ¶ 52.  Plaintiff did not hear back from Defendant Niziolek, so on July 2, 2013, Plaintiff emailed Defendant Niziolek stating that he had not heard anything regarding his request in over a month since Dr. Hutchinson's letter, and he has provided Bloomberg with all information requested.  Plaintiff again expressed the urgency of his request in light of his medical condition.  See Pl. 56.1 Statement ¶ 53.  On July 2, 2013, Defendant

Niziolek emailed Plaintiff about a meeting the two were set to have the next day, specifically stated he would not address the accommodation request, rather, "we will be in touch with you about your accommodation request at a later date."  See Pl. 56.1 Statement ¶ 54.  During his deposition, Defendant Niziolek admitted that he chose to meet with Plaintiff only about his response to his interim performance evaluation which he had no obligation under the law to do, before meeting with Plaintiff about his reasonable accommodation request, which he knew he had an obligation under the law to do.  See Pl. 56.1 Statement ¶ 55.  Around July 16, 2013, Plaintiff emailed Defendant Niziolek and Alison Trellis a second letter from Dr. Hutchinson, which stated, "it is my opinion that Mr. Woof must immediately be allowed to change his work environment.  Out of medical necessity, I strongly advise that accommodations be given to Mr. Woolf as soon as possible that will significantly lower his work stress as his work environment is obviously a major trigger to these more frequent and intense migraines.  Should you have any questions please do not hesitate to contact me directly at my office.  Mr. Woolf has given me authorization to disclose and discuss his ongoing treatment for this serious medical condition." See Pl. 56.1 Statement ¶ 57 – 58.  Again Defendant Niziolek admitted in his deposition that he never contacted Dr. Hutchinson, and that he did not recall why.  See Pl. 56.1 Statement ¶ 59.

After nearly four months elapsed from Plaintiff's first request for accommodation to Defendant Strada, and six weeks after Dr. Hutchinson's letter and Plaintiff's follow-up emails had gone unanswered, around July 17, 2013, Plaintiff filed a charge of discrimination with the EEOC, and sent an email to Defendant Niziolek, Alison Trellis, informing them/Bloomberg that he had filed a charge of discrimination against Bloomberg with the EEOC, and provided the charge number.  See Pl. 56.1 Statement ¶ 56.  Finally, on July 17, 2013, Defendant Niziolek emailed Plaintiff and said that he would like to speak with Plaintiff about his accommodation

request.  See Pl. 56.1 Statement ¶ 60.  Around July 19, 2013, Plaintiff and Defendant Niziolek met and Defendant Niziolek told Plaintiff that Bloomberg had never questioned Plaintiff's medical condition, but that any position within Bloomberg, including the positions Plaintiff had identified, would provide Plaintiff with the same level of stress, so Bloomberg would not even consider or evaluate any of the specific requested transfer positions, or Plaintiff's request to change supervisors.  Defendant Niziolek unilaterally told Plaintiff that intermittent FMLA leave suffice to manage Plaintiff's condition, despite the fact that Dr. Hutchinson specifically said that intermittent leave alone would not suffice.  See Pl. 56.1 Statement ¶ 61 – 64.  Defendant Niziolek did not provide Plaintiff with any next steps or otherwise offer guidance on furthering an interactive dialogue.  See Pl. 56.1 Statement ¶ 65.

Throughout the remainder of Plaintiff's employment, Plaintiff continued to seek an appropriate reasonable accommodation to his medical condition.  On December 13, 2013, Plaintiff emailed a third letter from Dr. Hutchinson to the Defendants.  Plaintiff asked, as part of an ongoing effort to seek an appropriate accommodation for his medical condition, that Bloomberg enter into a genuine interactive process with him.  Dr. Hutchinson's third letter reiterated, "I continue to strongly recommend Mr. Woolf reduce his stress levels, particularly at work, as it is still very important as part of his ongoing medical care as explained in my previous letters dated May 29, 2013 and July 15, 2013."  See Pl. 56.1 Statement ¶ 67 – 69.  Plaintiff never received a response to this letter.  See Pl. 56.1 Statement ¶ 70.  Finally, on January 10, 2014, Plaintiff wrote an email to Defendants Niziolek, Morris and Bowyer, stating that to date he had submitted three letters from Dr. Hutchinson, regarding his medical condition, and stating that none of his submissions and requests have resulted in any serious and genuine response or attempt to engage in a truly interactive dialogue regarding Plaintiff's requests, and, in fact,

Plaintiff's last two submissions to Bloomberg, were completely ignored.  Plaintiff again reiterated that he continues to seek a reasonable accommodation.  See Pl. 56.1 Statement ¶ 71.

