# EXHIBIT 1

Page 1

1
2    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
3    Case No. 16-cv-6953(PKC)
     - - - - - - - - - - - - - - - - - - - -x
4
     RONALD WOOLF,
5
                         Plaintiff,
6
             -against-
7
     BLOOMBERG L.P.,
8    ANDREW BOWYER, individually,
     MELISSA STRADA, individually,
9    MATHEW ASMAN, individually,
     MICHAEL MORRIS, individually, and
10   JIM NIZIOLEK, individually,
11                       Defendants.
12   - - - - - - - - - - - - - - - - - - - -x
13                       September 25, 2017
                         9:35 a.m.
14
15
16           Videotaped Deposition of
17   RONALD WOOLF, taken by Defendant, pursuant
18   to Notice, held at the offices of
19   EPSTEIN BECKER & GREEN PC, 250 Park
20   Avenue, New York, New York, before
21   Sharon Lengel, a Registered Professional
22   Reporter, Certified Realtime Reporter, and
23   Notary Public of the State of New York.
24
25           *       *       *

Page 99

```
 1               WOOLF
 2  actually, preview -- now we're going to
 3  start talking about your Bloomberg
 4  employment.
 5       A.    Okay.
 6       Q.    So when did you start working at
 7  Bloomberg?
 8       A.    June 27, 2011.
 9            MR. GARLAND:   Let's mark as
10       Exhibit RW8 an offer letter dated
11       May 20, 2011, with the production
12       numbers defendant's production numbers
13       112 through 115.
14            (Exhibit RW8, An offer letter
15       dated May 20, 2011, Bates DEF000112,
16       was hereby marked for identification,
17       as of this date.)
18       Q.    You have in front of you what's
19  been marked as RW8.
20            Is that a copy of the offer
21  letter that you received from Bloomberg in
22  May of 2011?
23       A.    Yes.
24       Q.    If you turn to the third page of
25  the exhibit.   Is that your signature above
```

Page 102

```
 1                    WOOLF
 2   confidentiality agreement that you
 3   received upon the commencement of your
 4   employment with Bloomberg?
 5        A.    Yes, it is.
 6        Q.    If you look at the first page of
 7   the exhibit, is all of that handwriting on
 8   that page yours?
 9        A.    Yes.
10        Q.    And if we turn to the third
11   page, the signature on the line which says
12   "by" and then in parentheses "employee's
13   signature" is your signature?
14        A.    Yes, it is.
15             MR. GARLAND:  Let's mark as
16        Exhibit RW11 a document entitled
17        "Bloomberg Employee Resource
18        Information Guide Acknowledgement"
19        with the defendant production No. 111.
20             (Exhibit RW11, Bloomberg
21        Employee Resource Information Guide
22        Acknowledgement, Bates DEF000111, was
23        hereby marked for identification, as
24        of this date.)
25        Q.    You have in front of you what's
```

Page 103

```
 1                WOOLF
 2   been marked as Exhibit RW11.
 3             Is that a copy of a document
 4   that you signed on May 24, 2011?
 5        A.    Yes, it is.
 6        Q.    All of the handwriting on that
 7   page of that Exhibit RW11 is yours?
 8        A.    Yes.
 9             MR. GARLAND:  Let's next mark as
10        Exhibit RW12 the Bloomberg global
11        resource information guide with the
12        production numbers -- defendant
13        production numbers 815 through 835.
14             (Exhibit RW12, Global Core
15        Guide, Bates DEF000815, was hereby
16        marked for identification, as of this
17        date.)
18        Q.    You have in front of you what's
19   been marked as Exhibit RW12.
20             Please take a look at it and
21   tell me if you recall whether or not
22   that's the global resource and information
23   guide on which you acknowledge receiving
24   upon the commencement of your employment.
25        A.    (Witness perusing document.)
```

1                      WOOLF

2            It appears to be the one.  I

3     didn't sign this, but I recall signing

4     one.

5        Q.    All right.  But as you sit here

6     today, do you believe that's the guide

7     which you acknowledge receiving when you

8     signed the acknowledgement we've marked as

9     Exhibit RW11?

10       A.    I can't say for sure, because I

11    know there was a change in the

12    antinepotism policy at Bloomberg after

13    Bloomberg received a letter from my

14    attorney.

15       Q.    Let me ask it this way.

16            Are you denying under oath that

17    RW12 is the -- is a copy of the global

18    resource of information guide that you

19    acknowledged receiving in Exhibit RW11?

20       A.    I'm not denying or confirming.

21    I just don't know if this is the exact

22    document.

23       Q.    All right.  Then let's mark as

24    Exhibit RW13 the employee resource

25    information guide United States supplement

Page 106

1              WOOLF
2    you acknowledged receiving in Exhibit
3    RW11?
4        A.    I'm not denying or confirming,
5    but I did not have -- I cannot say exactly
6    that this is the document that I signed.
7        Q.    Let's look at another document
8    you did sign, though, which we'll mark as
9    Exhibit RW14, which is the Bloomberg
10   voluntary identification form.  This has
11   defendant's Production Nos. 105 and 106.
12            (Exhibit RW14, Bloomberg
13       Voluntary Self Identification,
14       DEF000105, was hereby marked for
15       identification, as of this date.)
16       Q.    You have in front of you what's
17   been marked as Exhibit RW14.
18            Is that a copy of a document
19   that you signed on May 24, 2001?
20       A.    Yes, it is.
21       Q.    And if we look at the very first
22   page of this Exhibit RW14, all of the
23   handwriting on that page is yours?
24       A.    Yes, it is.
25       Q.    And so there are three check

Page 107

```
1                    WOOLF
2   marks next to the word "no" on that page.
3              Did you make those three check
4   marks?
5       A.    I did.
6       Q.    And you made those three check
7   marks after reading the material
8   immediately above the checkmark?
9       A.    Yes.
10      Q.    And if we turn to the next page,
11  the second page of Exhibit RW14, we see on
12  that page additional handwriting.
13             Is all of it yours?
14      A.    Yes, it is.
15      Q.    And on the second page of
16  Exhibit RW14, there are four checkmarks
17  next to the word "no"; correct?
18      A.    Yes, correct.
19      Q.    Did you make those four
20  checkmarks next to the word "no"?
21      A.    Yes, I did.
22      Q.    And you made those four check
23  marks next to the word "no" after you read
24  the material immediately above each
25  checkmark?
```

Page 108

1                     WOOLF
2       A.     Yes, I did.
3       Q.     And then if you look at the
4    bottom of the page, that's your signature?
5       A.     Yes, it is.
6       Q.     And you placed your signature on
7    this document with regard to Exhibit RW14
8    on May 24, 2011?
9       A.     Yes.
10      Q.     Let's just mark a couple of
11   other basic documents now.
12             Actually, I'll come to those
13   later.  Let me do something else at the
14   moment.
15             So when you started your
16   employment with Bloomberg in June 2011,
17   were you a sales representative?
18      A.     Excuse me.  I'm coming from a
19   cold.
20             Yes, or a content specialist to
21   negotiate BI contracts, mainly for the
22   Americas.
23      Q.     So when you say BI contracts,
24   what do you mean by that?
25      A.     Contracts to obtain commercially

Page 109

1                    WOOLF
2    available data for a price as well as
3    obtaining data from websites after getting
4    permission from the producer of that data.
5         Q.    So you were responsible for
6    negotiating commercial data contracts?
7         A.    That was one of my
8    responsibilities.
9         Q.    And you would do that with
10   third-party data contributors?
11        A.    Yes.
12        Q.    And BI stood for at the
13   commencement of your employment Bloomberg
14   Industries?
15        A.    That's correct.
16        Q.    When you started -- well, when
17   you started, to whom did you report?
18        A.    My immediate report was to Steve
19   Citrin.
20        Q.    Mr. Citrin was your team leader?
21        A.    That's correct.
22        Q.    At some point in time, was
23   Mr. Citrin replaced as your team leader?
24        A.    I was -- no.  My group -- I
25   moved from the group to a team led by

Page 110

```
1                    WOOLF
2    Andrew Bowyer.  I don't believe Steve
3    Citrin lost his job as team leader.
4         Q.     But --
5         A.     I could be wrong, but I don't
6    know.  Exactly.
7         Q.     In any event, at some point, you
8    began reporting to Mr. Bowyer as your team
9    leader.
10        A.     That's -- that's correct.
11        Q.     Do you recall when that change
12   took place?
13        A.     Well, officially, I believe it
14   happened in November, but I recall
15   discussing it with Andrew Bowyer at a
16   Christmas party in late December and then
17   at my January 2013 year-end performance
18   review, Steve Citrin, Mike Morris, and
19   Andrew Bowyer were in the room stating
20   that I was going to be officially moved to
21   the pricing group because of -- there
22   would be better opportunities to advance
23   my career, and that was also an internal
24   change, apparently.
25        Q.     But in or about November 2012,
```

1                    WOOLF

2   you began reporting to Mr. Bowyer?

3        A.    My recollection is that I was

4   still talking with Steve Citrin about most

5   what I was doing.

6        Q.    Do you have a specific

7   recollection as to when you began

8   reporting to Mr. Bowyer?

9        A.    In January.

10       Q.    January 2013?

11       A.    January 2013.

12       Q.    At some point, did you begin

13  reporting to a different team later other

14  than Mr. Bowyer?

15       A.    Yes.  Andrew Bowyer was replaced

16  by Laura Brown from our London office, and

17  I reported to her I believe after my

18  return from heart surgery, which was in

19  early November of 2013.

20       Q.    So to be clear, you began

21  reporting to Ms. Brown as opposed to

22  Mr. Bowyer in or about November 2013.

23       A.    Yes.

24       Q.    And you continued to report to

25  Ms. Brown until the termination of your

Page 112

```
 1              WOOLF
 2   employment.
 3       A.    That is correct.
 4       Q.    And that termination occurred on
 5   January 10, 2014.
 6       A.    Yes.
 7       Q.    In terms of their reporting
 8   relationship, did Mr. Citrin and
 9   Mr. Bowyer and Ms. Brown each report to
10   Michael Morris?
11       A.    Yes.  I believe, yes, that's an
12   accurate statement.
13       Q.    Do you recall what Mr. Morris'
14   position was within Bloomberg during the
15   time that you worked there?
16       A.    His official title was something
17   like global head of data acquisitions.
18       Q.    In your -- well, in your role
19   during the time that you were employed by
20   Bloomberg, did you understand that you
21   were expected to build and expand your
22   business and professional relationships
23   both inside and outside the organization?
24       A.    Yes.
25       Q.    And at least one of the reasons
```

Page 113

```
 1                    WOOLF
 2   to do that was so that you could get deals
 3   done on behalf of Bloomberg?
 4        A.    Well, it helped facilitate
 5   deal -- deals being done, yes.
 6        Q.    In terms of your job
 7   responsibilities during the time that you
 8   were employed by Bloomberg, did they
 9   essentially remain fairly constant
10   throughout?
11        A.    I'm sorry.  Can you repeat the
12   question?
13        Q.    During the time that you were
14   employed by Bloomberg, did your job
15   responsibilities essentially stay the
16   same?
17        A.    They -- as far as negotiating BI
18   contracts, they expanded into -- into
19   negotiating contracts that -- or where we
20   did not pay for the data as well as it
21   expanded to a project that was given in
22   December of 2011 to what we called a
23   C-Suite project with some of our prime
24   clients to try to create a new product.
25              And then additionally, in the
```

Page 114

1                        WOOLF
2      beginning of 2013, I was asked to train
3      Vlad Golden, who had just been hired the
4      month before, so I was also training
5      individuals not only in New York but also
6      occasionally the individual in London
7      regarding BI -- negotiating BI deals.
8          Q.    Did your position -- it wasn't
9      referred to as a global data content
10     specialist?
11         A.    I believe the exact title is
12     content acquisition specialist.
13         Q.    And that was essentially your
14     title throughout your tenure?
15         A.    Yes.
16         Q.    I'd like to take a look at some
17     of your performance evaluations with you.
18     The first one we're going to mark as
19     Exhibit RW15.  And it was produced by the
20     plaintiff with a reference of -- as
21     Exhibit 8 with the numbers 39 through 44.
22              (Exhibit RW15, 2011 Performance
23         Evaluation, Bates 000039, was hereby
24         marked for identification, as of this
25         date.)

Page 115

1                    WOOLF

2     Q.     You have in front of you what's

3  been marked as Exhibit RW15.

4             Please look at it and tell me if

5  that is a copy of the performance

6  evaluation that you received for the

7  portion of 2011 that you worked at

8  Bloomberg.

9     A.     (Witness perusing document.)

10             Yes, it is.

11     Q.     Was this evaluation completed by

12  Mr. Citrin?

13     A.     I do not know for sure.   I

14  believe he and probably Mike Morris did

15  this.

16     Q.     Did you speak with either one of

17  them about the contents of this

18  evaluation?

19     A.     I believe I spoke to both of

20  them at my year-end review.

21     Q.     Do you have any notes, records,

22  anything that would have documented what

23  was said during that review?

24     A.     No.   I did not document

25  anything.

Page 116

1                    WOOLF

2       Q.     When did that year-end review

3    take place?

4       A.     It would have been January 2012.

5       Q.     Is it your recollection that

6    both Mr. Morris and Mr. Citrin attended?

7       A.     It's my recollection.

8       Q.     Do you have any recollection of

9    what was said during that meeting?

10      A.     Essentially that I had gotten

11   off to a great start -- you can see from

12   the documents or from the document what

13   they thought I was doing well, what needed

14   to develop, and I was very happy in the

15   position that I was performing.

16      Q.     So let's look a little bit

17   greater depth at the actual exhibit, RW15.

18             If you look at the page with the

19   top has the production number 42, it

20   appears to be a self-evaluation on that

21   page.

22             Is that a self-evaluation that

23   you prepared?

24      A.     Yes, it is.

25      Q.     And does your self-evaluation

Page 117

1                    WOOLF
2    continue on the next page with the number
3    43 at the top of the page?
4        A.    Yes.
5        Q.    And then does your
6    self-evaluation continue onto the next
7    page with the number 44 at the top?
8        A.    Yes.
9        Q.    All right.  Let's, then, next
10   look at your 2012 year-end performance
11   evaluation, which we're going to mark as
12   Exhibit RW16.  It has the plaintiff's
13   production numbers Exhibit 8, No. 27
14   through 33.
15            (Exhibit RW16, 2012 Performance
16        Evaluation, Bates 000027, was hereby
17        marked for identification, as of this
18        date.)
19        Q.    You have in front of you what's
20   been marked as Exhibit RW16.
21            Is that a copy of your 2012
22   performance evaluation?
23        A.    Yes, it is.
24        Q.    Do you know who prepared this
25   2012 performance evaluation?

Page 118

1                    WOOLF

2        A.     I believe Steve Citrin and Mike

3    Morris.

4        Q.     Did you have a meeting with

5    anyone to discuss the contents of your

6    2012 performance evaluation?

7        A.     From what I recall, at this

8    meeting, which would have been in January

9    of 2013, Mike Morris, Andrew Bowyer, and

10   Steve Citrin were present.

11       Q.     Did you take any notes, like,

12   any record at all in terms of what was

13   said during that performance review

14   meeting?

15       A.     No.  I don't believe so.

16       Q.     I don't think I asked you this

17   earlier.  So let me ask it now.

18              At any point in time during your

19   Bloomberg employment, did you tape record

20   any conversation that you had with any

21   other Bloomberg employ?