Around March 30, 2016, the EEOC issued a determination on the merits of Plaintiff's charge, and found that the Defendants did not engage in good faith communication with Plaintiff concerning his request for a transfer as a reasonable accommodation, that the Defendants, "made no attempt to understand or discuss the recommendations of Plaintiff Woolf's doctor and unilaterally determined that changing positions would not help manage [Plaintiff's] stress and/or migraines."  Rather, Defendant "determined that leave was a reasonable accommodation instead, despite [Plaintiff's] doctor stating that 'a medical leave of absence, or intermittent medical leaves of absence, alone will not significantly mitigate this stress' and 'it is critical to control his headaches, and the only way I can see of doing this at this time is to reduce his stress levels.'"  The EEOC focused on the fact that Plaintiff identified specific jobs he could transfer to, but Defendant "stymied the process."  Therefore, the EEOC determined there was reasonable cause to believe Defendants discriminated against Plaintiff on account of his disability, in violation of the ADA.  See Pl. 56.1 Statement ¶ 72 – 76.

Thus, the record is clear that Bloomberg failed to engage in a good faith interactive process with Plaintiff, which shows disability discrimination, and that Bloomberg and the Defendants unlawfully refused to reasonably accommodate Plaintiff's disability.  *Sheng, supra,* 848 F.3d 78, 86–87.  Bloomberg never engaged in an inquiry into the viability of Plaintiff's requests while Plaintiff was employed.  Even if the Defendants' *post hoc* arguement in their position statements to the EEOC, that the requests were unreasonable, was true, this does not save them from the fact that while Plaintiff was employed, even their own records demonstrate that they never addressed the reasonableness of the specific requests

Plaintiff made, as "[t]he primary inquiry is whether the employer's interactions with the employee reveal at least some deliberation upon the viability of the employee's request. *Jacobsen, supra,* 22 N.Y.3d 824, 835.   It is clear that Plaintiff's suggestion of specific accommodations did not prompt Bloomberg to consider whether the burden that would be imposed upon their business would be reasonable, and Bloomberg never engaged in a dialogue about the impact of the proposed accommodation on Bloomberg's business (*Jacobsen, supra,* 22 N.Y.3d 824, 835) and did not give any individualized consideration to Plaintiff's specific requests, and rather arbitrarily rejected Plaintiff's proposal without further inquiry" demonstrating that they failed to accommodate Plaintiff's disability.  *Jacobsen, supra,* 22 N.Y.3d 824, 835.   Bloomberg's failure to engage in a genuine interactive dialogue with Plaintiff thus poses, "a formidable obstacle to [Bloomberg's] attempt to prove that no reasonable accommodation existed for [Plaintiff's Woolf's] disability." *Cruz, supra*, 36 N.Y.S.3d 407.

Furthermore, the NYCHRL requires that the interactive process continue until, if possible, an accommodation reasonable to the employee and employer is reached.  The record demonstrates Defendants clearly did not.   *Cruz, supra*, 36 N.Y.S.3d 407.   In fact, for approximately six months, from the July 2013 conversation with Defendant Niziolek to the January of 2014 termination of Plaintiff, the Defendants did not engage in any dialogue with Plaintiff regarding his request whatsoever, and ignored Plaintiff's further requests, including the third letter from Dr. Hutchinson, and Plaintiff's January 10, 2013 letter.  See Pl. 56.1 Statement ¶ 67 – 71.  Moreover, the NYCHRL places the burden on the employer to show the unavailability of any safe and reasonable accommodation and to show that any proposed accommodation would place an undue hardship on its business.  *Jacobsen, supra,* 22 N.Y.3d 824, 835, citing *Romanello, supra*, 22 N.Y.3d at 885.  In fact, even in the absence of a specific request by an

employee, an employer generally has an independent, affirmative duty to investigate feasible accommodations. *Cruz, supra*, 36 N.Y.S.3d 407; *Haight, supra,* 2014 WL 2933190, 17. It is clear that the Defendants failed to even engage in an interactive dialogue with Plaintiff, and certainly did not continue any interactive process until a reasonable accommodation was reached. More critically, Bloomberg certainly failed to engage in it's independent, affirmative duty to investigate feasible accommodations to show the unavailability of any safe and reasonable accommodation. *Cruz, supra*, 36 N.Y.S.3d 407; *Haight, supra,* 2014 WL 2933190, 17. As such, it is clear that Bloomberg unlawfully refused to provide Plaintiff with a reasonable accommodation as required under the ADA, NYSHRL and NYCHRL.

## CONCLUSION

For the foregoing reasons, Plaintiff requests that the Court issue an Order granting Plaintiff Summary Judgment as against all Defendants with respect to Plaintiff's federal, New York State and New York City claims for failure to provide a reasonable accommodation, together with such other and further relief as this Court may deem just and proper.

DATED:  New York, New York
        June 8, 2018

                    DEREK SMITH LAW GROUP, PLLC
                    *Attorneys for Plaintiff*
                    By:  /s/ Abe Melamed
                    Abraham Z. Melamed, Esq.
                    1 Penn Plaza, Suite 4905
                    New York, NY 10119
                    (212) 587-0760