22       A.     No.

23       Q.     Since you've left Bloomberg,

24   have you tape recorded any conversation

25   that you had with anyone who was employed

Page 123

1                       WOOLF
2       A.      I do not remember.
3       Q.      Hearing it now, do you agree or
4    disagree with that statement?
5       A.      I would say that the -- the
6    things that I did to document various
7    deals that I was working on was -- was
8    clear.  If at various stages someone
9    thought it was unclear, I was not aware.
10      Q.      Let me ask you this.
11              Looking back at your performance
12   in 2012, what, if anything, do you think
13   you could have done better?
14      A.      2012 was a very, very
15   interesting year, because in 2012,
16   Bloomberg Industries held back money in
17   the first six months of the year, and then
18   I got a phone call from Tim -- I cannot
19   recall the last name, but he worked in the
20   Princeton office.  He was a very senior
21   executive.  And he asked me about closing
22   deals as fast as possible and using at
23   least $1 million and still negotiating
24   good deals for Bloomberg but to expend
25   this money before year end, because they

Page 124

```
 1                    WOOLF
 2   were afraid, if they did not spend the
 3   money before the end of the year, that
 4   the -- that the budgets for BI would be
 5   reduced in 2013.
 6            So therefore, in the final six
 7   months of the year, my recollection is
 8   that, one, I canceled my vacation, which
 9   was scheduled for 10 or 14 days.  I came
10   into the office when Mike Morris requested
11   a full staff to be there, even though it
12   was a off day for me.  And I worked around
13   the clock or diligently to get these deals
14   done, which happened.
15            And if you note, in this
16   document, that my production numbers on
17   page -- on page 2, 00028, that my
18   production numbers in Q2, 2012, and Q3,
19   2012, exceeded the target of 100 for that
20   six-month period.  And that extended
21   beyond that.
22       Q.    My question to you was -- and
23   I'll remind you please answer my
24   question -- what, if anything, could you
25   have done better with regard to your
```

Page 125

```
 1                    WOOLF
 2   performance in 2012?
 3              MR. MELAMED:   Objection.
 4      A.    I could have better communicated
 5   with my business manager at BI.
 6      Q.    Who was that?
 7      A.    Eric Hernandez.
 8      Q.    Okay.  Why do you say that you
 9   could have communicated better with him?
10      A.    Well, there was a -- an obvious
11   permit conflict between him and I.  And
12   there was a meeting that was called for by
13   Steve Citrin to work out where I left off
14   in performing my negotiations and where it
15   was passed off to him, because he wanted
16   to be involved in my negotiations, which,
17   everyone agreed, at least management
18   agreed you cannot have two people
19   negotiating contracts.
20              Eric Hernandez disagreed with
21   that.  So therefore, there was a meeting
22   that established clear protocols as to how
23   those deals would be handed off.  And
24   perhaps it could have been done sooner.
25   But at the end of the day, as far as I
```

```
 1                    WOOLF
 2   line, where it says "regional
 3   coordinator," you're -- it says "JB."
 4           Do you know who that refers to?
 5      A.     I think it was John Brownie, if
 6   I recall.  I could be wrong.
 7      Q.     Now, at some point -- well, let
 8   me back up.  We've just been talking about
 9   January 2013.  That's when the email that
10   we've marked as Exhibit RW17 was sent.
11           In that same month, did you
12   attend a career development program at
13   Bloomberg?
14      A.     No.  I attended a career
15   networking event.
16      Q.     And as you -- just describe that
17   networking event, please.
18      A.     Well, I'll explain it the way it
19   was explained to me.  This was a -- it was
20   an event that was sanctioned by the most
21   senior managers at Bloomberg, and in my
22   conversations with some of the people in
23   professional development, they recognized
24   that previous events, previous networking
25   events were obviously there were people
```

Page 134

1                          WOOLF
2     going to these events because they were
3     looking for maybe other work within
4     Bloomberg would get back to their manager
5     and those managers didn't appreciate the
6     fact that they may leave their department.
7     And under the policy, after someone has
8     put in 18 months of solid work and was in
9     good standing, they could leave a
10    department.  And it was done without the
11    knowledge of the manager until at the very
12    end.  So they feared discrimination --
13         Q.     Hold on.
14         A.     -- taking place.
15         Q.     What was the networking event
16    that you attended?  Describe the
17    networking event that you attended.
18         A.     The networking event was a
19    sanctioned Bloomberg event by senior
20    Bloomberg executives, including the COO,
21    Beth Mazzeo, who I spoke with that evening
22    and asked about international
23    opportunities.  And that was the event.
24         Q.     So what did you say to
25    Ms. Mazzeo and what did she say to you?

Page 136

1                          WOOLF

2     that I should talk to.

3          Q.     Do you remember who she

4     recommended?

5          A.     There are about five or six

6     people that had experience working in

7     Asia.  Not all were there that evening.

8     But one or two were, I recall.  I think a

9     Michael Reese was one person.  I think --

10         Q.     Was that Matthew Reese?

11         A.     Or Matthew Reese.  And I believe

12    she recommended talk to Mathew.  And we

13    had an extensive conversation.

14         Q.     Who is "we"?

15         A.     Me and Matthew Reese about

16    opportunities in Asia and his experience

17    with Bloomberg in Asia.

18         Q.     All right.  So let me just stop

19    you there.

20                What did you say to Mr. Reese

21    and what did he say to you at the

22    networking events?

23         A.     I said to him that I was

24    interested in transferring to Asia, that I

25    had been working for BI, that this is what

Page 137

1                          WOOLF

2      I had accomplished, and I was ready to

3      take the next step for my career.  And he

4      in general gave me a picture of working in

5      Asia, working for Bloomberg, what he did,

6      and then offered to help me get in touch

7      with the right people in Asia sow that I

8      could pursue this opportunity.

9           Q.    Did you speak with anyone else

10     at the networking event?

11          A.    I spoke with many people.  I

12     spoke with professional development.  I

13     spoke with --

14          Q.    Do you remember the name of

15     anyone else you spoke with at the event?

16          A.    I believe Susie Walter was an

17     individual I spoke to.

18          Q.    Anyone else?

19          A.    From professional development,

20     I -- I believe it's in an email.  But I

21     can't recall it off the top of my head.

22          Q.    And why did you want to work in

23     Asia?

24          A.    Well, I knew how to do business

25     in Asia.

Page 138

1                    WOOLF

2      Q.     Based on what?

3      A.     My six years of experience

4  working in Asia.

5      Q.     But why then in January of 2013

6  did you want to go back to Asia?

7      A.      So as I explained before, the BI

8  Americas group, that platform that I had

9  been working on for 19, 20 months, was

10  essentially built out.  And I was being

11  told by BI analysts, "Hey, we have most of

12  our data, right, things are going to slow

13  down."  So I had the opportunity to

14  transfer, because I was an employee in

15  good standing.

16             And I wanted to develop my

17  career at Bloomberg.  And I thought that

18  my expertise and skill set suited doing

19  business in Asia.  And, in fact, I had

20  conversations with Robin Conn in the --

21  in -- the following month.

22      Q.     We'll get to the following

23  month --

24      A.     Okay.

25      Q.     -- at that time.

Page 139

```
 1                    WOOLF
 2           But January 2013, is there any
 3    other reason why you wanted to pick up and
 4    relocate to Asia?
 5       A.      No.  At that time, it was just
 6    career advancement.
 7       Q.      Do you remember the name of
 8    anyone else you spoke with at the
 9    networking event?
10       A.      I can remember Matthew Reese.
11       Q.      We talked about him.
12       A.      Susie Walter.
13       Q.      We talked about her.
14               Anyone else?
15       A.      I cannot remember specifically
16    by name at this time.  If I can see an
17    email, I might recognize a few names.
18       Q.      Well, let's mark as Exhibit RW18
19    some email traffic.
20       A.      Of course, I spoke with
21    colleagues as well.
22       Q.      Let's mark --
23       A.      But --
24       Q.      Let's mark as RW18 some email
25    communications involving the plaintiff
```

```
                                    Page 141
 1                 WOOLF
 2   for a position in Asia.
 3        Q.    Right.  And so you're writing to
 4   Matthew Reese --
 5        A.    Basically trying to tell him
 6   what I think I can do.  To help out the
 7   Asia initiative.
 8        Q.    Right.  Making your case as to
 9   why you wanted to be relocated to Asia.
10        A.    Yes.
11        Q.    Then if we look at the first two
12   pages of Exhibit RW18, we have an email
13   starting midway down the first page of
14   RW18 that you sent to Matthew Reese on
15   January 31, 2013?
16        A.    Correct, yes.
17        Q.    And, again, that looks like that
18   email contains the letter that we just
19   looked at just condensed into an email; is
20   that right?
21        A.    It looks like it.  It may have
22   been sent later, because it looks like I
23   summed up briefly for him, and then I may
24   have extended that later, a couple of days
25   later perhaps.  There's no date.  So I do
```

Page 144

1                    WOOLF

2    him?

3         A.    I don't believe so, because I

4    have worked in Japan, Hong Kong, and

5    Singapore.  I believed that I could cover

6    most of Pan-Asia.

7         Q.    And at the time, Bloomberg had

8    offices in Hong Kong?

9         A.    We had offices from what I can

10   remember Hong Kong, Singapore, Tokyo,

11   Mumbai, maybe Taiwan -- I don't think --

12        Q.    Shanghai?

13        A.    I don't think Shanghai was on

14   the list.  Maybe.

15        Q.    Beijing?

16        A.    Oh, wait a minute.  No.  That

17   was Roubini.  I don't believe Beijing was

18   on the -- was an office yet.

19        Q.    Shanghai?

20        A.    I don't believe so.

21        Q.    Seoul?

22        A.    Yes.  Seoul was one.

23        Q.    And if you go back and continue

24   looking at the second page of Exhibit

25   RW18, you wrote in January of 2013 as

Page 146

1                        WOOLF
2               (Exhibit RW19, A series of
3        emails, Bates WOOLF000042, was hereby
4        marked for identification, as of this
5        date.)
6        Q.      You have in front of you what's
7   been marked as Exhibit RW19.
8               Please take a look at it and
9   tell me if that exhibit contains a series
10  of email exchanges involving your desire
11  or interest to, as of February 2013,
12  relocate to Bloomberg's offices or an
13  office in Asia.
14       A.      Yes.   It looks like a
15  combination of emails sent over a period
16  of time.
17       Q.      In February of 2013?
18       A.      I think January to February.
19       Q.      2013?
20       A.      2013.   Yes.
21       Q.      So let's just look at some of
22  those emails.   Let's go to the third page,
23  the one that has the Woolf production
24  number 44.   Halfway down that page.
25  That's an email that you sent to Tim

Page 147

```
 1                  WOOLF
 2  Craighead?
 3      A.    Yes.
 4      Q.    And that was the
 5  same Mr. Craighead we just spoke about?
 6      A.    Yes.
 7      Q.    You write in that email to him
 8  that you were at an internal networking
 9  event last week.
10          That's the internal networking
11  event we spoke about a short time ago?
12      A.    Mm-hmm.
13      Q.    Yes?
14      A.    Yes, it is.
15      Q.    That's where you met Mr. Reese
16  and also here you write that you met
17  Nicole Comello, C-O-M-E-L-L-O.
18          Did you speak with her?
19      A.    I believe -- I believe Beth
20  Mazzeo, our COO, told me to reach out to
21  her as well, and she was basically the
22  assistant to Beth Mazzeo, and she was
23  offering, you know, her advice in going
24  about doing this.
25      Q.    All right.  Then if we look at
```

Page 151

```
 1                    WOOLF
 2  anything, you know, that she could do to
 3  help me would be, you know, appreciated.
 4  And that was basically the conversation.
 5       Q.    Right.  Well --
 6       A.    In the email that describes the
 7  email.
 8       Q.    But in February or March of
 9  2013, did you take any active steps to
10  actually apply for any of the positions
11  for which the requisitions were identified
12  in her email to you?
13       A.    I don't know if I took the
14  official steps to formally apply.  I don't
15  recall.
16       Q.    Did you -- did you --
17       A.    I -- I may have spoken to the
18  individuals.
19       Q.    Well, I only want you to testify
20  about that which you recall.  So if you
21  may have done something --
22       A.    Okay.
23       Q.    -- it's speculation.  But we
24  just want to know what you recall.
25       A.    I don't recall if I formally
```

Page 152

```
 1                    WOOLF
 2  applied or not.
 3       Q.    So at around that time, though,
 4  did you speak with someone at Bloomberg by
 5  the name of Melissa Strada, S-T-R-A-D-A?
 6       A.    Yes, I did.
 7       Q.    And how did that come about?
 8       A.    In February, things started to
 9  change.  And suddenly, I was getting
10  awkward emails, emails at home, which
11  never happened, in my first 20, 21 months
12  at Bloomberg, emails that made absolutely
13  no sense, given that it was someone who
14  was senior to me where I was being in an
15  offhanded way criticized.
16            And then there was also my
17  request for a CFA reimbursement on
18  March 1st, which should have taken, under
19  normal circumstances, two to five days.
20  Nothing was happening, and I was starting
21  to get -- one thing that was very telling
22  to me is that, normally, at Bloomberg, you
23  have a meeting with your TL every week to
24  go over what you're doing, what you need
25  to work on, what you're doing well, you
```

Page 155

1                    WOOLF
2       A.    I think I told her I want to
3  leave the group, period.
4       Q.    Do you remember whether or not
5  you told her about your interest in Asia?
6       A.    I probably would have told her
7  my interest in Asia, of course.
8       Q.    Do you remember whether or not
9  she referred you back to Robin Conn
10 because of Ms. Conn's greater working
11 knowledge about opportunities in Asia?
12      A.    I don't recall -- I'm sorry.
13 I'm having a migraine.  It affects my
14 speech.  I don't recall exactly.  But it's
15 something that is reasonable --
16      Q.    Let me just stop you.
17      A.    -- for her to say that.
18      Q.    You just said you were having a
19 migraine.
20      A.    Yes.
21      Q.    Let's be clear about this.
22            Are you able, as you sit here
23 now, to give truthful testimony in a
24 deposition setting?
25      A.    Yes, I am.

1                    WOOLF

2    about March 19, 2013, at 12:30 p.m.?

3         A.     I put it under her keyboard.

4    She was out to lunch, I believe, at

5    12:30 p.m.

6         Q.     On March 19th --

7         A.     On March 19th.

8         Q.     Again, remember, please let me

9    finish my question before you begin your

10   answer.

11        A.     Apologies.

12        Q.     So you left it in her office on

13   March 19, 2013, at around 12:30 p.m.

14        A.     That is correct.

15        Q.     When did you write it?

16        A.     Probably an hour before.

17        Q.     Where were you when you wrote

18   it?

19        A.     At my desk.

20        Q.     At Bloomberg?

21        A.     Yes.

22        Q.     731 Lexington?

23        A.     Yes.

24        Q.     So if we look at the handwritten

25   note, the second paragraph -- well, let's

Page 161

```
 1                      WOOLF
 2   start with the first paragraph.  You wrote
 3   as follows:  "I have just about of enough
 4   of what is obviously an intentional and
 5   concerted effort to discredit my work."
 6            Is what follows in this
 7   handwritten note your summary of the
 8   intentional and concerted effort to
 9   discredit your work?
10       A.    Could I read it?
11       Q.    Please.
12       A.    (Witness perusing document.)
13            Right.  So I wrote this, and I
14   urgently wanted to speak to her following
15   up the conversation I had with her --
16       Q.    Let me repeat the question for
17   you.
18       A.    Okay.
19       Q.    Is what follows the first
20   paragraph in RW20 a summary or a statement
21   of what you were referring to in the first
22   paragraph when you wrote about an
23   intentional and concerted to discredit
24   your work?
25       A.    Yes, it is.
```

Page 164

1                    WOOLF

2      Q.    Who was present?

3      A.    Me and Melissa Strada.

4      Q.    Anyone else?

5      A.    Not to my knowledge, no.    I

6  don't remember anyone else.

7      Q.    Did you take any notes of what

8  was said?

9      A.    No.

10      Q.    What did she say to you and what

11  did you say to her?

12      A.    Well, it was a followup to the

13  conversation on the previous Friday that

14  where I was complaining specifically about

15  what I considered a hostile work

16  environment, legitimate or delegitimate

17  characterizations of my work product, very

18  odd emails where I was criticized for

19  something very, very minor like reaching

20  out or making a phone call, instead of at

21  2:00, at 3:00, something of that nature.

22  And the stress was mounting.   And what --

23  what was the tipping point was that,

24  first, Andrew Bowyer didn't understand my

25  job.   So I had to educate him about how I

Page 165

```
1                    WOOLF
2    perform my job.
3        Q.    Bowyer was your supervisor at
4    the time.
5        A.    He was my supervisor.  But he
6    did not understand my job.  So he came
7    over to my desk after IB'ing me for about
8    an hour, which you could imagine, you're
9    sitting at your desk trying to do work,
10   and you've got these chat sessions popping
11   up every two minutes -- "What about this?
12   What about this?  What about this?"
13   Right?
14              So finally, I said wouldn't it
15   be easier to go into a conference room and
16   just have a conversation.  And then he
17   came over, and he pulled up a chair, and
18   he put both of his feet on top of my desk,
19   leaned back, and said basically he
20   disagreed with what I was doing on this
21   one deal.  And I can't remember
22   specifically what deal it was.  But it was
23   completely disrespectful, very rude.  And
24   Susan Lasovick was sitting literally two
25   feet from me.  And I didn't say it.  She
```

Page 166

```
 1                    WOOLF
 2   said it to me.  And at that point, what
 3   this letter states sums up how I felt.
 4        Q.    So when you were referring to
 5   hostile work environment, and those were
 6   your words, you were referring to this
 7   first full paragraph where you say he was
 8   very unprofessional and put his feet up on
 9   your desk and questioned what you were
10   doing?
11        A.    Yeah, in a very unprofessional
12   manner.
13        Q.    And when you say "in a very
14   unprofessional manner," what do you mean
15   by that?
16        A.    Talking down to me.
17        Q.    Did you ever ask him, "Why are
18   you talking down to me?"
19        A.    It was a confrontational
20   conversation.
21        Q.    Did you ask him during that
22   conversation, "Why are you talking down to
23   me?"
24        A.    I don't know if I used those
25   exact words.  But I tried to explain the
```

Page 167

```
 1              WOOLF
 2   strategy and why it was conducive to go
 3   down that path, and he disagreed.
 4        Q.    Did you ever find out from him
 5   or from anyone else why, in your words, he
 6   was talking down to you that day?
 7        A.    Well, like I said, there was a
 8   pattern starting to establish, starting to
 9   be established around early March, maybe
10   late February to early March.  Things
11   changed; right?  I was no longer having
12   meetings with my TL.
13        Q.    Okay.  And so you're referring
14   to February and March of 2013.
15        A.    Yeah.  Late February to early
16   March -- well, continued then --
17        Q.    Did you ever --
18        A.    -- obviously.
19        Q.    -- ask Mr. Bowyer, "Why aren't
20   we having meetings now" in its ongoing --
21   let's stay in this same period February or
22   March of 2013?
23        A.    Not at that time, no.
24        Q.    Okay.  Did you ask anyone else,
25   "Hey, why isn't Mr. Bowyer meeting with me
```

Page 179

```
 1                    WOOLF
 2       Q.    And it has the defendant's
 3  Production No. 411.
 4             You have in front of you what's
 5  been marked as Exhibit RW21.
 6             Does that contain an exchange of
 7  emails between you and Aline Tedesco on
 8  March 13th and 14, 2013?
 9       A.    Yes, it does.
10       Q.    Who is Aline Tedesco?
11       A.    She was the HR representative
12  for our group, data acquisitions.
13       Q.    The group in which you worked.
14       A.    Yes.
15       Q.    Now, you mentioned that you
16  received a verbal warning that was
17  written.
18             How did you receive that?
19       A.    I was called into a conference
20  room, which I believe just to be a regular
21  meeting with Mike Morris and Andrew Bowyer
22  and Aline Tedesco was sitting there as
23  well, and I was being read the Riot Act.
24       Q.    Well, when you say you were read
25  the Riot Act --
```

Page 180

1                    WOOLF
2        A.      Essentially --
3        Q.      Let me finish the question.
4                And I'll reset the playing
5    field.
6                So you said were you in a
7    conference room with Ms. Tedesco,
8    Mr. Bowyer, and Mr. Morris; is that right?
9        A.      That's correct.
10       Q.      Did you take any notes during
11   that meeting?
12       A.      No.
13       Q.      How did the meeting begin?
14       A.      Of course, I was asked to sit
15   down, and I think Aline Tedesco spoke --
16       Q.      What did she say?
17       A.      -- first.  She said, "We're here
18   to give you a verbal warning," and I think
19   I asked what does that mean exactly.
20       Q.      Who answered?
21       A.      I think she did, because it's an
22   HR thing.
23       Q.      What did she say?
24       A.      It's a performance warning, that
25   you're not meeting expectations, so you

Page 186

1                    WOOLF

2          (Exhibit RW22, An email dated

3      March 20, 2013, Bates DEF000248, was

4      hereby marked for identification, as

5      of this date.)

6          Q.    You have in front of you what's

7   been marked as Exhibit RW22.

8               Is that a copy of the warning

9   that you received in connection with the

10  meeting you just described?

11         A.    Yes.  This is -- this written

12  document is the verbal warning, just to be

13  clear.

14         Q.    And you received that on

15  March 20, 2013.

16         A.    Yes.

17         Q.    Did you respond in writing to

18  him?

19         A.    I did.

20         Q.    When did do you that?

21         A.    I did it as soon as possible.  I

22  think I took -- I know -- I remember the

23  next day, I was going to Massachusetts for

24  a meeting with IDC.  Then, upon my return,

25  I basically worked on a rebuttal sentence

Page 187

```
 1              WOOLF
 2  by sentence responding to this email.
 3      Q.     All right.
 4           MR. GARLAND:  So let's mark,
 5      then, as Exhibit RW23 a
 6      March 25, 2013, memo from Mr. Woolf to
 7      Mr. Bowyer with the plaintiff's
 8      production numbers Exhibit 4, 0001
 9      through 19.
10           (Exhibit RW23, A memo dated
11      March 25, 2013, Bates 0000001, was
12      hereby marked for identification, as
13      of this date.)
14      Q.    You have in front of you what's
15  been marked as Exhibit RW23.
16           Is that your written response to
17  the warning that we had marked as --
18  performance warning that we had marked as
19  Exhibit RW22?
20      A.    Yes.  That's the one or my
21  rebuttal.  Sorry.
22      Q.    Now, there's some handwriting on
23  this first page.  The lower right-hand
24  corner, there's the letter "E" followed by
25  the number 1.
```

Page 189

1                    WOOLF
2    July 15, 2013, alleging discrimination.
3    And that was one of my 13 exhibits.
4         Q.    So when you referred to a
5    federal investigator, you're referring to
6    the EEOC investigator.
7         A.    Yes.
8         Q.    Now, did you end up speaking
9    with Jim Niziolek --
10        A.    Niziolek.
11        Q.    -- regarding the warning and
12   your rebuttal?
13        A.    Yes.  Jim and I had a number of
14   conversations.
15        Q.    Did you meet with him
16   specifically, though, about the warning
17   and the rebuttal on or about March 26th,
18   the day after you provided the rebuttal?
19        A.    I believe that is the correct
20   date.
21        Q.    And when you spoke to him, did
22   you say that both Mr. Bowyer and
23   Mr. Morris had started to treat you
24   differently after you had attended that
25   Bloomberg networking event in January?

```
 1                    WOOLF
 2        A.    I probably alluded to the fact
 3   that something was amiss, and I could only
 4   tie it at that time to maybe them
 5   retaliating against me because I was
 6   looking to move departments.
 7        Q.    Did you also -- when you spoke
 8   with him on March 26th -- say that you
 9   wanted to transfer somewhere else within
10   Bloomberg?
11        A.    I probably did.
12        Q.    Did he explain to you during
13   that meeting that, in order for an
14   employee at Bloomberg to transfer
15   internally he or she must be in good
16   standing?
17        A.    I'm probably pretty sure he did.
18        Q.    Did he also explain to you that
19   he had to determine what impact the verbal
20   warning that you had just received would
21   have on your ability to transfer?
22        A.    Yes, he did.
23        Q.    At some point, did you have
24   communication with Melissa Strada about
25   your standing and your ability to
```

Page 191

```
 1                    WOOLF
 2  transfer, given it --
 3       A.     Yes.
 4       Q.     Was that email, in person, on
 5  the phone?
 6       A.     This --
 7       Q.     With Ms. Strada.
 8       A.     -- with Ms. Strada was in an
 9  email where she stated to me, because
10  there was confusion between the attorneys,
11  one that I had hired just two days prior,
12  or -- let's see -- March 26 -- no.  It was
13  two days before I hired my employment
14  attorney -- where she was clarifying what
15  the Bloomberg attorney was stating and
16  that this warning actually did not prevent
17  me from moving.  But then she corrected
18  the record and sent me an email and said
19  it does prevent you from moving and
20  recommended that I try to move departments
21  as soon as possible.
22       Q.     Well, let's break that down
23  chronologically.  It might be helpful to
24  look at some of the email communications.
25  So let's mark as Exhibit RW24 an exchange
```

Page 192

```
                                 WOOLF
 1
 2   of emails between Ms. Strada and Mr. Woolf
 3   on March 27, 2013, with the plaintiff's
 4   production number, Exhibit 5, and then the
 5   number 71.
 6             (Exhibit RW24, A series of
 7        emails dated March 27, 2013, Bates
 8        000071, was hereby marked for
 9        identification, as of this date.)
10        Q.    You have in front of you what's
11   been marked as Exhibit RW24.
12             Is that an exchange of emails
13   that you had with Ms. Strada on
14   March 27, 2013?
15        A.    Yes, it is.
16        Q.    And the first email in time, so
17   chronically, the first email was one that
18   she sent to you that appears about 1/3 of
19   the way down the page?
20        A.    Yes.  I don't recall if there
21   was a prior email regarding post -- the
22   post-19th letter.  But this was an
23   email -- this was I think the last email
24   that was exchanged between us.
25        Q.    Well, in her email to you,
```

Page 194

1                     WOOLF
2    the employment attorney that was hired
3    that day, I believe.  But it's not clear
4    to me.  There could have been a
5    conversation the day before that she was
6    going to look into it.  But the bottom
7    line was that I had no chance of pursuing
8    my career at Bloomberg at that point in
9    time.
10       Q.    Well, is it the bottom line that
11   simply at that point in time, you were not
12   eligible to transfer?
13       A.    Right.
14       Q.    Not eligible to transfer.
15             So it also might be helpful,
16   because I'm going to mark another exhibit,
17   because maybe there were other
18   conversations you were having around the
19   same time with different people about the
20   same subject.
21             MR. GARLAND:  So let's mark as
22        Exhibit RW25 an exchange of emails
23        involving the plaintiff, Ms. Tedesco,
24        and others with the defendant's
25        production numbers 413 through 420.

Page 196

1                  WOOLF
2       A.    Yes, almost immediately.
3       Q.    When you say "almost
4   immediately," I think you recall the date
5   for that.  What was it?
6       A.      Within the week of getting -- or
7   maybe -- it was eight or nine days.  I
8   don't -- I don't remember when I signed
9   the retainer agreement.  But it was
10  certainly before April 1st, because he
11  wrote a letter that I provided a lot of
12  information where I provided a lot of
13  information to him so that he could write
14  the letter, and that letter was dated
15  April 2nd.  But it was done April 1st.
16      Q.    And the triggering event for
17  your going out and retaining the lawyer
18  was your receipt of the verbal warning?
19      A.    Yes.
20      Q.    The lawyer's name was Leonard
21  Pack?
22      A.    Correct.
23           MR. GARLAND:  Let's mark as
24      Exhibit RW26 a letter from Mr. Pack
25      dated April 2, 2013, with the Woolf

Page 197

```
 1              WOOLF
 2      production numbers 71 through 75.
 3              (Exhibit RW26, A letter dated
 4      April 2, 2013, Bates WOOLF000071, was
 5      hereby marked for identification, as
 6      of this date.)
 7      Q.    You have in front of you what's
 8  been marked as Exhibit RW26.
 9              Is that a copy of the letter
10  that your attorney wrote on your behalf to
11  Beth Mazzeo and others on April 2, 2013?
12      A.    Yes, it is.
13      Q.    Did you review the letter
14  drafted by Mr. Pack?
15      A.    Absolutely.
16      Q.    Let me finish.
17              Did you review it before he sent
18  it?
19      A.    Yes.
20      Q.    So you reviewed it to ensure
21  that it accurately reflected your beliefs
22  as of the date that it was sent?
23      A.    Yes.
24      Q.    Now, did anyone at Bloomberg
25  speak with you about the letter that we've
```

Page 200

```
 1                    WOOLF
 2   four emails.  But my recollection is that
 3   it was after March 30th -- I'm sorry.  It
 4   was after May 29th when my neurologist
 5   wrote a letter and also provided copies to
 6   Jim Niziolek, Beth Mazzeo --
 7        Q.    Let's not jump ahead yet.  We're
 8   still at the beginning of April.
 9        A.    Okay.
10        Q.    I should have made that clear.
11              So your letter -- your lawyer's
12   letter is April 2, 2013.
13        A.    Yes.
14        Q.    Did you learn within the month
15   of April what, if anything, Mr. Asman did
16   in response to your letter, your lawyer's
17   letter?
18        A.    I do not recall Matt Asman doing
19   anything on my behalf or addressing any
20   concerns, and that's my recollection.  I
21   never met Matt Asman.  I don't know what
22   he looks like.
23        Q.    Did Mr. Niziolek ever meet with
24   you in April to inform you that you would
25   not be permitted to apply for other
```

Page 201

1                    WOOLF

2   positions within Bloomberg until your

3   performance improved?

4        A.    Yes.   I'm pretty certain that

5   happened.

6        Q.    Did that happen on or about

7   April 30, 2013?

8        A.    I'm sure it happened, but I

9   can't recall the date.   But it was

10  probably -- it's a reasonable date.

11       Q.    Let's mark as Exhibit RW27 an

12  email from Mr. Niziolek to Mr. Woolf on

13  May 14, 2013, with a Bloomberg production

14  numbers 294 and 295.

15            (Exhibit RW27, An email dated

16       May 14, 2013, Bates DEF000294, was

17       hereby marked for identification, as

18       of this date.)

19       Q.    You have in front of you a

20  document we've marked as Exhibit RW27.

21       A.    Yes.

22       Q.    I want to direct your attention

23  to the email from Mr. Niziolek on

24  May 14, 2013, to you, which is about a

25  third of the way down on the first page of

1                    WOOLF

2    this exhibit.

3              Do you see that?

4    A.      Yes, I do.

5    Q.      Is that an email that you

6    received from him on that date?

7    A.      Yes.  That is -- that is an

8    accurate email from Jim Niziolek.

9    Q.      And that email responded to

10   yours of the same date, which appears

11   immediately below it?

12   A.      Yes.  It was two hours after.

13   Q.      And if you turn the page, you'll

14   see an entry for April 30, 2013, which

15   refers to an apparent meeting between you

16   and Mr. Niziolek.

17             Did you meet with him at

18   Princeton on or about April 30th?

19   A.      Yes, we did have a meeting in

20   Princeton.

21   Q.      And was that on or about

22   April 30th?

23   A.      Yes, probably around that date.

24   Q.      And according to this entry, he

25   informed you that he looked into your

Page 203

```
 1                    WOOLF
 2  concerns and found nothing to support
 3  rescinding the performance warning.  Did
 4  he tell that you during that meeting?
 5       A.    He stated that to me.  If it
 6  occurred at that meeting, I'm not
 7  positive.  But he stated such to me.
 8       Q.    Did he also indicate to you at
 9  or about the time of that meeting that you
10  would need to achieve at least a "meets
11  expectation" rate to go apply for
12  positions internally?
13       A.    Yes.
14       Q.    Did he ask you during that
15  meeting to be open to feedback from your
16  managers?
17       A.    I'm sorry.  Can you repeat that?
18       Q.    Did he ask you to be open to
19  feedback from your managers?
20       A.    Yes.  He used the word
21  "feedback."  But I disagreed entirely with
22  that word.
23       Q.    Did he say that he would work
24  with your managers to help in any way that
25  he could to --
```

```
 1                    WOOLF
 2  proposing to allow us to buy.  And that's
 3  why I wrote that note.
 4      Q.    Let's actually back up for a
 5  moment.
 6           So prior to your receipt of this
 7  email, had you had a meeting or a call
 8  with Mr. Bowyer regarding the subjects
 9  covered in the email?
10      A.    No, not with Mr. Bowyer.  I, at
11  the time -- this is dated April 25th.  So
12  this may have been the first meeting or
13  the second meeting post the verbal
14  warning.  And I was now updating deals
15  that I was working on and making notes to
16  an email.
17      Q.    So you had meetings with
18  Mr. Bowyer following the issuance of the
19  verbal warning.
20      A.    Yes, as we had agreed to at that
21  meeting on March 20th that we would have
22  weekly meetings, because I wanted to be
23  removed from the not in good standing
24  list.
25      Q.    So, in fact, did you have weekly
```

Page 208

                              WOOLF
1
2   he, and Mr. Morris covered?
3        A.    I can't -- I don't remember if
4   Michael Morris was in that meeting.  I
5   would assume he was, given what happened
6   on March 20th and the fact that Bloomberg
7   probably wanted the witness in the room.
8   But this is something that I insisted on,
9   something in writing, which Bloomberg up
10  to that point never responded to my
11  concerns in writing.
12       Q.    So there you have it.  There's
13  the writing and you responded on
14  April 25th to Mr. Bowyer as follows:
15  "Thanks for the detailed explanations of
16  my job expectations.  This is immensely
17  helpful to me in meeting the desired
18  expectations of my role, which I fully
19  intend to do."
20       A.    Right.
21       Q.    Now, there's some more
22  handwriting in what I would call a grid in
23  the upper right-hand corner of this first
24  page of RW28.
25       A.    Right.

Page 210

1                    WOOLF
2        A.     -- followup.
3        Q.     Please let me finish.
4        A.     I'm sorry.
5        Q.     At the very top of the first
6   page of RW28 where your email appears,
7   there's a subject line for the email which
8   refers to "Meetings this week followup."
9   Right?
10       A.     Yes.
11       Q.     And, in fact, you had more than
12  one meeting with Mr. Bowyer and Mr. Morris
13  that week; correct?
14       A.     No.   That refers to my meetings
15  with clients.
16       Q.     Do you recall whether or not you
17  met with Mr. Morris and Mr. Bowyer on
18  April 23rd and April 25, 2013?
19       A.     Yes.   I believe that actually is
20  true, because I had insisted that
21  Bloomberg put on the record, on paper,
22  their response to my rebuttal.   And in the
23  discovery documents, Jim Niziolek said you
24  need to meet with Mr. Woolf and clarify
25  his concerns.

Page 211

```
 1                    WOOLF
 2       Q.     So --
 3       A.     So we met on April 23rd, and we
 4  covered three of the 16 topics I had on my
 5  agenda.  So we met again on the 25th,
 6  which, anyone, was -- something was put in
 7  writing perhaps for the first time after
 8  my verbal warning.  And I was, of course,
 9  grateful, because I hoped to get off the
10  "not in good standing" list so I could
11  leave the department.
12       Q.     So my question is as follows:
13  It's true, then, that you met with
14  Mr. Morris and Mr. Bowyer on April 23rd
15  and April 25th to go over the issues you
16  had raised in your rebuttal to the verbal
17  warning; correct?
18       A.     That was the intention.
19       Q.     And, in fact, you said at least
20  at the first meeting, three of the sixteen
21  issues that you raised were discussed; is
22  that right?
23       A.     That's correct.
24       Q.     And during the second meeting,
25  additional issues that you raised
```

Page 212

1                          WOOLF

2      were addressed; correct?

3          A.     Very few.

4          Q.     Some of those issues that you

5      raised were addressed; correct?

6          A.     Not all -- I -- I submitted and

7      it's in my rebuttal I believe 11

8      questions, seven observations, and eight

9      suggestions.  Maybe 25 percent was

10     addressed.  And I do recall the comment as

11     I was leaving the room on April 25th.

12     Andrew Bowyer said to me I guess we can

13     agree to disagree.

14               MR. GARLAND:  Let's mark as

15          Exhibit RW29 an exchange of emails

16          between the plaintiff and Ms. Strada

17          on April 26, 2013, with the

18          defendant's production number 297.

19               (Exhibit RW29, A series of

20          emails dated April 26, 2013, Bates

21          DEF000297, was hereby marked for

22          identification, as of this date.)

23          Q.     You have in front of you what's

24     been marked as Exhibit RW29.

25               Does that contain an exchange of

Page 213

```
 1                    WOOLF
 2   emails between you and Ms. Strada on
 3   April 26, 2013?
 4       A.    Yes, it does.
 5            MR. GARLAND:   Let's mark as
 6       Exhibit RW30 a series of emails from
 7       May of 2013 with the defendant's
 8       production numbers 288 through 290.
 9            (Exhibit RW30, A series of
10       emails, Bates DEF000288, was hereby
11       marked for identification, as of this
12       date.)
13       Q.    You have in front of you what's
14   been marked as Exhibit RW30.
15       A.    I do.   You also handed me RW29.
16   I don't think we discussed that.
17       Q.    Was RW29 the exchange of emails
18   with Strada?
19       A.    Yes.
20       Q.    So I think we had just done
21   that.   But for the sake of certainty, does
22   RW29 contain an exchange of emails between
23   you and Ms. Strada?
24       A.    It does.
25       Q.    Let's go to RW30 now.
```

Page 214

1                    WOOLF
2        A.      Okay.
3        Q.      I want to direct your attention
4    to the first page of Exhibit RW30.
5    Specifically about halfway down the page,
6    there appears to be an email from
7    Mr. Bowyer to you, CCed to Mr. Morris on
8    May 23, 2013.
9                 Is that, in fact, an email that
10   Mr. Bowyer sent to you on that date?
11       A.      Yes.  It looks like that email.
12   Yes.
13       Q.      And that's the email that starts
14   with the words as follows:  "Ron, I'm at a
15   loss why after numerous discussions we've
16   had you are still updating all these
17   people on IDC."
18                Do you see that?
19       A.      Yes, I do.
20       Q.      What does IDC stand for?
21       A.      I think it's international data
22   corporation.
23       Q.      And what's the significance of
24   that in the context of this email?
25       A.      IDC was a group -- was one of

Page 216

```
 1              WOOLF
 2  you.
 3         Do you recall whether or not he
 4  had had any discussions with you as to why
 5  you were still updating all of the people
 6  in IDC?
 7    A.    No.
 8    Q.    Are you saying they didn't
 9  happen or you just don't remember whether
10  it happened?
11    A.    No, it didn't happen.
12    Q.    So did you respond to
13  Mr. Bowyer's email of May 23rd?
14    A.    I think there was a meeting
15  between me and Andrew Bowyer and Gary
16  Kotovetz, because --
17    Q.    Specifically --
18    A.    -- there was confusion.
19    Q.    Specific with respect to the
20  subject of this May 23rd email?
21    A.    I believe so, yes.
22    Q.    So the three of you -- you,
23  Mr. Bowyer, Mr. Kotovetz -- attended the
24  meeting?
25    A.    Yes.
```

Page 218

1                    WOOLF

2      Q.    Who said what during that

3   meeting?

4      A.    Gary Kotovetz said to me that

5   things do not have to be set out to this

6   list of people that was established the

7   month before.

8      Q.    What else was said, if you

9   recall anything else, about this subject

10   at that meeting?

11      A.    Well, all I know is that it was

12   news to me.  So --

13      Q.    Whether or not it was news to

14   you, was anything else said?

15      A.    Just to not send out emails to

16   people that were above Gary -- essentially

17   above Gary Kotovetz.

18      Q.    Anything else that you recall

19   that was said during that meeting?

20      A.    No, nothing that I can think of.

21      Q.    All right.

22            MR. GARLAND:  Let's mark as

23      Exhibit RW31 an email from Mr. Bowyer

24      I believe to Mr. Woolf on

25      May 23, 2013, with the production

Page 219

```
 1              WOOLF

 2     numbers defendant's production number

 3     287.

 4          (Exhibit RW31, An email dated

 5     May 23, 2013, Bates DEF000287, was

 6     hereby marked for identification, as

 7     of this date.)

 8     Q.    You have in front of you what's

 9 been marked as Exhibit RW31.

10          Please take a look at it and let

11 me know if you recall receiving that

12 communication from Mr. Bowyer on or about

13 May 23, 2013.

14     A.    (Witness perusing document.)

15          I do recall receiving this

16 email.

17     Q.    Do you recall responding to the

18 email?

19     A.    (Witness perusing document.)

20          No.  I think this was probably

21 raised in a meeting after I got this

22 email.  I don't recall sending an email,

23 responding to this.  Normally, I did not

24 respond to emails like this.

25     Q.    All right.  So as you sit here
```

Page 220

```
1                    WOOLF
2   now, you're not aware of any response that
3   you --
4        A.    I'm not aware of any response.
5   I'm not saying it didn't happen, but I
6   don't recall.  It was March -- May 2013.
7        Q.    Okay.
8             MR. GARLAND:  So let's mark,
9        then, as Exhibit RW32 the 2013 interim
10       performance evaluation, plaintiff's
11       Exhibit 8 with the production numbers
12       21 through 24.
13            (Exhibit RW32, 2013 Interim
14       Performance Evaluation, Bates 000021,
15       was hereby marked for identification,
16       as of this date.)
17       Q.    You have in front of you what's
18   been marked as Exhibit RW32.
19            Please take a look at it and let
20   me know if you recall if that was your
21   2013 interim performance evaluation.
22       A.    (Witness perusing document.)
23            Yes.  It looks like the
24   evaluation I received.
25       Q.    Do you recall when you received
```

```
 1               WOOLF
 2  it?
 3      A.    I want to say June 6, 2013.
 4      Q.    Why do you say June 6th?
 5      A.    Or June 5th, only because on
 6  June 3rd, I had written an extensive
 7  weekly wrap, which showed -- I believe it
 8  was 21 paragraphs, which showed all the
 9  work that I was doing at Bloomberg and
10  submitted that prior to this evaluation
11  and also gave it to Aline Tedesco,
12  basically making this piece of paper, in
13  my view, look ridiculous.
14      Q.    So you thought your 2013 interim
15  performance evaluation was ridiculous?
16      A.    Has absolutely no merit.
17      Q.    And so how did you receive your
18  2013 interim performance evaluation?
19      A.    I was called into a conference
20  room.  Mike Morris and Andrew Bowyer were
21  sitting on the other side of the table.
22  Aline Tedesco was there to witness the
23  meeting.  And I was not privy to this
24  document until I walked into the room.  So
25  I had no expectation of what was going to
```

Page 224

1                    WOOLF
2        Q.    Did you respond verbally?
3        A.    I probably looked at it and just
4   said I have nothing.
5        Q.    Did you say anything else during
6   that meeting?
7        A.    No.  It was --
8        Q.    Did you say anything else during
9   the meeting?  Yes nor.
10       A.    I don't believe so.  I don't
11  believe so.  It was very short.
12       Q.    Did anyone else -- did anyone
13  else say anything additional in the
14  meeting?
15       A.    Aline Tedesco may have said
16  something about, like, "Ron this is your
17  interim performance review, and, you know,
18  you're still in the 'needs improvement'
19  area."
20       Q.    Was anything else said?
21       A.    I -- I can't recall exactly.  I
22  believe it was a very short meeting.
23       Q.    Did Ms. Tedesco say to you that
24  you should read the evaluation thoroughly?
25       A.    Well, they don't give you time

Page 236

```
 1                    WOOLF
 2    confident, that you can continue to go
 3    forward with the deposition and that the
 4    testimony that you're going to be giving
 5    it rueful and accurate?
 6         A.    Yes, I can.
 7         Q.    All right.
 8              MR. GARLAND:  Let's mark as
 9         Exhibit RW36 a typewritten rebuttal to
10         the 2013 interim performance
11         evaluation with the plaintiff's
12         production.  It says Exhibit 11 and
13         then pages 23 through 39.
14              (Exhibit RW36, A typewritten
15         rebuttal, Bates 000023, was hereby
16         marked for identification, as of this
17         date.)
18         Q.    So you have in front of you
19    what's been marked as Exhibit RW36.
20              Is that a document that you
21    prepared in rebuttal or in response to
22    your 2013 interim performance evaluation?
23         A.    Yes, it is.
24         Q.    When did you prepare it?
25         A.    Well, I submitted it on the
```

Page 237

1                    WOOLF
2  24th.  So a couple of days before.
3      Q.    So when you say you submitted
4  it, you submitted it on June 24, 2013?
5      A.    That is correct.
6      Q.    To whom did you submit it?
7      A.    It would have gone to Andrew
8  Bowyer, Mike Morris, and Aline Tedesco.
9      Q.    Did Mr. Bowyer and Mr. Morris
10 and Mr. Niziolek meet with you on or about
11 July 3, 2013, to address what you had
12 raised in your rebuttal with regard to
13 Exhibit RW36?
14     A.    Yes, I believe there was a
15 meeting in July following this submission.
16     Q.    On or about July 3rd?
17     A.    Yes.
18     Q.    Do you have any recollection as
19 to what was said during that meeting?
20     A.    I recall that Jim Niziolek said
21 that he could not find any -- any
22 inappropriate behavior or false
23 statements, and there was conversation
24 about performance.  I don't recall
25 exactly.  But it was to address some of my

Page 238

1                          WOOLF
2    concerns about what was in my 2012 interim
3    evaluation.
4          Q.      2013?
5          A.      2013 evaluation.
6          Q.      Is there anything specifically
7    that you recall saying during that
8    meeting?
9          A.      Well, I would identify it in
10   this document.  So I can't recall exactly.
11   I would have to look at the document
12   specifically.  But the one obvious thing
13   that I know I would have raised is that my
14   performance, productivity, individual
15   performance scores, decisionmaking, value
16   added impact were all ascending during my
17   first 20 months at Bloomberg -- every
18   single metric.  And then all of a sudden,
19   they dropped to almost the lowest level
20   they can possibly grade you at.
21         Q.      And when you say they dropped,
22   you're talking about starting at the end
23   of January 2013 or is it '12?  Let me see.
24   I want to make sure I get the right date
25   for the networking event.  That was

Page 239

                    WOOLF

 1
 2   something we discussed this morning.

 3        A.      That was January 2013.

 4        Q.      So anyway, you always associated

 5   the descending performance appraisals or

 6   review and feedback to be starting around

 7   the time of your attending the networking

 8   event; correct?

 9        A.      Correct.

10        Q.      All right.  Now, at the

11   conclusion of the July 3, 2013, meeting

12   that you had with Mr. Bowyer, Mr. Morris,

13   and Mr. Niziolek, did Mr. Niziolek tell

14   you that your work performance was still

15   not meeting expectations?

16        A.      I believe that was communicated.

17        Q.      And did he also tell you that if

18   you did not improve, you could receive a

19   written warning?

20        A.      I believe that was communicated.

21             MR. GARLAND:  Let's mark as

22        Exhibit RW37 a written warning,

23        performance warning dated

24        September 19, 2013, with defendant's

25        production numbers 250 through 53.

Page 240

1              WOOLF
2         (Exhibit RW37, A performance
3      warning dated September 19, 2013,
4      Bates DEF000250, was hereby marked for
5      identification, as of this date.)
6         Q.    You have in front of you what's
7    been marked as Exhibit RW37.
8              Is that a written performance
9    warning that you received on or about
10   September 19, 2013?
11        A.    Yes, it is.
12        Q.    Did you prepare a written
13   rebuttal to it?
14        A.    I did.
15        Q.    Did you submit it?
16        A.    I did.
17        Q.    To whom did you submit it?
18        A.    I believe I submitted it to Jim
19   Niziolek, Andrew Bowyer, and Michael
20   Morris.
21        Q.    Let's go back for a minute.
22              How did you receive the written
23   warning?
24        A.    I was called into a conference
25   room.  Jim Niziolek was on video out of

Page 243

1                    WOOLF
2    data, which was similar but maybe not as
3    comprehensive.
4        Q.    And so as part of your job
5    function, you were tasked with trying to
6    get an agreement in place with Rentrak?
7        A.    That is correct.
8        Q.    And that agreement would acquire
9    data for Bloomberg.
10        A.    For Bloomberg, yes.
11        Q.    And in the process of doing
12    that, and by that I mean you negotiated
13    with Rentrak.
14        A.    Absolutely.
15        Q.    And in negotiating with Rentrak,
16    did you make certain concessions to
17    Rentrak as part of the negotiating
18    process?
19        A.    I first understand -- try to
20    understand what's -- what does the other
21    party value.  And then I try to tailor
22    something that Bloomberg can do, which
23    won't cost a lot of money and bring the
24    value that they're asking for to our
25    budget.

Page 244

                              WOOLF

1        Q.     So did you make certain
2    concessions then to try to get a deal
3    done?
4        A.     I made certain concessions or
5    actually me and Paul Sweeney made certain
6    comments to Rentrak about what we could do
7    so that they would sign up for a year.
8        Q.     Did anyone at Bloomberg make any
9    comments critical of the concessions that
10   you provided to Rentrak?
11       A.     Well, obviously, this email
12   states that, you know, this is something
13   that is unprecedented when, in fact, I
14   think there are five, if I read this
15   correctly, five concessions that they call
16   concessions but really value added
17   negotiating -- negotiated items that
18   brought the value of the deal down from
19   1.75 million to 100,000.  And these
20   quote/unquote concessions were something
21   that we had done in the past.
22       Q.     Did anyone criticize you for
23   anything you did in that negotiation with
24   Rentrak?
25

Page 245

1                    WOOLF
2      A.    Well, obviously, they did,
3   because it's in this email, which I had
4   not seen until discovery.
5      Q.    So prior to discovery, had
6   anyone at Bloomberg mentioned to you any
7   level of dissatisfaction or discomfort or
8   unhappiness?
9      A.    Yes.  I think there was -- there
10  was always -- always concerns about not
11  having long term deals.  But I couldn't
12  force a counterparty to do a five-year
13  deal if they wanted to do a one-year deal.
14     Q.    So who made any comments
15  critical of anything that you concede or
16  gave away during the Rentrak negotiation?
17     A.    Well, I wouldn't say conceded or
18  give away.  I got something in return.
19     Q.    What were the criticisms that
20  you heard?
21     A.    Essentially the one year deal is
22  a criticism.  Putting people on
23  television, offering them press
24  attribution, something that was done and
25  actually acknowledged by Andrew Bowyer and

Page 246

                    WOOLF

1    Eric Hernandez and approved throughout

2    2013 and 2012.

3       Q.    So who was it that let you know

4    that there was some level of

5    dissatisfaction with what you had

6    negotiated with Rentrak?

7       A.    I believe it was Eric Hernandez

8    about a one-year deal.

9       Q.    Anyone else made comments to you

10   critical of anything related to your

11   performance with the Rentrak deal?

12      A.    My conversation would have taken

13   place with Eric Hernandez and also the

14   contracts team.  It wasn't -- it was a

15   conversation with the contracts team,

16   because I knew what the client --

17   potential client could do.

18      Q.    But my question to you was did

19   anyone else make any comments critical of

20   any anything that you did in the

21   negotiations with Rentrak?

22      A.    I would -- I can only recall the

23   conversation with Eric Hernandez.

24      Q.    So when Laura Brown became your

```
1                    WOOLF
2    team leader, did she articulate, express,
3    talk to you about any concerns that she
4    had with your performance?
5        A.    No.  In fact, my first
6    conversation with Laura Brown occurred via
7    telephone when we learned that Andrew
8    Bowyer was no longer our TL.  And I had to
9    explain to her what my job was, because
10   she had no idea what I did.
11       Q.    At any point in time, did she
12   ever make any comments to you critical of
13   your work performance?
14       A.    No.  She did not make
15   comments --
16       Q.    What did she --
17       A.    -- my performance.
18       Q.    Well, what did she do it
19   indicate any level of dissatisfaction with
20   your performance?
21       A.    It wasn't indication
22   dissatisfaction.  She was following the
23   Andrew Bowyer practice of putting things
24   down in writing as to expectations that
25   some of those expectations had to be done
```

Page 248

```
 1              WOOLF
 2  by a certain date, et cetera, and then we
 3  would discuss it at a meeting.
 4      Q.   So she would have one-on-1
 5  meetings with you.
 6      A.   I believe we had three in total.
 7      Q.   And during those meetings, she
 8  would set out expectations that she had
 9  for you in terms of the work that you
10  needed to get done.
11      A.   Usually, or it was post-meeting
12  in an email.
13      Q.   And those expectations including
14  making progress on certain commercial
15  deals; correct?
16      A.   Commercial deals and what we
17  call web letter deals.
18      Q.   Right.  So she also expressed to
19  you that you needed to make progress on
20  web letters that had been assigned to you;
21  correct?
22      A.   That's correct.  Yes.
23      Q.   And what -- just very briefly --
24  what is a web letter?
25      A.   So essentially, it's acquiring
```

Page 249

```
 1                    WOOLF
 2    data through barter, not paying money, but
 3    offering them a page on the terminal.
 4         Q.    And was there something referred
 5    to as the DRQS, all caps?
 6         A.    Yes.
 7         Q.    Queue, Q-U-E-U-E?  What was
 8    that?
 9         A.    Q-U --
10         Q.    The Queue.  The DRQS Queue.
11         A.    Oh.  The DRQS was a way to
12    document major things that happened while
13    you were negotiating the deal or something
14    from contracts or someone from contracts
15    wanted to add something.  Basic anyone
16    that opened a DRQS would be up to date on
17    that deal.
18         Q.    Did she express in one way or
19    another to you that she wanted you to push
20    negotiations forward with web letters that
21    may have been stagnant in that queue?
22         A.    Yes.  In November, I was given,
23    I believe, 17 additional web letters to
24    work on, because they had been failed
25    attempts by my colleague, Vlad Golden.
```

Page 250

1                    WOOLF

2      Q.      Did Ms. Brown ever speak with

3   you to inform you about the observations

4   she had made comparing your productivity

5   to the productivity of any of your peers?

6      A.      No.

7      Q.      Do you know whether she had

8   formed such assessments?

9      A.      I had no idea.  I thought our

10  relationship was good, and I performed

11  what was asked of me.

12     Q.      Do you remember that on

13  December 11, 2013, she met with you and

14  told you that you needed to make immediate

15  progress on commercial deals?

16     A.      There was a December 11th

17  meeting.  I read that in the discovery

18  documents.  It was written before the

19  meeting happened.

20     Q.      Do you recall that there was a

21  meeting on December 11th during which she

22  told you that you needed to make immediate

23  progress on commercial deals?

24     A.      I remember a meeting where I

25  informed her of the status of where

```
1                    WOOLF
2  commercial deals were and then I submitted
3  an update to her explaining every deal,
4  where it was, and my recommendations for
5  each deal in which she agreed ten percent
6  with me.
7       Q.    Do you remember whether or not
8  during the December 11, 2013 meeting she
9  told you that you needed to make immediate
10 progress on commercial deals?
11      A.    I think -- no, because we had no
12 budget.
13      Q.    Are you saying she didn't say --
14      A.    She --
15      Q.    -- that, or you just don't
16 remember at this point, some nearly four
17 years later, whether or not she said it?
18      A.    Well, I do recall that, in
19 November 2013, the BI budget was 0.
20      Q.    Regardless of what the budget
21 was my question to you is, as you sit here
22 now, some nearly four years after that
23 December 11, 2013, meeting, do you recall
24 whether or not she said that you needed to
25 make progress on commercial deals?
```

Page 252

1                    WOOLF

2        A.    No.  I do not.

3        Q.    Do you remember whether or not

4   you met with her again on

5   December 18, 2013?

6        A.    There were three meetings.  So

7   the 18th of December probably would have

8   been the last meeting between us.

9        Q.    Do you remember whether or not

10  during that meeting she told you that you

11  would be assigned additional work only

12  after you completed and maintained the

13  assignments that had already been given to

14  you?

15       A.    No.  I recall that she agreed

16  with all my recommendations going forward

17  and that essentially we were wrapping up

18  the year, because not much could be done.

19       Q.    Are you denying under oath that

20  she said to you during that December 18th

21  that you would only be assigned additional

22  work after you completed what had already

23  been given to you?

24       A.    I had completely it, so I deny

25  it.  I do not recall her saying that

Page 254

1                    WOOLF
2       Q.    So did you speak to Ms. Brown at
3    all about the termination of your
4    employment?
5       A.    Ms. Brown?
6       Q.    Ms. Brown.   Laura Brown.
7       A.    About my termination?
8       Q.    Yes.
9       A.    She was in the conference room.
10   And I said to her before departing that --
11   I said, "Laura, good working with you.
12   There's nothing between us."
13      Q.    So you're referring to the
14   termination meeting?
15      A.    Yes.
16      Q.    Outside of the termination
17   meeting, did you speak with her at all
18   about the termination of your employment?
19      A.    No, never.
20      Q.    So at the termination meeting
21   itself, who was present?
22      A.    Mike Morris, Laura Brown,
23   representative from HR, who I did not
24   know, and do not recall the name, and Jim
25   Niziolek via video.

Page 255

1                    WOOLF

2       Q.    So I want to go through the

3    meeting -- you probably know this well

4    enough by now, knowing who said what.

5    So --

6       A.    I can -- I know exactly what

7    happened at that meeting.

8       Q.    So take me from the beginning of

9    the meeting.  Tell me who said what.

10      A.    Okay.  So I was called into a

11   conference room.  Obviously, when I saw an

12   HR person, I knew what was happening.  I

13   sat down.  There were envelopes in front

14   of me.  And Jim Niziolek was appearing to

15   my left on video screen.  And he said to

16   me, "Ron, today is your last day at

17   Bloomberg."  And I remember my exact

18   comment to him.  I said, "Bold call.  Bold

19   call."  Then I turned to HR.  She puts

20   across the severance agreement to me, and

21   she explained what they were offering.

22   And, basically, I said "not interested."

23      Q.    What else was said, if anything,

24   during the meeting?

25      A.    Mike Morris asked me what I left

Page 257

1                    WOOLF
2      A.    No.  I was going out the door.
3      Q.    I just want to mark some other
4   documents briefly so we have them as part
5   of the deposition record.
6              MR. GARLAND:  Let's mark as
7         Exhibit RW39 the August 15, 2013,
8         Bloomberg Global Resource and
9         Information Core Guide.
10             (Exhibit RW39, Bloomberg Global
11        Resource and Information Core Guide,
12        Bates DEF000979, was hereby marked for
13        identification, as of this date.)
14     Q.    You have in front of you what's
15  been marked as Exhibit RW39.  As it
16  indicates on the cover, it's the Bloomberg
17  Global Resource and Information Core Guide
18  with a date of August 15, 2013, which is a
19  separate document from the one that you
20  acknowledged receiving when you joined.
21     A.    Right.
22     Q.    So my question to you is do you
23  recall whether or not you have seen this
24  version of the global resource and
25  information core guide?

Page 258

```
 1                      WOOLF
 2      A.    I believe we were notified that
 3  it was on the terminal.  I -- I don't
 4  recall reading it.
 5      Q.    How were you notified that it
 6  was on the terminal?
 7      A.    I think via email.
 8      Q.    From human resources?
 9      A.    Probably from HR.
10      Q.    And we might have referred to
11  the terminal at some point earlier in the
12  deposition, but I don't think we defined
13  what is meant by that in the Bloomberg
14  context.
15            So what does terminal mean?
16      A.    So terminal is basically --
17  think of it as a monitor that has access
18  to all the pages of data and information
19  that Bloomberg produces.  And there's over
20  30,000 functions on that terminal through
21  your keyboard.
22      Q.    So you as an employee of
23  Bloomberg had access to the terminal and
24  in particular or specifically access to
25  the global resource and information core
```

Page 260

1                    WOOLF

2     Q.     And you would have had access to

3    it --

4     A.     I would have had access to it,

5    yes.

6     Q.     All right.

7          MR. GARLAND:   Let's mark as

8      Exhibit RW41 an email from Mr. Woolf

9      to Mr. Morris dated April 12, 2013.

10     And it has the production numbers

11     defendant's production numbers 304

12     through 305.

13          (Exhibit RW41, An email dated

14     April 12, 2013, Bates DEF000304, was

15     hereby marked for identification, as

16     of this date.)

17     Q.     You have in front of you what

18    we've marked as Exhibit RW41.  I want to

19    direct your attention to the email that

20    starts at the bottom of the first page.

21          Is that an email that you sent

22    to Mr. Morris copying Mr. Bowyer on

23    April 12, 2013?

24     A.     Yes, it is an email I sent on

25    April 12th.

Page 261

1                    WOOLF
2       Q.      And in that email, you advise
3   them that you were suffering from a severe
4   migraine, which happens very infrequently.
5       A.      Right.   The severity was
6   obviously the infrequent part.   But my
7   migraines were becoming not simple
8   migraines -- from simple migraines to
9   complex migraines with neurological
10  deficits.   That's what I have today.
11      Q.      And you associated the stress
12  that you were under with the stress you
13  perceived you were under in the Bloomberg
14  workplace with the severity of your
15  migraines; correct?
16      A.      Well, actually, it was my
17  neurologist who assessed that.
18      Q.      So you, then, based upon what
19  your neurologist is saying, connect the
20  migraines, the severity of the migraines
21  to the stress that you say you experienced
22  in the Bloomberg workplace; correct?
23      A.      Yes.
24      Q.      All right.
25              MR. GARLAND:   Let's mark, then,

Page 262

```
 1              WOOLF
 2     as Exhibit RW42 some email
 3     communications involving the plaintiff
 4     from May of 2013 with the defendant's
 5     products numbers 285 through 286.
 6              (Exhibit RW42, A series of
 7     emails, Bates DEF000285, was hereby
 8     marked for identification, as of this
 9     date.)
10     Q.     You have in front of you what's
11 been marked as Exhibit RW42.
12     A.     Yes.
13     Q.     The first email on the top of
14 the first page is one that you sent to Jim
15 Niziolek and CCed Aline Tedesco on
16 May 28, 2013?
17     A.     Yes.
18     Q.     And the subject of that email
19 was to inform you that you've been -- that
20 you had been suffering from regular and
21 sometimes very serious migraines and
22 headaches now for over two months;
23 correct?
24     A.     That's correct.  Yes.
25              MR. GARLAND:  Let's mark as
```

Page 263

1                      WOOLF

2        Exhibit RW43 a letter from Michael

3        Hutchinson, M.D., dated May 29, 2013,

4        with the production numbers -- the

5        Woolf production numbers 76 and 77.

6                (Exhibit RW43, A letter dated

7        May 29, 2013, Bates WOOLF000076, was

8        hereby marked for identification, as

9        of this date.)

10       Q.    You have in front of you what's

11   been marked as Exhibit RW43.

12                Is that a copy of a letter that

13   you obtained from Dr. Michael Hutchinson?

14       A.    Yes, it is.

15       Q.    To whom did you provide that

16   letter --

17       A.    I believe I sent it to Jim

18   Niziolek, to the head of professional

19   development, Melinda Woolf, and --

20       Q.    To whom?

21       A.    Melinda Woolf, head of

22   professional development.  She was fired

23   during my tenure there.  But -- or she

24   left.  I don't know what happened to her.

25   I believe I sent it to -- to the senior

1             WOOLF
2  executives and Jim Niziolek.
3       Q.    And when you say the senior
4  executives -- I mean, you provided this --
5  let's be clear.
6             You provided the letter --
7  Dr. Hutchinson's letter to human
8  resources; correct?
9       A.    Yes, I did.
10      Q.    And how long have you been
11 treating with Mr. Hutchinson?
12      A.    Since about the year 2000.
13      Q.    And when you first went to him,
14 what was the medical reason that you went
15 to see him?
16      A.    I was having tension headaches,
17 sometimes migraines, but mostly tension
18 headaches.
19      Q.    Did he treat you for any other
20 condition at any point in time other than
21 headaches?
22      A.    No.  Oh, No. Actually, he did
23 treat me for -- actually, he didn't treat
24 me.  There was concern about maybe there
25 being a brain abnormality.  He checked it

Page 266

                              WOOLF

1   without putting my life in jeopardy.

3       Q.    So did you -- tell me how did

4   you communicate with Mr. Niziolek?  Was it

5   in person?  Was it on the phone?

6       A.    I believe there was a meeting

7   that followed this letter.

8       Q.    Who attended that meeting?

9       A.    I believe it was only me and Jim

10  Niziolek.  I think, in Document RW42, "Jim

11  spoke with Ron Woolf on 5/31 for about 45

12  minutes."

13      Q.    Okay.  So, in fact, the two of

14  you spoke for about 45 minutes on

15  May 31st.

16      A.    Yes.

17      Q.    And when you spoke, it was

18  actually Mr. Niziolek who reached out to

19  you after he received the letter from

20  Dr. Hutchinson; correct?

21      A.    I don't know if I sent him -- I

22  believe I notified him that I was going to

23  be applying for FMLA.

24      Q.    Well, did he tell you that you

25  could take a medical leave if you needed

Page 267

```
 1              WOOLF
 2  one?
 3      A.    I don't recall him saying that I
 4  could take a medical leave.  I think I
 5  researched it on my own and decided to
 6  apply and I needed medical documentation
 7  from Dr. Hutchinson.  I got that, and it
 8  was approved.
 9      Q.    Well, initially, with this
10  May 31st meeting, did Mr. Niziolek tell
11  you that could you take a medical leave if
12  you needed one?
13      A.    I believe so.
14      Q.    Did you tell him during that May
15  31st meeting that a leave at that time was
16  not necessary?
17      A.    No.  I don't believe so.  I
18  mean, I -- it just -- the letter -- the
19  May 29th letter is pretty serious.  It
20  speaks for itself.
21      Q.    Well, whether or not it speaks
22  for itself, as you sit here now, do you
23  have a recollection of a conversation that
24  took place more than four years ago where
25  you specifically said to Mr. Niziolek that
```

Page 269

```
 1              WOOLF
 2  again.  We're focused on May 31st.  Let's
 3  try it this way.
 4              During that meeting, did you
 5  tell Mr. Niziolek that you were looking to
 6  change your work environment that you
 7  wanted to do the same job but just with
 8  different managers, not with Bowyer and
 9  Morris?
10      A.    I believe that conversation came
11  up, because, obviously, it was recommended
12  by my neurologist that I needed to change
13  my work environment and, as I noted two
14  months prior, that I was under extreme
15  stress and suffering headaches daily, and
16  now my complex migraines could cause
17  death.
18      Q.    So -- and when you referred to
19  two minutes earlier, you're referring to
20  your note to --
21      A.    -- Melissa Strada.  Yes.
22      Q.    All right.  So then at the
23  May 31st meeting, you said to Mr. Niziolek
24  what you wanted was to be able to do the
25  same job but with different managers;
```

1                    WOOLF

2     correct?

3          A.     Essentially.   Essentially, yes.

4          Q.     Did Mr. Niziolek tell you that

5     he was sympathetic to your medical

6     problems during that meeting?

7          A.     He may have said it.   But

8     actions speak louder than words.   So I

9     didn't believe it.

10         Q.     Well, again, I'm not interested

11    at this point in your beliefs.   I'm

12    interested in what was said.

13                So let me ask it again.

14                At that May 31st meeting, do you

15    recall whether or not Mr. Niziolek said

16    that he was sympathetic to your medical

17    problems?

18         A.     He may have said it.

19         Q.     Do you remember whether or not,

20    during that May 31st meeting, he said

21    words to the effect that his investigation

22    did not reveal that your managers had been

23    harassing you in any way?

24         A.     Yes.   He did say that.

25         Q.     Now, did you speak again with

Page 272

```
 1                    WOOLF
 2    to go on record for almost everything that
 3    had happened, that he put something in
 4    writing, and the next day, I received a
 5    letter from him.  The document that you
 6    gave me --
 7         Q.    Let me mark an exhibit, because
 8    maybe that will help us with the dates.
 9              MR. GARLAND:  So let's mark as
10         Exhibit RW44 a June 4th letter from
11         Mr. Niziolek to Mr. Woolf with the
12         Woolf production number Exhibit 12,
13         page 27.
14              (Exhibit RW44, A letter dated
15         June 4, 2013, Bates WOOLF000027, was
16         hereby marked for identification, as
17         of this date.)
18         Q.    So you have in front of you
19    what's been marked as Exhibit RW44.
20              Is that a letter that you
21    received from Mr. Niziolek dated
22    June 4, 2013?
23         A.    It is.
24         Q.    And would the June 4th date
25    suggest to you that you met had with him
```

Page 273

```
 1                    WOOLF
 2   prior to June 4th?
 3        A.    No.   I remember being -- I
 4   remember this conversation quite well.
 5        Q.    So which conversation?
 6        A.    It was June 3rd.  It was a phone
 7   conversation with Jim.  I believe he was
 8   in Princeton.
 9        Q.    All right.  So let's go through
10   that conversation.
11              What did you say to him and what
12   did he say to you?
13        A.    I said that -- or I asked for
14   what do I need to do to get a reasonable
15   accommodation for this severe neurological
16   problem.  And he said that he would be in
17   touch, and I said I need it in writing.
18   And he then produced this letter and sent
19   it to me.
20        Q.    Okay.  But before we get to this
21   letter, we're just talking about the
22   conversation that you had on June 3rd.
23              Is there anything else that he
24   said to you or you said to him?
25        A.    I believe that we discussed that
```

Page 274

```
 1              WOOLF
 2  I should probably be looking for positions
 3  within Bloomberg but that he could make no
 4  guarantees.  And essentially, I said,
 5  "Please put it in writing, what you need,
 6  so that I can do what you -- what you need
 7  to make something happen."
 8      Q.    Is there anything else aside
 9  from what you've already told us that was
10  said during that conversation on June 3rd?
11      A.    That I needed -- I needed an
12  accommodation.
13      Q.    Anything else that was said?
14      A.    No.  It was very
15  confrontational.  That's all I remember.
16      Q.    All right.  So, then, following
17  that conversation, you received this
18  June 4th letter that we've marked as
19  Exhibit RW44?
20      A.    Yes.
21      Q.    And, again, there's some
22  handwriting at the top, Exhibit 10.
23            Is that your handwriting
24  reflecting an exhibit that you provided to
25  the opportunities in Asia EC --
```

Page 278

1                    WOOLF

2    NY."

3             What does that mean?

4        A.    That probably refers to how many

5    positions were in New York that I could

6    possibly transfer to.

7        Q.    But what does the "X" signify?

8        A.    A number.  X positions.  Without

9    the "S."  I didn't write the "S."

10       Q.    And -- what's that?

11       A.    I didn't write the "S."  But

12   number of positions in New York.  I --

13   that's how I read that.

14       Q.    Well, were you looking for a

15   position in New York on June 4, 2013?

16       A.    Well, I was looking for an

17   accommodation that would get me out of the

18   situation that was making me sick every

19   day.

20       Q.    So you were looking for an

21   accommodation, in your words, that would

22   take you from working for Mr. Bowyer and

23   Mr. Morris to working for somebody else;

24   correct?

25       A.    Yes.  I wanted to reduce the

Page 279

1                     WOOLF

2      stress, as recommended by my neurologist.

3          Q.    And then the last comment on

4      Exhibit RW44, which says "Comments to your

5      evaluation," what does that refer to?

6          A.    I don't know why that's written.

7              MR. GARLAND:  Let's mark the

8          next exhibit.  So this will be RW45.

9          And this is a letter from the

10         plaintiff to Mr. Niziolek with the

11         Woolf production numbers 93 through

12         97.

13             (Exhibit RW45, A letter, Bates

14         WOOLF000093, was hereby marked for

15         identification, as of this date.)

16         Q.    You have in front of you what's

17     been marked as Exhibit RW45.

18         A.    Yes.

19         Q.    Is that your written response to

20     the June 4th letter that we had marked as

21     RW44?

22         A.    Yes, it is.

23         Q.    And you submitted or sent that

24     letter to Mr. Niziolek on June 5, 2013.

25         A.    That is correct.

Page 281

```
 1                    WOOLF
 2      A.     Which would have been a
 3  reasonable accommodation.
 4      Q.     But you told him that you wanted
 5  to transfer; correct?
 6      A.     I told him that I wanted to be
 7  placed in a situation where my work was
 8  appreciated and I was not being subjected
 9  to manufactured stress.
10      Q.     And that would necessarily
11  involve in your mind a transfer; correct?
12      A.     It would.
13      Q.     And he asked you what specific
14  role you wanted to transfer to; correct?
15      A.     Yes.  And I responded.
16      Q.     Well, he also mentioned to you,
17  though, did he not, that the termination
18  would have to be made whether you were
19  qualified for the other position; correct?
20      A.     He stated that, and then he also
21  stated that there was an employment
22  committee, which I had never heard of, but
23  that they had to review my request.
24      Q.     Did he also say to you, or,
25  rather did you say to him -- did you say
```

Page 282

```
 1              WOOLF
 2  to him that you would look for open
 3  positions that you believe you were
 4  qualified for a transfer to?
 5      A.    Actually, I provided him with a
 6  specific suggestion.
 7      Q.    Ultimately, you did.  But
 8  initially, you said that you would
 9  research that and bet get back to him;
10  correct?
11      A.    Right, but I offered the
12  immediate solution.
13      Q.    And --
14      A.    And that was working for BI
15  under BI managers, because 95 percent of
16  my job was supporting BI, not data
17  acquisitions.
18      Q.    And did you initially suggest
19  that you would do that from Asia?
20      A.    No.  I suggested it in New York.
21      Q.    And do you have anything in
22  writing to confirm that?
23      A.    It was a conversation that we
24  had.  But it would have meant me moving
25  back three rows on my floor.
```

Page 283

1                      WOOLF

2        Q.     What do you mean by that?

3        A.     To accommodate me would have

4   taken a move from the fifth row to the

5   eighth row on my floor and to put me under

6   the management of BI, which, essentially,

7   they were my managers, because I worked

8   for that group.  Mike Morris, Andrew

9   Bowyer, Laura Brown did not understand my

10  job.  BI analysts and managers understood

11  my job.

12       Q.     And so moving you, however many

13  rows that was, would have also required

14  you to be reporting to different

15  supervisors; correct?

16       A.     Yes, it would have.

17       Q.     Now let's take a look at another

18  exhibit we're about to mark, which is

19  RW46.

20            MR. GARLAND:  And it is an

21       exchange of emails between Mr. Woolf

22       and Mr. Niziolek in June of 2013.

23

24

25

1            WOOLF
2        (Exhibit RW46, A series of
3    emails, Bates DEF000283, was hereby
4    marked for identification, as of this
5    date.)
6        Q.    You have in front of you Exhibit
7    RW46, which contains an exchange of emails
8    involving you.  I want to direct your
9    attention to the second page of this
10   exhibit, specifically where it says "Jim's
11   response" or "Jim responds 6:13:13."
12   There's a communication that follows.  It
13   starts with the words "Hello, Ron.  Good
14   to hear that you have submitted
15   documentation to validate your leave."
16            Is that a communication that you
17   received from Mr. Niziolek on
18   June 13, 2013?
19       A.    I believe so.  Yes.
20       Q.    And he was responding to your
21   email that starts on the prior page also
22   on June 13th at 10:58 a.m.
23       A.    Right.  Around that time, there
24   was -- well, so the comments to you --
25   just to clarify, No. 3 on document RW44,

Page 287

1                    WOOLF
2           (Exhibit RW47, A series of
3       emails, Bates WOOLF000025, was hereby
4       marked for identification, as of this
5       date.)
6       Q.    So you have in front of you
7   what's been marked as Exhibit RW47.
8           Does it contain an exchange of
9   emails that you had with Mr. Niziolek in
10  June 2013, specifically June 17th?
11      A.    Yes, it does.
12      Q.    Now, the first email
13  chronologically is one that you sent to
14  him at 9:26 a.m., which appears about
15  halfway down the page?
16      A.    Yes.
17      Q.    Then he responded to your email
18  about five minutes later?
19      A.    Yes.
20      Q.    And in his email to you, he
21  wrote that your email to him was very
22  concerning.  "Very concerning to me as I
23  don't believe you understood our last
24  conversation based on what you have
25  written."

Page 288

1                    WOOLF

2            Correct?

3      A.     That's what he wrote.

4      Q.     Then you and he had a phone call

5  later that day?

6      A.     Apparently, Jim said he would

7  call me at 9:45.

8      Q.     Well, actually, you wrote to

9  him, did you not, that you would call him?

10     A.     Oh, I see.  I would call him at

11  9:45.

12     Q.     So did you call him at 9:45?

13     A.     If I -- I probably called him at

14  9:45 if I said I was going to call him I

15  would have called him.

16     Q.     Did you speak with him?

17     A.     He responded, "Thank you," so

18  there was a conversation.

19     Q.     Do you actually recall having

20  that conversation on June 17th?

21     A.     Well, I was -- I remember

22  getting this and what was so frustrating

23  to me --

24     Q.     Question:  Do you recall whether

25  or not you had a conversation on June 17th

```
 1                    WOOLF
 2    with Mr. Niziolek?
 3        A.      Yes, I do.
 4        Q.      Do you recall what was said?
 5        A.      Yes.  Conversations about a
 6    reasonable accommodation.
 7        Q.      Well, what did you say to him
 8    and what did he say to you?
 9        A.      We discussed what I needed to do
10    to obtain a reasonable accommodation.  And
11    he was apparently concerned --
12        Q.      Don't get into apparently.
13                What did he -- my question --
14    remember --
15        A.      Well --
16        Q.      Please, please.  The question is
17    a simple one.  I know it may not be easy
18    to answer, but I'm trying to make it a
19    simple question.
20                I simply want to know what
21    Mr. Niziolek said to you and you said to
22    him during that June 17th conversation.
23        A.      He spoke about the number of
24    positions that I submitted and said
25    that -- that this was unreasonable.  And I
```

Page 291

1                    WOOLF
2   can recall.
3       Q.    Did he during that conversation
4   tell you that transferring to another
5   position was not automatic?
6       A.    Yes, I think so.
7       Q.    Did he tell you during that
8   conversation that the transfer to another
9   position would be discussed, though, as
10  part of the back and forth with you?
11      A.    He said it would be reviewed by
12  an employment committee.
13              MR. GARLAND:  Let's mark as
14      Exhibit RW48 a memo from Mr. Woolf to
15      Mr. Niziolek with the Woolf production
16      numbers 21 through 22.
17              (Exhibit RW48, A letter dated
18      June 24, 2013, Bates WOOLF000021, was
19      hereby marked for identification, as
20      of this date.)
21      Q.    You have in front of you what's
22  been marked as Exhibit RW48.
23              Is that a letter that you sent
24  to Mr. Niziolek?
25      A.    It is.

Page 292

1              WOOLF

2      Q.    And you sent that to him on

3   June 24, 2013.

4      A.    Yes.

5      Q.    And in that letter, the two

6   positions you suggested transferring to,

7   one was in Singapore and the other was in

8   Hong Kong?

9      A.    I believe so.  One -- it's --

10  yes.  That's true.

11     Q.    And those were the only two

12  positions you suggested as a transfer in

13  your June 24th letter to Mr. Niziolek;

14  correct?

15     A.    Yes.

16           MR. GARLAND:  Let's mark as

17     Exhibit RW49 a letter from

18     Dr. Hutchinson dated July 15, 2013,

19     with the plaintiff production number

20     Exhibit 4, page 22.

21           (Exhibit RW49, A letter dated

22     July 15, 2013, Bates WOOLF000022, was

23     hereby marked for identification, as

24     of this date.)

25     Q.    You have in front of you what's

Page 293

1                        WOOLF

2    been marked as Exhibit RW49.

3              Is that a copy of a letter that

4    you obtained from Mr. Hutchinson on or

5    about July 15, 2013?

6         A.    Yes, it is.

7         Q.    You then sent that letter to

8    Mr. Niziolek?

9         A.    And others, yes.

10        Q.    And you've sent that to

11   Mr. Niziolek and others on July 16th?

12        A.    Either the 15th or 16th.

13        Q.    In response to that letter, did

14   you meet with Mr. Niziolek on or about

15   July 19th?

16        A.    I did.

17        Q.    Where did that meeting take

18   place?

19        A.    I was in a conference room in

20   New York, and he was on a video from

21   Princeton.

22        Q.    Do you recall that, during that

23   call, Mr. Niziolek reminded you that even

24   if you transferred to a position in Asia,

25   your managers would still provide you with

Page 294

1                    WOOLF
2    feedback about your job performance?
3         A.    Yes.   I remember the
4    conversation, and I took notes about that
5    conversation.
6         Q.    And where are those notes now?
7         A.    I believe they're in my files.
8         Q.    Have you provided those notes to
9    your counsel?
10        A.    I don't -- I don't know.  I
11   don't -- I'm not sure.
12        Q.    So I'm going to ask you to go
13   find those notes and get them to your
14   counsel so they can be provided to us.
15   Understood?
16        A.    Understood.
17        Q.    And when you say your files,
18   they're in your files -- or you said "my
19   files," what do you mean by your files?
20        A.    I have -- I have a number of
21   documents, some that are relevant to this
22   case, some that are not.  But, remember, I
23   put together a 52-page report for the EEOC
24   and sent them a number of exhibits, so I
25   have a lot of paperwork about this case.

Page 296

```
 1              WOOLF
 2  was confrontational.  I asked what was
 3  said.  So that means please tell me what
 4  you said and please tell me what he said.
 5       A.    So I said that I asked for a
 6  reasonable accommodation.  And I said to
 7  him that "You gave me no guidance in terms
 8  of the second request for a reasonable
 9  accommodation," which narrowed my list
10  from 13 to 2 which happened to be in Asia.
11             And then I believe he said to me
12  it's unrealistic to relocate an employee
13  under "needs improvement" to Asia at the
14  cost of the firm.  So he rejected my
15  suggestions, and then he said to me -- and
16  he used the word "feedback," which is an
17  incorrect characterization of the
18  criticisms I received from my managers --
19       Q.    Again, you're starting
20  editorial.  Stick with the words.
21       A.    Okay.  He said I would receive
22  the same feedback regardless of where I
23  worked, from any manager at Bloomberg.  So
24  I questioned his knowledge of the 15,000
25  plus positions in Bloomberg and how he
```

Page 313

1

2  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
3  Case No. 16-cv-6953(PKC)
   - - - - - - - - - - - - - - - - - - -x
4
   RONALD WOOLF,
5
                    Plaintiff,
6
          -against-
7
   BLOOMBERG L.P.,
8  ANDREW BOWYER, individually,
   MELISSA STRADA, individually,
9  MATHEW ASMAN, individually,
   MICHAEL MORRIS, individually, and
10 JIM NIZIOLEK, individually,
11                  Defendants.
12 - - - - - - - - - - - - - - - - - - -x
13                  September 26, 2017
                    10:12 a.m.
14

15

16          Continued Videotaped
17 Deposition of RONALD WOOLF, Volume II,
18 taken by Defendant, pursuant to Notice,
19 held at the offices of EPSTEIN BECKER &
20 GREEN PC, 250 Park Avenue, New York,
21 New York, before Sharon Lengel, a
22 Registered Professional Reporter,
23 Certified Realtime Reporter, and Notary
24 Public of the State of New York.
25          *       *       *

Page 324

```
 1                    WOOLF
 2   cannot give truthful testimony?
 3       A.    No.
 4            MR. GARLAND:  Let's mark as
 5       Exhibit RW52 some emails of the
 6       plaintiff's from October 2013 with the
 7       plaintiff's production number
 8       Exhibit 4 and documented page 33.
 9            (Exhibit RW52, A series of
10       emails, Bates 000033, was hereby
11       marked for identification, as of this
12       date.)
13       Q.    You have in front of you what's
14   been marked as Exhibit RW52.
15            Does that exhibit contain two
16   email, one that you sent to Mr. Morris on
17   October 14, 2013, and a second that you
18   sent to Mr. Niziolek on the same day?
19       A.    Yes, it does.
20       Q.    Did you receive any response
21   from either of them to the emails on this
22   exhibit?
23       A.    I believe I did.  I think
24   verbally Mike of course said, you know,
25   take the day to get this checked out, and
```

Page 325

```
 1                    WOOLF
 2    I don't know if there was a note from Jim
 3    Niziolek, but perhaps there was.
 4         Q.    Do you recall any other response
 5    by either Mr. Morris or Mr. Niziolek to
 6    either of these emails?
 7         A.    I don't remember.
 8         Q.    By the way, did you always
 9    consider that you had a good relationship
10    with Mr. Morris?
11         A.     I thought highly of Mr. -- Mike
12    Morris.  We shared a lot in common.  He
13    spent eight years in Asia.  I spent seven
14    years in Asia.  We spoke the same
15    language.  We understood business
16    practices that worked in Asia and
17    elsewhere.  And up until about March of
18    2013, that changed.
19         Q.    All right.
20              MR. GARLAND:  Let's mark as
21         Exhibit RW53 a May 30th memo from the
22         Reed Group to the plaintiff with the
23         plaintiff's production number
24         Exhibit 11, Document No. 10.
25
```

Page 326

```
 1              WOOLF
 2          (Exhibit RW53, A memo dated May
 3       30, 2013, Bates 000010, was hereby
 4       marked for identification, as of this
 5       date.)
 6       Q.     You have in front of you what's
 7   been marked as Exhibit RW53.
 8              Is that a copy of a document
 9   that you received from the Reed Group on
10   or about May 30, 2013?
11       A.     Yes, it is.
12       Q.     Now, the Reed Group was the
13   entity with which you corresponded
14   regarding your applications for leave
15   while you were employed by Bloomberg?
16       A.     That is correct.
17          MR. GARLAND:  Let's mark as
18       Exhibit RW54 a fax from the plaintiff
19       to the Reed Group with the plaintiff's
20       production number Exhibit 7 pages 37
21       through 13 -- excuse me -- yeah.  Let
22       me reidentify that.
23              So the first page states
24       Exhibit 7, page 37.  And then that
25       goes through page 41.  And then we get
```

Page 330

1              WOOLF

2          MR. GARLAND:  So, then, let's

3     mark as Exhibit RW55 a June 13, 2013,

4     letter from the Reed Group to

5     Mr. Woolf with his production Nos.

6     Exhibit 6, pages 28 and 29.

7          (Exhibit RW55, A letter dated

8     June 13, 2013, Bates 000028, was

9     hereby marked for identification, as

10    of this date.)

11    Q.    You have in front of you what's

12 been marked as Exhibit RW55.

13    A.    Yes.

14    Q.    Is that a copy of a letter that

15 you received from the Reed Group on or

16 about June 13, 2013, approving your

17 application?

18    A.    Yes, it is.

19         MR. GARLAND:  Let's mark as

20    exhibit RW56 a memo from the Reed

21    Group to the plaintiff with the

22    defendant's production No. 545 and

23    this memo is dated November 14, 2013.

24

25

Page 331

1                    WOOLF
2            (Exhibit RW56, A memo dated
3        November 14, 2013, Bates DEF000545,
4        was hereby marked for identification,
5        as of this date.)
6        Q.    You have in front of you what's
7    been marked as Exhibit RW56.
8            Is this a memo that you received
9    from the Reed Group on or about
10   November 14, 2013?
11       A.    You said November -- yeah.  Yes.
12   Yes.  That's correct.
13            MR. GARLAND:  So then let's mark
14       as Exhibit RW57 a fax from the
15       plaintiff to Lucia Piriz, P-I-R-I-Z,
16       with the defendant's production
17       Nos. 560 through 563.
18            (Exhibit RW57, A fax dated
19        November 27, 2013, Bates DEF000560,
20        was hereby marked for identification,
21        as of this date.)
22       Q.    You have in front of you what's
23   been marked as Exhibit RW57.
24            Is that a fax that you submitted
25   to the Reed Group on or about

Page 334

```
 1                      WOOLF
 2           (Exhibit RW59, A letter dated
 3      December 9, 2013, Bates DEF000568, was
 4      hereby marked for identification, as
 5      of this date.)
 6           Q.    You have in front of you what's
 7      been marked as Exhibit RW59.
 8                Is that a copy of a letter that
 9      you received from the Reed Group on or
10      about December 9, 2013?
11           A.    It is.
12           Q.    And that's a letter approving
13      your application for extending your
14      intermittent leave; correct?
15           A.    Yes, based on my migraines with
16      neurological deficits.
17                MR. GARLAND:   So let's, then,
18           mark as Exhibit RW60 an October 15,
19           2013, memo from the Reed Group to the
20           plaintiff.   This one with the
21           defendant's production No. 570.
22                (Exhibit RW60, A memo dated
23           October 15, 2013, Bates DEF000570, was
24           hereby marked for identification, as
25           of this date.)
```

Page 340

1              WOOLF

2      Q.    So just to be clear, what the

3   Reed Group required in the way of

4   documentation you provided.

5      A.    Yes, I did.

6              MR. GARLAND:   So then let's mark

7         as Exhibit RW65 a November 12, 2013,

8         letter from the Reed Group to the

9         plaintiff bearing the production

10        numbers defendant's production

11        Nos. 607 to 608.

12              (Exhibit RW65, A letter dated

13        November 12, 2013, Bates DEF000607,

14        was hereby marked for identification,

15        as of this date.)

16      Q.    You have in front of you what's

17   been marked as Exhibit RW65.

18              Is that a copy of a letter that

19   you received from the Reed Group on or

20   about November 12, 2013?

21      A.    Yes, it is.

22      Q.    And this letter approves your

23   application for FMLA leave.

24      A.    Yes, it does.

25              MR. GARLAND:   So let's then mark

Page 341

```
 1              WOOLF
 2      as Exhibit RW66 a December 13, 2013,
 3      memo from the Reed Group to the
 4      plaintiff with the plaintiff's
 5      production number Exhibit 6, page 34.
 6              (Exhibit RW66, A letter dated
 7      December 13, 2013, Bates 000034, was
 8      hereby marked for identification, as
 9      of this date.)
10      Q.     You have in front of you what's
11 been marked as Exhibit RW66.
12              Is that a memo that you received
13 from the Reed Group on or about
14 December 13, 2013?
15      A.     Yes, it is.
16      Q.     And this memo relates to not
17 your medical condition but the medical
18 condition of your wife?
19      A.     That's correct.
20      Q.     And you sought a leave in
21 connection with her medical condition.
22      A.     I sought a few hours here and
23 there because psychiatrists and
24 psychologists wanted collateral
25 information from me because she was
```

Page 344

1              WOOLF

2         MR. GARLAND:  So then let's mark

3    as Exhibit RW69, a memo from the Reed

4    Group to the plaintiff dated

5    January 10, 2014.  And it bears the

6    plaintiff's production numbers

7    Exhibit 6, pages 30 and 33.

8         (Exhibit RW69, A memo dated

9    January 10, 2014, Bates 000030, was

10   hereby marked for identification, as

11   of this date.)

12   Q.    You have in front of you what's

13   been marked as Exhibit RW69.

14         Is that a letter that you

15   received from the Reed Group on or about

16   January 10, 2014?

17   A.    Yes, it is.

18   Q.    And that letter approved your

19   request for intermittent leave in

20   connection with your wife's issues.

21   A.    That's correct.

22   Q.    So all of the leave applications

23   that you made -- well -- for FMLA leave

24   while were you employed by Bloomberg were

25   approved.

Page 345

```
1                    WOOLF
2         A.    Yes, that's correct.
3              MR. GARLAND:   Let's mark as
4    Exhibit RW70 a notice of charge of
5    discrimination from the EEOC together
6    with a charge dated September 5, 2013,
7    bearing the defendant's Production
8    Nos. 637 through 639.
9              (Exhibit RW70, A notice of
10   charge of discrimination dated
11   September 5, 2013, Bates DEF000637,
12   was hereby marked for identification,
13   as of this date.)
14        Q.    You have in front of you what's
15   been marked as Exhibit RW70.
16              If you turn to the third page of
17   that exhibit, is that third page a copy of
18   the charge of discrimination that you
19   filed against Bloomberg with the EEOC in
20   the summer of 2013?
21        A.    It's only the first three pages
22   of 120 documents submitted that day.
23        Q.    So --
24        A.    Or prior to that -- this -- the
25   date of September 5th.
```

Page 390

```
 1              WOOLF
 2  opportunities while you were employed by
 3  Bloomberg.
 4          Did those jobs have the same
 5  sort of work hour requirements as the job
 6  that you had in New York?
 7      A.    I'm sorry.  You said work --
 8      Q.    Work hours, the same type of --
 9      A.    Oh, work hours?  It didn't
10  specify, but I assumed a full-time -- it
11  was a full-time job.  So --
12      Q.    And did those two positions have
13  the same sort of complexity and challenges
14  as the one -- work challenges, not
15  supervisory challenges, but work challenge
16  as the one that you had in New York?
17      A.    Well, there's only a paragraph
18  that describes the opportunity.  So
19  without guidance from HR, I wasn't
20  positive if it was the right fit.  Only
21  after I submitted my two roles in Asia was
22  I told, well, one was, I think, below my
23  skill levels and one was above my skill
24  levels.
25      Q.    Who told you that?
```

1                    WOOLF

2        A.     Jim Niziolek.

3        Q.     But were you looking for a job

4    at least equivalent in terms of

5    challenges, complexity, opportunities as

6    the one that you had in New York; correct?

7        A.     That's what I was -- that's what

8    I wanted to find, yes.

9        Q.     Do you know whether or not

10   Mr. Bowyer had any role whatsoever in the

11   decision to terminate your employment?

12       A.     I believe he played a tremendous

13   role.

14       Q.     And what's the basis of your

15   saying that?  And let me be clear.  Let me

16   ask a better question.

17              Has anybody told you that

18   Mr. Bowyer played any role in the decision

19   to terminate your employment?

20       A.     No.

21       Q.     Have you read anywhere that

22   Mr. Bowyer was involved in any way in the

23   decision to terminate your employment?

24       A.     My performance warning.

25       Q.     Okay.  Well, that warning

Page 401

1                    WOOLF
2       A.      Absolutely, yes.
3       Q.      Do you recall a specific time
4    that you did that?
5       A.      Yeah.  I recall this
6    specifically, because it required a lot of
7    followup by doctors that day.
8       Q.      So let me just -- what -- let's
9    fix the time.
10               When did you speak to Mr. Morris
11   about your having a headache?
12      A.      So I want to say in May --
13      Q.      May of 2013.
14      A.      May of 2013.
15      Q.      What did you say to him?
16      A.      I told -- we were having a
17   meeting off our floor downstairs, our
18   entire group.  I went up to Mike Morris,
19   because right before the meeting, my
20   vision -- half of my vision --
21      Q.      What did you say to him?
22      A.      I went up to him, and I just
23   said to him, "Mike, I'm losing vision in
24   my left eye.  I need to get to see -- I
25   need to see a doctor right now."

Page 402

1                    WOOLF
2      Q.    What did he say?
3      A.    And he said, "Go."
4      Q.    Did you ever speak to him on any
5  other time about your having a headache?
6      A.    Yes.  And then I came back after
7  seeing three doctors in a matter of three
8  hours, because they thought it was --
9      Q.    No.  I don't want to know what
10  they thought it was.
11          What did you say to him?
12      A.    I told him -- he was surprised
13  to see that I came back.
14      Q.    I don't want to know whether he
15  was surprised or not.
16          What did he say?
17      A.    I said to him, "I'm back, and
18  I'm going to finish the day."  And he
19  said, "Okay.  Fine."
20      Q.    Was there any other occasion
21  that you spoke to him about having
22  headaches?
23      A.    Yes.  Well, I obviously wrote
24  him an email.  Usually when I had to call
25  in, because I could not work --

Page 405

```
 1              WOOLF
 2      to Alison Trellis and others on
 3      July 15, 2013, with the plaintiff's
 4      Production No. Exhibit 4 and then
 5      page 28.
 6              (Exhibit RW83, An email dated
 7      July 15, 2013, Bates 000028, was
 8      hereby marked for identification, as
 9      of this date.)
10      Q.     You have in front of you what's
11 been marked as Exhibit RW83.
12              Is that an email that you sent
13 to Alison Trellis on July 15, 2013?
14      A.     Alison Trellis, Melinda Woolf
15 who was deleted, and Jim Niziolek.
16      Q.     So you sent it to three people
17 at Bloomberg?
18      A.     Yes.
19      Q.     What was Ms. Trellis' role?
20      A.     She was head of HR for the
21 Americas.
22      Q.     And Melinda Woolf's name is not
23 on this document.
24              Why is that?
25      A.     That's how Bloomberg deals with
```

Page 407

                                    WOOLF

2   this email.

3       Q.      So --

4       A.      Not to my knowledge.  So I

5   included her.

6       Q.      Was this email your first

7   notification to anyone at Bloomberg that

8   you had filed a charge of discrimination

9   with the EEOC against the firm?

10      A.      Yes, it is.

11      Q.      Did anyone speak with you at

12  Bloomberg about this email at any time?

13      A.      Well, of course.  There were

14  many -- there were conversations

15  regarding, you know, the allegations made

16  and there were investigations.  So --

17      Q.      Well, let me ask it this way.

18              Did you speak with anyone at

19  Bloomberg after July 15, 2013, about your

20  having filed --

21      A.      Yes.

22      Q.      -- a charge of discrimination

23  with the EEOC?

24      A.      Specifically this July 19th

25  meeting, which I had been asking for for

1              WOOLF

2   Bowyer was aware.  Obviously, through my

3   attorney, Matt Asman was aware.  I don't

4   know if Melissa Strada was aware.

5        Q.    Okay.  I'm not asking you who

6   was aware.

7              I'm asking you with whom --

8        A.    I spoke --

9        Q.    Let me finish, please.

10             With whom did you ever speak

11  about the fact that you had filed a charge

12  of discrimination with the EEOC against

13  the firm?

14        A.    So Jim Niziolek -- speaking --

15  Jim Niziolek, Mike Morris, Andrew Bowyer.

16        Q.    Anyone else?

17        A.    Maybe a few colleagues.

18        Q.    Do you remember any colleagues

19  with whom you spoke about that fact?

20        A.    One colleague that was no

21  longer -- actually, it wasn't a colleague.

22  It was someone who had left the firm

23  already.  So I felt comfortable speaking

24  about it because she had a similar

25  situation.

Page 415

1              WOOLF

2    on the 15th, you're looking at RW83?

3         A.     Yes, I am.

4         Q.     There's no attachment with your

5    charge to that email, is there?

6         A.     No.  There's a charge number.

7         Q.     Okay.  So there's a charge

8    number.  But my question to you is, as of

9    July 19th, do you know who he actually saw

10   the charge that you had filed with the

11   EEOC?

12        A.     Oh, if you're talking about the

13   120-plus documents I submitted to the

14   EEOC, obviously not.  No.

15        Q.     Okay.  So in the conversation on

16   July 19, 2013, do you recall anything he

17   specifically said, using the words "EEOC

18   charge"?

19        A.     Yes.  That was the conversation.

20   That was the topic of the conversation.

21        Q.     So what did he say specifically

22   about the EEOC charge?  If you say he used

23   those words.

24        A.     I -- that he believed that it

25   was not legitimate, that there was no

```
 1              WOOLF
 2  discrimination on the part of the firm.
 3  Okay?
 4      Q.    Did he say anything else about
 5  the EEOC charge on July 19th?
 6      A.    Well, to the extent that he was
 7  denying it.
 8      Q.    He was denying something that he
 9  hadn't seen yet; correct?
10      A.    Well, he was denying the fact
11  that Bloomberg had done nothing wrong.
12      Q.    Do you actually remember if the
13  words EEOC charge even came up during your
14  July 19th meeting?
15      A.    Obviously, that's what the email
16  references.  And that's what -- that's
17  what I was discussing.  So --
18      Q.    So as you're sitting here today,
19  you're 100 percent sure that you spoke
20  about the EEOC charge on July 19th.
21      A.    Absolutely.
22      Q.    So did you ever speak with him
23  about the EEOC charge at any other time?
24      A.    Yes.
25      Q.    When?
```

Page 422

1                         WOOLF

2       Q.      And when you say after the

3  filing --

4       A.      And --

5       Q.      -- when was that?

6       A.      And in the numerous weekly

7  meetings that happened from that date

8  forward until essentially my termination

9  date.

10      Q.      Do you recall anything that

11  Mr. Morris ever said about the fact that

12  you had filed an EEOC charge?

13      A.      He pushed it to HR.  He passed

14  the buck.

15      Q.      What did he say?

16      A.      He said -- and it's also

17  written.

18      Q.      I'm asking the question.

19              What did he say?

20      A.      He said that's something that HR

21  handles.

22      Q.      Did he say anything else about

23  the fact that you had filed an EEOC

24  charge?

25      A.      He passed the buck.

```
 1                    WOOLF
 2       Q.     Did he say anything else?
 3       A.     I can't recall his exact words.
 4  But he passed the buck.
 5       Q.     To HR.
 6       A.     Yes.
 7       Q.     Now, is there anything you
 8  recall Mr. Bowyer ever saying to you about
 9  the fact that you had filed an EEOC charge
10  against the firm?
11       A.     Oh, Andrew Bowyer knew.
12       Q.     I'm not asking whether he knew.
13              Did Mr. Bowyer ever say anything
14  to you about the fact that you had filed
15  an EEOC charge?
16       A.     I believe there was a discussion
17  during the performance warning where I
18  refused to sign the document, which
19  happened on September 19th with Jim
20  Niziolek, Mike Morris, and Andrew Bowyer.
21  It came up.
22       Q.     No.  Look, my question to you is
23  did Mr. Bowyer ever reference to you --
24       A.     He acknowledged --
25       Q.     -- say to you -- say to you
```

```
1                    WOOLF
2       Q.    You said to him that the EEOC
3    was involved.
4       A.    Yes.
5       Q.    He said words to the effect that
6    he was aware of that; correct?
7       A.    Yes.
8       Q.    Did either of you ever say
9    anything else about the fact that you had
10   filed an EEOC charge against the firm?
11      A.    No.  It was --
12      Q.    Now, when did you -- did you
13   actually speak with Aline Tedesco about
14   having filed an EEOC charge against the
15   firm?
16      A.    I believe it came up in a
17   meeting, yes.
18      Q.    When?
19      A.    After July 15th.
20      Q.    Who was present?
21      A.    Jim Niziolek -- Jim Niziolek and
22   Aline Tedesco were the two primary HR
23   contacts for me.  So --
24      Q.    Now I'm asking when you -- when
25   did you speak to Aline Tedesco about the
```

Page 435

                          WOOLF

1
2    though, that she said that you remember
3    regarding your EEOC charge?
4        A.    I don't know exactly.  The firm
5    took the position of deny everything,
6    admit nothing.
7        Q.    Do you remember anything she
8    said, sir?
9        A.    No.
10       Q.    Did any of your managers at
11   Bloomberg ever state to you that you
12   should not apply for FMLA leave?
13       A.    No.
14       Q.    Did any of your managers or
15   supervisors at Bloomberg ever suggest to
16   you or state to you that you should not
17   use FMLA leave?
18       A.    There was a conversation --
19   actually, there was a couple of
20   conversations where Mike Morris suggested
21   to me that -- "Go ahead, Ron.  Take as
22   many days as you need."  And under the
23   law -- and I'm not an attorney.  So I am
24   only basing this off what I read.
25       Q.    Okay.  And that's not -- okay.

Page 437

                        WOOLF

1

2      A.    I can't explain it unless I tell

3    you that fact.

4      Q.    Try it this way.

5            You say you had a conversation

6    with Mr. Morris where he spoke words to

7    you about FMLA leave; is that right?

8      A.    Yes.

9      Q.    All we're asking is what were

10   the words that Mr. Morris spoke?

11     A.    He said, "Ron, take as many days

12   as you need."

13     Q.    Did he say anything else?

14     A.    No.   That -- he -- I called in,

15   told him had an intense migraine.  He

16   said, "Ron, take as many days as you

17   need."

18     Q.    All right.   Let's take our lunch

19   break.

20     A.    Okay.

21            THE VIDEOGRAPHER:   Thank you.

22   The time now is approximately 12:38.

23   We're going off the record.

24            (Luncheon recess:   12:38 p.m.)

25

Page 439

```
 1                    WOOLF
 2            (Exhibit RW84, An employment
 3       information report, Bates DEF000269,
 4       was hereby marked for identification,
 5       as of this date.)
 6       Q.    You have in front of you what's
 7   been marked as Exhibit RW84.  I want to
 8   direct your attention to the first page
 9   about 2/3 of the way down the page.
10   There's an email from Mr. Morris to you on
11   July 9, 2013, at 9:30.
12            Do you see that?
13       A.    I see that.
14       Q.    Please read the email to
15   yourself, and when you've finished it, let
16   me know, and I'll ask the next question.
17       A.    (Witness perusing document.)
18            Okay.  I've read it.
19       Q.    So did you, in fact, receive
20   that email from Mr. Morris on
21   July 9, 2013?
22       A.    I did.
23       Q.    Was there anyone at Bloomberg
24   during the time that you worked there who
25   said to you that you just shouldn't take
```

Page 440

```
1                    WOOLF
2    leave -- you shouldn't take FMLA leave?
3         A.    No.   They encouraged -- well, I
4    say Mike Morris encouraged me to take as
5    much time as I needed.
6         Q.    And so beyond that, nobody
7    discouraged you; correct?
8         A.    No one discouraged me.
9              MR. GARLAND:   Let's mark as
10        Exhibit RW85 a document that has the
11        heading "Download of Draft Comments
12        from 2013 End-of-Year Self-Evaluation"
13        with the plaintiff's production Nos.
14        Exhibit 7, pages 6 through 8.
15              (Exhibit RW85, Download of draft
16        comments, Bates 000006, was hereby
17        marked for identification, as of this
18        date.)
19        Q.    You have in front of you what's
20    been marked as Exhibit RW85.
21              Have you seen that before?
22        A.    Yes, I have.
23        Q.    What is it?
24        A.    It's my -- my evaluation of
25    myself addressing the seven Bloomberg
```

Page 444

```
 1              WOOLF
 2   because you either sought or took FMLA
 3   leave?
 4              MR. MELAMED:   Objection.
 5       A.     If I can explain, FMLA was paid
 6   leave, fully paid leave for 60 days over
 7   12 calendar months.  So when I say to you
 8   that I was encouraged to take as many days
 9   as I wanted, I was informed by the Reed
10   Group that your FMLA would turn into
11   short-term disability.
12              It was my understanding from
13   reading various documents that that would
14   reduce my pay that I collected biweekly to
15   a short-term disability individual rather
16   than an individual taking FMLA.  So in my
17   mind, I questioned when I was encouraged
18   to take as much time as I wanted, because
19   I made sure -- and the Reed Group advised
20   me -- that if you exceed eight days off in
21   a row, it automatically converts to
22   short-term disability.
23       Q.     Is there any fact other than
24   what you've just stated in your last
25   answers that you would point to to support
```

Page 449

```
 1                    WOOLF
 2       Exhibit RW89 an email from Mr. Woolf
 3       to Ms. Trellis with the plaintiff's
 4       production No. Exhibit 4, page 34.
 5             (Exhibit RW89, An email dated
 6       December 13, 2013, Bates 000034, was
 7       hereby marked for identification, as
 8       of this date.)
 9       Q.     You have in front of you what's
10  been marked as Exhibit RW89.
11             Is that an email that you sent
12  to Ms. Trellis and others at Bloomberg on
13  December 13, 2013?
14       A.     Yes, it is.
15             MR. GARLAND:   Let's mark as
16       Exhibit RW90 a November 27, 2013,
17       letter from Dr. Hutchinson, "To whom
18       it may concern," with the plaintiff's
19       Production No. Exhibit 4, page 23.
20             (Exhibit RW90, A letter dated
21       November 27, 2013, Bates 000023, was
22       hereby marked for identification, as
23       of this date.)
24       Q.     You have in front of you what's
25  been marked as Exhibit RW90.
```

Page 450

1              WOOLF

2          Is that a copy of a letter that

3   you received from Dr. Hutchinson on or

4   about November 27, 2013?

5      A.    It is.

6      Q.    Is that the letter referred to

7   in your email that we've marked as exhibit

8   RW89?

9      A.    Yes, it is.

10     Q.    I noticed that about two weeks

11  past from the date of the Dr. Hutchinson's

12  letter until the time that you submitted

13  it to Ms. Trellis.

14          Why the delay?

15     A.    At that point, I had become very

16  discouraged with the lack of response from

17  Bloomberg's HR department, my managers.

18  So it was provided.  But the first two

19  letters were ignored.  So I didn't think

20  much would happen.

21     Q.    So you decided on your own to

22  wait a couple of weeks before you

23  submitted it?

24     A.    Yes.

25          MR. GARLAND:  Let's mark as

Page 474

1              WOOLF

2              (Exhibit RW93, A complaint, was

3       hereby marked for identification, as

4       of this date.)

5       Q.     You have in front of you what's

6    been marked as Exhibit 93.

7              Take a look at it and tell me

8    you've seen it before.

9       A.     Yes, it is.

10      Q.     You've seen before?

11      A.     Yes.

12      Q.     Is that a lawsuit that -- a

13   complaint that you filed against Zurich in

14   the New York State Supreme Court?

15      A.     I have been advised on my

16   attorney at that time, my attorneys at

17   this time, that I cannot comment on this

18   case.

19      Q.     Let me ask you --

20      A.     There's an agreement in place

21   where I cannot speak about this case.

22   Otherwise I'll be in violation of a Court

23   order.

24      Q.     And so you're saying that your

25   attorneys in this lawsuit -- the Derek