UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                     :

RONALD WOOLF,                     :

                  Plaintiff,      :    **Case No. 16-cv-6953 (PKC)**

          – v –           :

BLOOMBERG L.P., ANDREW BOWYER,    :
individually, MELISSA STRADA, individually,  :
MATHEW ASMAN, individually, MICHAEL   :
MORRIS, individually, and JIM NIZIOLEK,   :
individually,                    :

                  Defendants.  :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## MEMORANDUM OF LAW OF DEFENDANTS BLOOMBERG L.P., ANDREW BOWYER, MELISSA STRADA, MATTHEW ASMAN, MICHAEL MORRIS AND JIM NIZIOLEK IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND IN SUPPORT OF THEIR CROSS-MOTION FOR SUMMARY JUDGMENT

EPSTEIN BECKER & GREEN, P.C.
250 Park Avenue
New York, New York 10177
(212) 351-4500

Attorneys for Defendants

Firm:46487251

## <u>TABLE OF CONTENTS</u>

<u>PAGE</u>

PRELIMINARY STATEMENT ................................................................................................ 1

STATEMENT OF FACTS .................................................................................................... 3

    A.   Woolf's Reporting Relationships and Responsibilities. .............................................. 3

    B.   Woolf's Performance Issues Under His First Two Supervisors. ................................. 4

        1.   2011 and 2012 Performance Evaluations. ...................................................... 4

        2.   Woolf Explores an Internal Transfer to Asia. ................................................. 5

        3.   Woolf Receives A Verbal Warning for Poor Performance in
           March 2013, And Responds By Sending Bloomberg a Letter
           Threatening Litigation. ................................................................................... 6

        4.   Woolf's 2013 Interim Performance Evaluation Reflects His
           Continued Performance Problems. ................................................................... 9

        5.   Woolf Receives a Written Warning for Continued Performance
           Problems. ...................................................................................................... 11

    C.   Woolf's Performance Problems Continue After Brown Replaces
       Bowyer As Woolf's Supervisor. ............................................................................... 12

    D.   Because of Woolf's Continuing Performance Problems, Bloomberg
       Terminates Woolf's Employment. ............................................................................ 13

    E.   Bloomberg Engages in the Interactive Process With Woolf Regarding
       His Unclear Accommodation Request For The Migraines Caused By
       His Workplace Stress. ............................................................................................... 14

ARGUMENT .................................................................................................................... 20

I.     WOOLF'S DISABILITY DISCRIMINATION CLAIMS FAIL AS A
      MATTER OF LAW. ................................................................................................... 20

    A.   Woolf Is Not Disabled Under the ADA, NYSHRL, or NYCHRL. ......................... 20

    B.   Woolf's Discriminatory Termination Claims Should Be Dismissed. ...................... 23

    C.   Woolf's Failure to Accommodate Claims Should Be Dismissed. ........................... 26

II.    WOOLF'S RETALIATION CLAIMS FAIL AS A MATTER OF LAW. ....................... 30

i

III.   THE INDIVIDUAL DEFENDANTS CANNOT BE HELD LIABLE
       UNDER THE NYSHRL AND NYCHRL. .......................................................... 32

IV.    THE FMLA CLAIMS ALSO FAIL AS A MATTER OF LAW ......................................... 34

       A.   Woolf's FMLA Claims Are Time-Barred. .................................................. 34

       B.   No Evidence Supports A FMLA Interference Claim. ................................. 35

       C.   There Is No Record Support For A FMLA Retaliation Claim. ................................. 36

CONCLUSION ................................................................................................................... 39

Firm:46487251

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Barton v. Unity Health Sys.*,
 No. 14 CV 6658, 2018 U.S. Dist. LEXIS 44125 (W.D.N.Y. Mar. 19, 2018) .........................29

*Ben-Levy v. Bloomberg L.P.*,
 No. 11 Civ. 1154, 2012 U.S. Dist. LEXIS 90292 (S.D.N.Y. June 26, 2012),
 *aff'd*, 518 F. App'x 17 (2d Cir. 2017).....................................................................................26

*Bento v. City of Milford*,
 213 F. Supp. 3d 346 (D.Conn. 2016) .....................................................................................29

*Borkowski v. Valley Cent. Sch. Dist.*,
 63 F.3d 131 (2d Cir. 1995).....................................................................................................27

*Brown v. Northrop Grumman Corp.*,
 No. 14-CV-1488, 2014 U.S. Dist. LEXIS 116188 (E.D.N.Y. Aug. 19, 2014).......................38

*Cameron v. Cmty. Aid for Retarded Children, Inc.*,
 335 F.3d 60 (2d Cir. 2003)..............................................................................................20, 24

*Chang v. MetroPlus Health Plan*,
 No. 12 CV 3181, 2014 U.S. Dist. LEXIS 28318 (S.D.N.Y. Mar. 4, 2014),
 *aff'd*, 590 F. App'x 74 (2d Cir. 2015)..........................................................................22, 30, 31

*Costello v. St. Francis Hosp.*,
 258 F. Supp. 2d 144 (E.D.N.Y. 2003) ...................................................................................25

*Dearden v. Glaxosmithkline LLC*,
 No. 15 Civ. 7628, 2017 U.S. Dist. LEXIS 149408 (S.D.N.Y. Sept. 14, 2017) ................ 21-22

*Di Giovanna v. Beth Israel Med. Ctr.*,
 651 F. Supp. 2d 193 (S.D.N.Y. 2009)...............................................................35, 36, 37, 38

*Domenech v. N.Y. City Emps.' Ret. Sys.*,
 No. 15 CV 2521, 2016 U.S. Dist. LEXIS 61175 (E.D.N.Y. May 9, 2016)......................20, 21

*Eisner v. Cardozo*,
 684 F. App'x 29 (2d Cir. 2017) .............................................................................................30

*El Sayed v. Hilton Hotels Corp.*,
 627 F.3d 931 (2d Cir. 2010)..................................................................................................31

*Flynn v. McCabe & Mack LLP*,
 No. 15 CV 5776, 2018 U.S. Dist. LEXIS 21346 (S.D.N.Y. Feb. 8, 2018) ......................24, 26

*Gaul v. Lucent Techs., Inc.*,
 134 F.3d 576 (3d Cir. 1998)..............................................................................................22, 27

*Grillo v. N.Y. City Transit Auth.*,
 291 F.3d 231 (2d Cir. 2002)..................................................................................................24

Firm:46487251

*Hockenjos v. Metro. Transp. Auth.*,
No. 14 CV 1679 (PKC), 2016 U.S. Dist. LEXIS 65341
(S.D.N.Y. May 18, 2016), *aff'd*, 695 F. App'x 15 (2d Cir. 2017) ...............................36, 37, 38

*Hollander v. Am. Cyanamid Co.*,
895 F.2d 80 (2d Cir. 1990) ...............................................................................................30

*Hozer v. Pratt Indus. (USA)*,
No. 10 CV 3874, 2012 U.S. Dist. LEXIS 78811 (E.D.N.Y. June 6, 2012) ...........................33

*Jain v. McGraw-Hill Cos.*,
827 F. Supp. 2d 272 (S.D.N.Y. 2011), *aff'd*, 506 F. App'x 47 (2d Cir. 2012) .......................24

*Kennedy v. Dresser Rand Co.*,
193 F.3d 120 (2d Cir. 1999).........................................................................................28, 29

*Kinneary v. City of N.Y.*,
601 F.3d 151 (2d Cir. 2010).................................................................................................23

*Lenhoff v. Getty*,
No. 97 Civ. 9458, 2000 U.S. Dist. LEXIS 9835 (S.D.N.Y. July 13, 2000)............................22

*McBride v. BIC Consumer Prods. Mfg. Co.*,
583 F.3d 92 (2d Cir. 2009)...................................................................................................27

*Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*,
715 F.3d 102 (2d Cir. 2013).................................................................................................30

*Missick v. City of N.Y.*,
707 F. Supp. 2d 336 (E.D.N.Y. 2010) ...................................................................................27

*O'Neill v. Swiss Post Solutions, Inc.*,
Index No. 154976.12, 2013 N.Y. Misc. LEXIS 2766
(N.Y. Sup. Ct. N.Y. Cty. July 1, 2013).................................................................................32

*Paolitto v. Brown E.&C. Inc.*,
151 F.3d 60 (2d Cir. 1998)...................................................................................................29

*Patrowich v. Chem. Bank*,
63 N.Y.2d 541 (1984) ...........................................................................................................33

*Porter v. N.Y.U. Sch. of Law*,
392 F.3d 530 (2d Cir. 2004) (per curiam)............................................................................34

*Potenza v. City of N.Y.*,
365 F.3d 165 (2d Cir. 2004)......................................................................................34, 36, 37

*Potter v. Xerox Corp.*,
88 F. Supp. 2d 109 (W.D.N.Y. 2000), *aff'd*, 1 F. App'x 34 (2d Cir. 2001) ...............22, 27, 28

*Raisley v. First Manhattan Co.*,
4 Misc. 3d 1022(A), 2004 N.Y. Misc. LEXIS 1494
(N.Y. Sup. Ct. N.Y. Cty. 2004)............................................................................................22

*Riddle v. Citigroup*,
449 F. App'x 66 (2d Cir. 2011) ...........................................................................................34

iv

*Rodal v. Anethesia Grp. of Onondaga, P.C.*,
  369 F.3d 113 (2d Cir. 2004) .................................................................................20

*Schneiker v. Fortis Ins. Co.*,
  200 F.3d 1055 (7th Cir. 2000) .............................................................................20

*Short v. Deutsche Bank Sec., Inc.*,
  79 A.D.3d 503 (1st Dep't 2010) ..........................................................................26

*Siemon v. AT&T Corp.*,
  117 F.3d 1173 (10th Cir. 1997) ...........................................................................22

*Silva v. Peninsula Hotel*,
  509 F. Supp. 2d 364 (S.D.N.Y. 2007)..................................................................26

*Slattery v. Swiss Reinsurance Am. Corp.*,
  248 F.3d 87 (2d Cir. 2001)...................................................................................31

*Soderberg v. Gunther Int'l, Inc.*,
  124 F. App'x 30 (2d Cir. 2005) ...........................................................................25

*Sutherland v. N.Y. State Dep't of Law*,
  216 F.3d 1073, 2000 WL 730413 (2d Cir. June 2, 2000) ......................................37

*Thompson v. FRB*,
  No. 01 CV 11640, 2004 U.S. Dist. LEXIS 2613 (S.D.N.Y. Feb. 20, 2004) ........22

*Turowski v. Triarc Cos.*,
  761 F. Supp. 2d 107 (S.D.N.Y. 2011)..................................................................32

*Univ. of Tex. Southwestern Med. Ctr. v. Nassar*,
  570 U.S. 338 (2013)..............................................................................................30

*Vinokur v. Sovereign Bank*,
  701 F. Supp. 2d 276 (E.D.N.Y. 2010) .................................................................25

*Weiler v. Household Fin. Corp.*,
  101 F.3d 519 (7th Cir. 1996) ...............................................................................22

*Weissman v. Dawn Joy Fashions, Inc.*,
  214 F.3d 224 (2d Cir. 2000)..................................................................................30

*Wesley-Dickson v. Warwick Valley Cent. Sch. Dist.*,
  586 F. App'x 739 (2d Cir. 2014) .........................................................................24

*Williams v. New York City Hous. Auth.*,
  61 A.D.3d 62 (1st Dep't 2009) ............................................................................26

*Yetman v. Capital Dist. Transp. Auth.*,
  669 F. App'x 594 (2d Cir. 2016) .........................................................................35

**Rules and Statutes**

29 C.F.R. § 825.220(c).......................................................................................................34

29 U.S.C. § 2612(a)(1).......................................................................................................34

29 U.S.C. § 2615(a) ...........................................................................................................34

v

29 U.S.C. § 2617(c) ......................................................................................................34

29 U.S.C. § 2617(c)(2) ...................................................................................................34

N.Y.C. Admin. Code § 8-107(6) .....................................................................................32

N.Y.C. Admin. Code § 8-107(1) .....................................................................................33

N.Y.C. Admin. Code § 8-107(15)(a) ...............................................................................27

N.Y.C. Admin. Code § 8-107(15)(b) ...............................................................................27

N.Y. Exec. Law § 292(21-e) ...........................................................................................27

N.Y. Exec. Law § 296(1) .................................................................................................33

N.Y. Exec. Law § 296(3)(a) ............................................................................................27

N.Y. Exec. Law § 296(6) .................................................................................................32

vi

## PRELIMINARY STATEMENT

Plaintiff Ronald Woolf, a former employee of defendant Bloomberg L.P. ("Bloomberg" or the "Company"), alleges in his Amended Complaint that Bloomberg discriminated against him based upon a disability, failed to provide him with a reasonable accommodation, and retaliated against him in violation of the Americans With Disabilities Act of 1990, 42 U.S.C. § 12101, *et seq.* ("ADA") and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, ("Title VII"). He also claims that Bloomberg and Andrew Bowyer, Michael Morris, Matthew Asman, Melissa Strada and Jim Niziolek (collectively, the "Individual Defendants") discriminated and retaliated against him in violation of the New York State Human Rights Law, N.Y. Exec. Law § 296 ("NYSHRL"), and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-101, *et seq.* ("NYCHRL"). Finally, Woolf alleges that Bloomberg failed to provide him with appropriate leave and retaliated against him in violation of the Family and Medical Leave Act, 29 U.S.C. § 290, *et seq.* ("FMLA"). As set forth in this brief, these claims are ripe for summary judgment and Woolf's motion for partial summary judgment on his failure to accommodate claims under the ADA, NYSHRL, and NYCHRL should be denied.

This is a case about an employee – Ronald Woolf – who wanted to transfer from Bloomberg's New York City office to one of its offices in Asia because he had a strong interest in that part of the world. He became ineligible for a transfer under Bloomberg's policies, however, because he received a verbal warning for various performance deficiencies and was no longer considered an employee in "good standing." Undeterred, Woolf asserted that he was "disabled" – claiming that symptoms of long-controlled migraine headaches were exacerbated by the stress he experienced working for his supervisors – and then contended that the Company should transfer him to a position with a different supervisor – in Asia – as a "reasonable accommodation" for his "disability." As a matter of law, however, Woolf was not disabled by

virtue of his admission that he could have performed *the exact same job duties* for a different supervisor.

Additionally, the Court should dismiss Woolf's failure to accommodate claims because Bloomberg was not required to "accommodate" Woolf by providing him with a completely stress-free environment.  Moreover, Woolf has failed to overcome the presumption that a request to change supervisors is not a reasonable accommodation, and therefore he has not met his burden to identify a reasonable accommodation.  Given the foregoing, Woolf's motion for partial summary judgment on his accommodation claims – which is based on the patently frivolous contention that Bloomberg failed to engage in the interactive process – should be denied. Additionally, no evidence suggests that Bloomberg's decision to terminate Woolf's employment when his substandard performance continued was pretextual or gives rise to any inference of disability discrimination.

Woolf's retaliation claims under federal, state, and city law should also be dismissed because he cannot establish a *prima facie* case of retaliation, as the continued progression of performance problems that ultimately led to Woolf's termination began *before* he filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC").  No evidence suggests that Bloomberg's stated reason for Woolf's termination (*i.e.*, his poor work performance) was pretextual.

Likewise, Woolf's claims against the Individual Defendants under the NYSHRL and NYCHRL should also be dismissed.  The record is undisputed that none of the Individual Defendants "actually participated" in any discriminatory or retaliatory conduct, or failed to provide Woolf with a reasonable accommodation, and therefore none can be liable as an "employer" or "aider and abettor."

Lastly, Woolf's FMLA claims should be dismissed because they are time-barred.  Even the latest possible alleged FMLA violation (Woolf's termination on January 10, 2014) occurred outside the applicable two-year statute of limitations.  Woolf also cannot establish an FMLA interference claim because Bloomberg *granted* each of the three FMLA leaves for which he applied during his employment (and provided salary continuation to him during each such leave), and no evidence suggests that any of his managers or any other Bloomberg employee took any action that discouraged him from applying for or using FMLA leave.  Further, Woolf's FMLA retaliation claim should be dismissed because, as noted above, no evidence suggests that Bloomberg's articulated reason for his termination (his poor work performance) was pretextual.

Accordingly, the Court should grant Defendants' cross-motion for summary judgment, deny Woolf's motion for partial summary judgment, and dismiss the Amended Complaint in its entirety.

## STATEMENT OF FACTS

### A.  Woolf's Reporting Relationships and Responsibilities.

Woolf commenced employment with Bloomberg in June 2011 as a Sales Representative responsible for negotiating commercial data contracts with third party data contributors on behalf of the Bloomberg Industries Group ("BI").  (Woolf Dep. 99:6-8, 108:15 to 109:15, 112:25 to 113:5).[1]  Woolf was expected to build and expand his business and professional relationships both inside and outside the organization to get these deals done.  (Woolf Dep. 112:18 to 113:5). His job responsibilities generally remained unchanged throughout his tenure with Bloomberg. (Woolf Dep. 113:13 to 114:7).

---

[1] References to the transcript of Woolf's September 25 and 26, 2017 deposition, excerpts of which are attached as Exhibit 1 to the accompanying Declaration of David W. Garland, are designated as "(Woolf Dep. [page:line])." References to exhibits attached to the Garland Declaration are designated as "(Garland Dec. Ex. __)."

Firm:46487251

Woolf initially reported to Steve Citrin, but in approximately January 2013, he began reporting to Andrew Bowyer.  (Woolf Dep. 109:16-21, 110:7-10, 111:6-11).  Woolf continued to report to Bowyer until November 2013, when Laura Brown replaced Bowyer as Woolf's direct supervisor.  (Woolf Dep. 111:12-23).  Woolf reported to Brown until the termination of his employment on January 10, 2014.  (Woolf Dep. 111:24 to 112:6).  Citrin, Bowyer, and Brown each reported to Michael Morris during the time that they supervised Woolf.  (Woolf Dep. 112:7-12).

### B.  Woolf's Performance Issues Under His First Two Supervisors.

#### 1.  2011 and 2012 Performance Evaluations.

Although Woolf joined Bloomberg halfway through 2011, Citrin (with Morris's assistance) completed a year-end review for Woolf.  (Woolf Dep. 115:2-15; Garland Dec. Ex. 6).  As part of that review, Citrin wrote that he and others in Woolf's department "would like to see [Woolf] take on a greater leadership role as a Content Specialist.  This includes better communication with others in our group about his initiatives."  (Garland Dec. Ex. 6, p. 2).  Citrin added that he and other managers "look forward to working with [Woolf] to improve in this area."  (*Id.*).

At the end of 2012, Woolf's first full calendar year with Bloomberg, he received an overall performance rating of "Meets Expectations" – which was in the bottom half of available ratings.  (Woolf Dep. 117:19-23; Garland Dec. Ex. 7).[2]  Citrin and Morris noted in Woolf's evaluation that "[h]e has struggled to provide a clear overview of where we stood with providers in various stages and this has caused additional work for others involved in the process."  (Woolf Dep. 117:24 to 118:3; Garland Dec. Ex. 7, p. 1).  Additionally, the 2012 evaluation noted that

---

[2] There were three ratings above "Meets Expectations": "Good," "Distinguished," and "Exceptional"; there were two below: "Needs Improvement" and "Unacceptable."  (Garland Dec. Ex. 7, p. 1).

Woolf's "communication issues with other business managers need[ed] to improve," and

outlined other areas of needed improvement where Woolf:

- "could have improved on his DIPS & Business Intelligence scores by making better decisions in working with business managers and expanding his involvement in the overall BI platform,"

- "could stand out more if he did things like join BI analysts on client meetings or work with terminal sales on understanding the BI value proposition for end users," and

- "struggled to collaborate well with key BI business managers for various reasons," and his "managers had to address these communication issues with him on multiple occasions and stressed the need for this to be rectified."

(Garland Dec. Ex. 7, pp. 3-4).

Woolf's 2012 evaluation concluded by identifying three development action areas: (1)

"[Woolf] needs to expand his knowledge of both the internal and client enabled functions of the

Bloomberg terminal in order to become more effective and efficient in his day to day work…";

(2) "[Woolf] needs to ensure that he's keeping all the relevant parties looped into decision

making process when he's running into issues with contributors"; and (3) "[Woolf] needs to keep

focused on the task at hand[,] which is getting the best deal for Bloomberg in the most efficient

way keeping in mind the needs of the business managers he's responsible to without getting lost

in the detail."  (*Id.*, p. 5).  Woolf acknowledged in his 2012 self-evaluation that "collaboration"

with others was his "greatest weakness."  (*Id.*, p. 6).

### 2.  <u>Woolf Explores an Internal Transfer to Asia.</u>

At the end of January 2013, Woolf attended a career networking program hosted by

Bloomberg where he inquired about the possibility of transferring to a position in Asia.[3]  (Woolf

Dep. 133:7-15, 134:15-23, 136:18).  Woolf wanted to transfer to Asia because he had experience

---

[3] At the time, Bloomberg had offices in Hong Kong, Singapore, Tokyo, Shanghai, and Seoul.  (Woolf Dep. 144:7-22).

Firm:46487251

in the region and thought it was a way to advance within the Company.  (Woolf Dep. 137:22 to

139:6).  He communicated that interest to others within Bloomberg via e-mail on January 31 and

February 4, 2013, "making [his] case" why the Company should relocate him (and his family) to

Asia.  (Woolf Dep. 141:3-16 and 146:6 to 147:14; Garland Dec. Exs. 8 and 9).

On February 24, 2013, Robin Conn, a member of Bloomberg's Career Development

team, suggested that Woolf review two job listings for open positions in Asia.  (Woolf Dep.

146:6-20; Garland Dec. Ex. 9).  Woolf did not apply for either of those positions at the time, but

he spoke with Melissa Strada, another member of the Career Development team, in early March

2013 about his interest in transferring to Asia.  (Woolf Dep. 151:8 to 152:6, 155:4-7).  Strada,

who had no authority to grant Woolf an internal transfer, discussed steps that Woolf could take

(*i.e.*, reviewing job board postings, or contacting various individuals) to pursue his interest in

moving to Asia.  (Strada Dep. 22:22 to 23:6, 25:18 to 26:14; Strada Dec. ¶ 4).[4]  Strada recalled

that Woolf wanted to transfer to Asia "because it seemed to fit with his personal and family

work-life balance priorities," and because his wife was originally from Asia.  (Strada Dep. 25:23

to 26:14).

### 3.  Woolf Receives A Verbal Warning for Poor Performance in March 2013, And Responds By Sending Bloomberg a Letter Threatening Litigation.

In early March 2013, Bowyer outlined for Aline Tedesco, in Human Resources, his

continuing concerns with Woolf's performance, including specific projects where Woolf had

underperformed.  (Bowyer Dec. ¶ 4 & Ex. 1).[5]  On March 20, Bowyer (together with Morris and

Tedesco) met with Woolf to issue a verbal warning and to set forth objectives for Woolf to

---

[4] References to the transcript of Melissa Strada's December 5, 2017 deposition, excerpts of which are attached to the Garland Declaration as Exhibit 2, are designated as "(Strada Dep. [page:line])."  References to the Declaration of Melissa Strada are designated as "(Strada Dec. ¶ __)."

[5] References to the Declaration of Andrew Bowyer are designated as "(Bowyer Dec. ¶ __)." References to exhibits attached to the Bowyer Declaration are designated as "(Bowyer Dec. Ex. __)."

improve his performance.  (Woolf Dep. 179:15 to 180:19, 186:6-16; Garland Dec. Ex. 10).

Bowyer followed up on the meeting with an e-mail to Woolf on the same day, summarizing the

points they had discussed.  (Woolf Dep. 186:6-16; Garland Dec. Ex. 10).  After identifying

specific areas requiring improvement (*i.e.*, product knowledge, internal relationships, and

productivity), Bowyer concluded: "Our expectation is that we see immediate and sustained

improvement on your side regarding these points or you could be subject to further disciplinary

action."  (*Id.*).

On March 25, Woolf responded to the verbal warning by sending Bowyer a 19-page

memo, refusing to acknowledge any of the problems identified by Bowyer (except that he

needed to improve his relationship with Eric Hernandez, the BI business manager).  (Woolf Dep.

124:22 to 125:7, 187:14-21; Garland Dec. Ex. 11).   Reflecting his refusal to accept any other

responsibility for his performance issues, Woolf maintained that Bowyer – his supervisor – "did

not understand" Woolf's job.  (Woolf Dep. 164:10 to 165:6).

On the following day, March 26, at Woolf's request, Jim Niziolek, Human Resources

Business Partner, met with Woolf to discuss the verbal warning and his written response.

(Woolf Dep. 189:8-20).  During that meeting, Woolf asserted that Bowyer and Morris

"retaliate[ed]" against him because he had attended the internal Bloomberg networking event in

January 2013.  (Woolf Dep. 189:21 to 190:6, 239:4-9).  Woolf asked Niziolek about the

possibility of transferring somewhere else within Bloomberg, but Niziolek explained that any

employee wishing to transfer internally must be in good standing.  (Woolf Dep. 190:7-22).[6]

During a subsequent email exchange between Woolf and Strada, she confirmed that because of

---

[6] The "good standing" requirement is set forth in the Global Resource & Information Core Guide.  (Woolf Dep.
103:18 to 104:4; Garland Dec. Ex. 12, p. 4).  On May 24, 2011, Woolf signed an acknowledgement that he "agree[d]
to read the Guide and to abide by its contents as a condition of [his] employment."  (Woolf Dep. 102:15 to 103:5;
Garland Dec. Ex. 13).  The requirement remained the same when a new version of the Guide was published in
August 2013.  (Woolf Dep. 257:14 to 258:4; Garland Dec. Ex. 14, p. 6).

the verbal warning that he had received, he was not in "good standing" and was therefore ineligible for a transfer. (Woolf Dep. 192:6-15, 194:10-13; Garland Dec. Ex. 15).

In the midst of the issues involving his performance, Woolf's attorney, Leonard Pack, Esq., sent a letter to Bloomberg on April 2, 2013, complaining that the verbal warning lacked any "rational basis," and threatening to commence litigation unless Bloomberg "rescinded" the verbal warning and permitted Woolf to explore other opportunities within the Company. (Woolf Dep. 196:16-22, 197:7-12; Garland Dec. Ex. 16). Pack hypothesized that a "likely explanation" for the issuance of Woolf's verbal warning was retaliation for Woolf's having attended a Career Development Group Networking Event. (*Id.*). *The letter said nothing about Woolf's suffering from any disability.* (*Id.*).

Meanwhile, Niziolek investigated Woolf's claims that his verbal warning was unwarranted and his managers had treated him unfairly by speaking to Woolf's managers and reviewing various documents that Woolf provided to him. (Niziolek Decl. ¶ 7 & Ex. 2).[7] Ultimately, Niziolek concluded that Morris and Bowyer had managed Woolf appropriately and had not treated him unfairly. (*Id.*). Niziolek met with Woolf on April 30, 2013 and informed him that he had looked into his concerns with the performance warning and found nothing to support rescinding it. (Woolf Dep. 200:23 to 201:10, 202:17 to 203:13; Niziolek Dec. ¶ 8 & Ex. 3). Niziolek confirmed these communications in an e-mail to Woolf on May 14, 2013. (Woolf Dep. 201:19 to 202:12; Garland Dec. Ex. 17). Separately, Matthew Asman, Bloomberg's Global Head of Employment Law, informed Pack that Bloomberg had investigated the allegations in his April 2 letter, and had found nothing to support rescinding Woolf's verbal warning, and

---

[7] References to the Declaration of Jim Niziolek are designated as "(Niziolek Dec. ¶ __)." References to exhibits attached to the Niziolek Declaration are designated as "(Niziolek Dec. Ex. __)."

consistent with Bloomberg's policy, Woolf could not apply for internal transfers into other positions within the Company until his performance improved.  (Asman Dec. ¶ 6).[8]

### 4.  Woolf's 2013 Interim Performance Evaluation Reflects His Continued Performance Problems.

On April 23 and 25, 2013, Morris and Bowyer met with Woolf to discuss the issues that he had raised in his written response to the verbal warning.  (Woolf Dep. 206:6-24, 210:16-20, 211:13-18).  Following the April 25 meeting, Bowyer sent Woolf an e-mail (copied to Morris) providing "an update of what we covered in terms of focus over the near term"; in response, Woolf thanked them "for the detailed explanations of [his] job expectations," which he characterized as "immensely helpful."  (Woolf Dep. 208:12-20; Garland Dec. Ex. 18).  The next day, Woolf e-mailed Strada again to inquire about his "potential options" for transferring to a different department in Bloomberg.  (Woolf Dep. 212:23 to 213:4, 213:17-24; Garland Dec. Ex. 19).  Strada replied that, although she would meet with him, she did not have any additional insight or information to provide.  (*Id.*).

On May 14, Woolf e-mailed Niziolek about his upcoming 2013 Interim Performance Review, and complained that although he found some weekly meetings with his managers "productive," others felt like "'witch hunts.'"  (Woolf Dep. 201:19 to 202:12; Garland Dec. Ex. 17).  Niziolek replied to Woolf that he had "discussed your concerns in detail … following my looking into the issues you had raised in connection with your receipt of the verbal warning," and counseled Woolf to "reach out to" Morris and Bowyer if he had "further questions on what they said or [if he] wish[ed] to get more clarification."  (*Id.*).[9]

---

[8] References to the Declaration of Matthew Asman are designated as "(Asman Dec. ¶ __)." References to exhibits attached to the Asman Declaration are designated as "(Asman Dec. Ex. __)."

[9] On May 23, Bowyer received a copy of an "update" e-mail that Woolf had sent to a number of senior leaders at Bloomberg, including Gary Kotovets (Morris's supervisor), which repeated information about which they were already aware.  (Garland Dec. Ex. 20).  Bowyer immediately questioned Woolf why he had sent the "update" e-mail

After Woolf continued to struggle with his performance, on June 5, Bowyer and Morris

met with him to deliver his 2013 Interim Performance Evaluation, which provided an overall

performance rating of "Needs Improvement" and a metrics rating of "Unacceptable." (Woolf

Dep. 220:17 to 221:5; 221:17-23; 224:12-19; Garland Dec. Ex. 21).[10]  With respect to Woolf's

metrics rating, the review stated:

- "[Woolf] has had limited results in terms of completed tasks and many of the deals he's responsible for have been held up by his poor management of his time, internal relationships and deal details."

- "He must improve on taking control of deals he's responsible for closing and also putting himself at the center when business problems arise.  [Woolf] must grasp hold of the key concepts, come up with plans of action and communicate clearly and concisely to the various stakeholders and execute on them more efficiently and effectively."

- "The expectation is that someone with his level of experience and time at the firm would have mastered the basics and would be coming up with high value additive concepts for both the group and the products he is responsible for."

(Garland Dec. Ex. 21).

On or about June 24, 2013, Woolf submitted a written rebuttal of his 2013 Interim

Performance Evaluation to Niziolek, Bowyer, and Morris, and they all met on July 3, 2013 to

discuss this rebuttal, as well as Bowyer and Morris's concern that Woolf was not completing the

deals needed to acquire necessary data for BI.  (Woolf Dep. 236:18 to 238:5; Garland Dec. 23).

At the conclusion of the meeting, Niziolek informed Woolf that his work performance was still

not meeting expectations, and that he needed to improve immediately or he could receive a

written warning.  (Woolf Dep. 239:10-20).

---

when Bowyer had previously instructed him not to do so.  (Woolf Dep. 214:3-19; Garland Dec. Ex. 20).  At a follow-up meeting, Kotovets counseled Woolf that he should not be sending emails of that kind to a broad group within the Company.  (Woolf Dep. 216:12-15, 218:2-17).

[10] In late May, Bowyer had spelled out in an e-mail to Woolf what he should be doing to achieve his performance objectives.  (Woolf Dep. 219:8-16; Garland Dec. Ex. 22).  Bowyer instructed Woolf to "look at how you're managing your time closely on these deals … and make necessary adjustments so we see more immediate output from you."  (Garland Dec. Ex. 22).

Firm:46487251

### 5.  **Woolf Receives a Written Warning for Continued Performance Problems.**

Woolf failed to improve his work performance, and on September 19, 2013, Morris,

Bowyer, and Niziolek met with Woolf to issue him a Written Warning.  (Woolf Dep. 240:6-11;

Garland Dec. Ex. 24).  The Written Warning outlined specific negotiation and management

concerns with respect to five of his accounts and provided concrete performance objectives:

- "You need to make immediate progress in the coming weeks in terms of pushing negotiations forward quickly and effectively in order to achieve significant results of getting the deals closed (or close to closed) with the best possible terms for Bloomberg."

- "Improve your productivity in the time and effort you spend on your workflow to improve your overall performance."

- "Improve your communication with internal stakeholders to drive forward the business for which you are responsible."

- "Achieve tangible, measurable results in terms of closing out deals that you're responsible for in an effective and timely manner and ensure these deals are structured in Bloomberg's best interest."

- "Play an active, central role in your deals.  Interpret, analyze and communicate appropriate conclusions from this process so that you[r] colleagues are able to make informed business decisions based on your negotiations."

(Garland Dec. Ex. 24).  The Written Warning also informed Woolf that if his performance did

not improve immediately, then he could be subject to further disciplinary action, up to and

including termination of his employment.  (*Id.*).

About a week after issuance of the Written Warning, Woolf's managers learned that

during a negotiation, Woolf had inappropriately offered a data provider contractual concessions

that Woolf knew (or should have known) Bloomberg would not agree to.  (Woolf Dep. 243:4 to

246:24; Garland Dec. Ex. 25).  In addition, Hernandez and others continued to complain to Bowyer about Woolf's performance and interaction with clients.  (Bowyer Dep. 116:7-18).[11]

### C.  Woolf's Performance Problems Continue After Brown Replaces Bowyer As Woolf's Supervisor.

In November 2013, Brown became Woolf's supervisor and she began holding periodic one-on-one meetings with him to set out her expectations.  (Woolf Dep. 111:20-23, 247:18 to 248:12).  During a meeting with Woolf on December 11, Brown told Woolf that he needed to make immediate progress on commercial deals and web letters assigned to him so that he could push negotiations forward where possible or, alternatively, escalate the matter to the appropriate Bloomberg unit when progress on a deal did not seem possible.  (Woolf Dep. 249:18 to 251:6; Brown Dec. ¶ 5).[12]  Brown observed that Woolf had consistently low productivity in closing or resolving deals during 2013, as compared to his peers working on similar initiatives, and that Woolf's deals frequently languished in lengthy negotiations periods, while Woolf added little value to the process.  (Brown Dec. ¶ 6).

On December 18, 2013, Brown met with Woolf to discuss his productivity and work results, and informed him that he would not be assigned additional work until after he completed and maintained the assignments already given to him.  (Woolf Dep. 252:3-8; Brown Dec. ¶ 7; Morris Dec. Ex. 1).[13]  Later that same day, Brown e-mailed Morris and Niziolek, reviewing Woolf's inadequate results since her December 11 meeting with him, and reporting that Woolf had failed "to meet the expectations we laid out" for him.  (Brown Dec. ¶ 7; Morris Dec. Ex. 1).

---

[11] References to the December 14, 2017 deposition transcript of Andrew Bowyer (excerpts of which are attached as Exhibit 3 to the Garland Declaration) are designated as "(Bowyer Dep. [page:line])."
[12] References to the Declaration of Laura Brown are designated as "(Brown Dec. ¶ __)."
[13] References to the Declaration of Michael Morris are designated as "(Morris Dec. ¶ __)."  References to the exhibits attached to the Morris Declaration are designated as "(Morris Dec. Ex. __)."

Firm:46487251

**D.  Because of Woolf's Continuing Performance Problems, Bloomberg Terminates Woolf's Employment.**

Subsequently, Brown provided Niziolek with a detailed summary that she had prepared to document Woolf's performance problems since September 2013.  (Brown Dec. ¶ 8; Morris Dec. Ex. 2).  Brown noted that "business managers and [Woolf's] own supervisors have lost confidence and trust in [his] ability to close a deal and negotiate the most favorable terms for the company," and added that Woolf's performance problems had "started to affect morale within the team." (*Id.*).

Based upon Brown's report of Woolf's failure to meet expectations, as well as his own observations of Woolf's performance deficiencies, Morris recommended to Kotovets that Woolf's employment be terminated.  (Morris Dec. ¶ 11).  Morris informed Niziolek of his recommendation, and then Niziolek prepared a summary of Woolf's performance shortcomings and the steps that he and Woolf's managers had taken to address them.  (Niziolek Dec. ¶ 11 & Ex. 4).  Niziolek specifically noted that even after Brown became Woolf's supervisor and provided him with expectations and feedback, Woolf still "did not successfully close any BI or web letter deals."  (*Id.*)  He also noted that Brown believed that Woolf had failed to meet "basic" job requirements, and she had concerns about assigning Woolf any additional work to do.  (*Id.*)

Kotovets accepted Morris's recommendation to terminate Woolf's employment.  (Kotovets Dec. ¶ 6; Morris Dec. ¶ 11).[14]  On January 10, 2014, Morris, Brown, and Niziolek met with Woolf and informed him that his employment was being terminated.  (Woolf Dep. 254:20 to 255:22).  As he left the termination meeting, Woolf said to Brown, "Laura, good working with you.  There's nothing between us."  (Woolf Dep. 254:10-12).  Neither Bowyer nor Strada played

---

[14] References to the Declaration of Gary Kotovets are designated as "(Kotovets Dec. ¶ __)."

any role in the decision to discharge Woolf; Asman purely provided legal advice in his role as

counsel.  (Bowyer Dec. ¶ 7; Strada Dec. ¶ 5; Asman Dec. ¶ 11).[15]

   **E.  Bloomberg Engages in the Interactive Process With Woolf Regarding His Unclear Accommodation Request For The Migraines Caused By His Workplace Stress.**

   Upon the commencement of his employment, Woolf completed a Voluntary Self-Identification form and affirmed therein that he was not "a disabled individual," meaning that he did not have "a physical or mental impairment that substantially limits one or more major life activity," had no "record of such an impairment," and was not "regarded as having such an impairment."  (Woolf Dep. 106:16-20, 107:10 to 108:9; Garland Dec. Ex. 26).  Thereafter, Woolf mentioned having a headache on only three occasions before April 2013; on each of August 15, 2011 and May 23, 2012, Woolf informed Citrin that he would be arriving about an hour late to work because he had a migraine, and on February 5, 2013, Woolf wrote to Bowyer that he would be slightly late to work due to a migraine.  (Melamed Dec. Exs. B, C & D).

   Only *after* Woolf received a verbal warning regarding his performance did he start describing the headaches in much starker terms.  On April 12, 2013, he e-mailed Morris and Bowyer to inform them that he was suffering from a "severe migraine ... [which] happens very infrequently" and *which he expected to last for "24 to 36 hours."*  (Woolf Dep. 260:17 to 261:24; Garland Dec. Ex. 27).  Woolf sent a similar e-mail to Niziolek on the same day, claiming that the headache had "practically incapacitated" him.  (Melamed Dec. Ex. I).  On May 2 and 7, Woolf wrote to Bowyer and Morris, respectively, about having headaches on those days. (Melamed Dec. Exs. K and L).

---

[15] Woolf's January 10, 2014 response to the September 19, 2013 performance warning (a copy of which is attached as Exhibit GG to the Declaration of Abraham Z. Melamed in Support of Plaintiff's Motion for Partial Summary Judgment (hereinafter, "Melamed Dec. Ex. __") was received *after* the termination decision had already been made. (Niziolek Dec. ¶ 13).

A few weeks later, on May 28, Woolf wrote to Niziolek that he had "been suffering from regular and sometimes very serious migraines/headaches for quite some time now (over 2 months)," and that he had suffered a "serious migraine attack with significant visual disturbances" during the prior week.  (Woolf Dep. 262:10-24; Garland Dec. Ex. 28).  Woolf's May 28 e-mail to Niziolek focused solely on his need for *time off*, and did not contain any request for other types of potential accommodations.    (Garland Dec. Ex. 28).

On May 30, 2013, Woolf sent an e-mail to Niziolek attaching a May 29 letter from his physician, Michael Hutchinson, M.D.  (Woolf Dep. 263:10-14, 264:6-9; Garland Dec. Exs. 28, 29).  Hutchinson wrote, in pertinent part, that Woolf's headaches had become "very poorly controlled" and that "the only way" he could see to control them was "to *reduce his stress levels*."  (Garland Dec. Ex. 29)(Emphasis added).  Accordingly, Hutchinson recommended that

> Woolf do what is necessary to change his current work environment, as *it is apparent that the primary trigger of these most recent, intense and frequent migraines involving neurological deficits, is emotional stress at work*, which in the short-term has impacted his speech, sight, and ability to concentrate.

(*Id.*).  At around the same time, Woolf applied for intermittent FMLA leave, and Reed Group, which administered Bloomberg's leave program, notified Woolf that he was eligible for FMLA leave and requested that he submit an FMLA certification form.  (Woolf Dep. 326:6-16; Garland Dec. 30).  Reed Group subsequently approved Woolf's request for intermittent FMLA leave for the period between May 24, 2013 and November 23, 2013.  (Woolf Dep. 326:12-16, 330:11-18; Garland Dec. Ex. 31).[16]

Meanwhile, after receiving Woolf's May 30 email, Niziolek spoke to Woolf on May 31. (Woolf Dep. 266:3-16).  Niziolek informed Woolf that he could take a medical leave of absence,

---

[16] As Woolf acknowledged during his deposition, he was paid his full salary throughout his FMLA leave.  (Woolf Dep. 444:5-7).

but Woolf said that was not necessary.  (Woolf Dep. 267:9-13).  When Niziolek inquired

whether Woolf was seeking anything else from Bloomberg, Woolf responded that he believed he

could do the same job without being managed by Bowyer and Morris.  (Woolf Dep. 269:4-11,

269:22 to 270:3).  Niziolek told Woolf that he was sympathetic to Woolf's medical problems,

but that Woolf's managers had managed him appropriately and were not harassing him in any

way.  (Woolf Dep. 270:14-24).

Niziolek and Woolf spoke again on June 4, and Niziolek sent Woolf a letter confirming

that Woolf was requesting "a medical accommodation" in the form of a "transfer to another

position outside of [his] existing department."  (Woolf Dep. 272:18 to 273:8, 274:16-20; Garland

Dec. Ex. 32).  Niziolek, in pertinent part, wrote:

> In order for us to consider a request for this accommodation, we
> will need specific documentation from your health care provider
> describing the nature, severity and duration of your impairment,
> the specific activities that your impairment limits and the extent to
> which the impairment limits your ability to perform those
> activities.  We will also need information substantiating why you
> need the specific accommodation you are requesting.  Any such
> documentation should be forwarded to me immediately so that we
> may consider your request.

(Garland Dec. Ex. 32).

Woolf replied on June 5 with a letter that largely quoted from Dr. Hutchinson's May 29

letter, and adding that his migraine condition rendered him "unable to work" and "impair[ed]"

his ability "to accurately and efficiently perform [his] work."  (Woolf Dep. 279:16-25; Garland

Dec. Ex. 33 at WOOLF000094).  After receiving the June 5 letter, Niziolek called Woolf and

said that he still did not understand what specific accommodation Woolf sought – particularly

given Woolf's statement that he was unable to work.  (Niziolek Dec. ¶ 20 & Ex. 6).   Woolf

clarified that he wanted a transfer so that he could report to a different supervisor.  (Woolf Dep.

281:4-15, 283:2-16).

Firm:46487251

On June 13, Niziolek sent a follow-up e-mail to Woolf, which stated:

> In terms of your accommodation request, we would need to have any positions you are suggesting [to transfer into] so that we can evaluate these as an accommodation.

(Woolf Dep. 284:6-19; Garland Dec. Ex. 34).  In a June 17 e-mail response, Woolf wrote that he had "thoroughly reviewed the job data base on [Bloomberg's internal job posting site] for which I would have an interest and feel I am relatively qualified to perform AND which would probably be a reasonable accommodation under the ADA."  (Woolf Dep. 287:6-11; Garland Dec. Ex. 35).  Woolf did not provide Niziolek with the specific job titles of any of these positions, but instead *only identified the areas of the world in which those positions were located* and asked how he should "go about requesting this transfer."  (Garland Dec. Ex. 35).  Niziolek replied a short time later that Woolf's e-mail was "very concerning to me as I don't believe you understood our last conversation based on what you have written"; he asked Woolf to call him at his "earliest convenience."  (*Id.*).

Niziolek and Woolf spoke later in the day on June 17, and Niziolek reiterated that transferring to another position was not "automatic"; Niziolek explained (as part of the interactive process), the Company would have to evaluate the essential functions of the specific positions that Woolf wanted to transfer to so that it could determine whether or not he was qualified for those positions.  (Niziolek Dec. ¶ 21 & Ex. 7; Woolf Dep. 288:24 to 289:3, 291:3-12).  At the end of the conversation, Woolf agreed to provide Niziolek with the specific names and job posting numbers of the open positions for which he believed he was qualified.  (Niziolek Dec. ¶ 21 & Ex. 7).

In a June 24 memo to Niziolek, Woolf wrote that he had "narrowed [his] job search currently down to two positions . . . ."  (Woolf Dep. 291:21 to 292:15; Garland Dec. Ex. 36).  The first was a "Fixed Income Electronics Trading Specialist" located in Singapore, and the

17

second was a "BI Research Associate" located in Hong Kong.  (*Id.*).  Niziolek followed up with

the appropriate managers, who informed him that based upon the requirements of each position,

Woolf was not qualified for the Fixed Income Electronics Trading Specialist position because it

required skills that he did not have (*i.e.*, fixed income trading experience and an in-depth

knowledge and abilities with the Bloomberg terminal product), and that he would not be an

appropriate fit for the BI Research Associate position given his demonstrated difficulties in

communicating and cooperating with internal BI stakeholders.  (Niziolek Dec. ¶ 23; Morris Dec.

¶ 15; Woolf Dep. 390:20 to 391:2).[17]

On July 16, Woolf submitted to Bloomberg a July 15 letter from Dr. Hutchinson, in

which Dr. Hutchinson wrote:

> [I]t is my opinion that Mr. Woolf must immediately be allowed to
> change his work environment.  Out of medical necessity, I strongly
> advise that *accommodations be given to Mr. Woolf as soon as
> possible that significantly lower his work stress* as his work
> environment is obviously a major trigger to these more frequent
> and intense migraines.

(Woolf Dep. 292:25 to 293:12; Garland Dec. Ex. 37) (Emphasis added).  Niziolek then met with

Woolf again on July 19, 2013.  After Woolf confirmed that his exacerbated migraine condition

was the result of the stress caused by his supervisors, Niziolek reiterated that he had already

looked into Woolf's concerns about his managers and, as he had already advised Woolf several

times, Morris and Bowyer were not targeting him or treating him unfairly, but were simply

offering feedback on his performance.  (Woolf Dep. 293:13-16; Niziolek Dec. ¶ 24 & Ex. 8).

Niziolek also explained that an internal transfer to one of the two positions that Woolf had

identified in Asia would not eliminate workplace stress because any manager anywhere in the

world would offer necessary feedback about his job performance; according to Woolf, Niziolek

---

[17] Woolf admitted at his deposition that he did not know if he was the "right fit" for either position.  (Woolf Dep. 390:19-20).

Firm:46487251

also said that one of the positions was "below [his] skill levels" while the other was "above [his] skill level." (Woolf Dep. 293:22 to 294:5, 390: 20 to 391:2; Niziolek Dec. ¶ 24 & Ex. 8).

On October 24, Woolf informed Morris and Niziolek that he had been diagnosed with a new medical condition that would require him to undergo cardiac surgery. (Woolf Dep. 324:13-19; Garland Dec. Ex. 38). Woolf also notified Reed Group, which approved Woolf's request for intermittent FMLA leave for his cardiac condition for the period between October 18, 2013 and April 15, 2014. (Woolf Dep. 340:16-24; Garland Dec. Ex. 39). About a month later, Woolf applied to extend his intermittent FMLA leave for his migraine condition, which was set to expire on November 23, 2013. (Woolf Dep. 331:6-12; Garland Dec. Ex. 40). Reed Group approved this request, and extended this intermittent FMLA leave until May 23, 2014. (Woolf Dep. 334:6-16; Garland Dec. Ex. 41).

On December 13 (at which time he was no longer reporting to Bowyer), Woolf submitted to Human Resources yet another letter from Dr. Hutchinson, this one dated November 27, which made the same vague recommendations as his prior letters:

> I continue to strongly recommend Mr. Woolf *reduce his stress levels, particularly at work*, as it is still very important as part of his ongoing medical care as explained in my previous letters dated May 26, 2013 and July 15, 2013.

(Woolf Dep. 449:9-14, 449:24 to 450:9; Garland Dec. Exs. 42 and 43) (emphasis added).

Also on December 13, Woolf submitted another request to Reed Group for FMLA leave, this time to care for his wife. (Woolf Dep. 341:10-19; Garland Dec. Ex. 44). Reed Group approved this third request for FMLA leave on January 10, 2014. (Woolf Dep. 344:12-21;

19

Garland Dec. Ex. 45).  Thus, Reed Group *approved* all of the FMLA applications made by Woolf during his employment with Bloomberg.  (Woolf Dep. 344:22 to 345:2).[18]

## ARGUMENT

### I.   WOOLF'S DISABILITY DISCRIMINATION CLAIMS FAIL AS A MATTER OF LAW.

#### A.   Woolf Is Not Disabled Under the ADA, NYSHRL, or NYCHRL.

Woolf claims that Bloomberg violated the ADA, NYSHRL, and NYCHRL by "failing to consider [Woolf's] requests for a reasonable accommodation," and terminating his employment because of his disability.  As an initial matter, Woolf has failed to demonstrate that he is "disabled" within the meaning of any of these statutes because he has established only that he could not work for particular supervisors – *not* that he could not perform any major life activities or, indeed, that he could not perform any of his job duties.[19]  *See Schneiker v. Fortis Ins. Co.*, 200 F.3d 1055, 1062 (7th Cir. 2000) (finding that "if [the plaintiff] can do the same job for another supervisor, she can do the job, and does not qualify [as disabled].") (citation omitted); *Domenech v. N.Y. City Emps.' Ret. Sys.*, No. 15 CV 2521, 2016 U.S. Dist. LEXIS 61175, at *12-13 (E.D.N.Y. May 9, 2016) (finding the plaintiff's "severe anxiety" allegedly developed as a result of stress due to working under a particular supervisor does not qualify as a disability).

Woolf alleges that Dr. Hutchinson treated him for "tension headaches" as early as 2000.  (Woolf Dep. 264:10-18).  Woolf describes these as "simple migraines" that were initially

---

[18] During discovery, Bloomberg learned that about ten years earlier, Woolf had filed a disability discrimination lawsuit against a prior employer, Zurich Financial Services Company ("Zurich").  *Woolf v. Zurich Fin. Servs. Co.*, No. 04 CV 5553 (PKC) (S.D.N.Y. 2004).  In his *pro se* Complaint, Woolf made the same allegations against Zurich that he now makes against Bloomberg: Woolf claimed to suffer from a disability (in that case, migraines "triggered by a hypersensitivity to bright light"), he sought a transfer to a different position as an "accommodation" for that disability, and he asserted that Zurich denied him a reasonable accommodation when it declined his request to transfer.  (Woolf Dep. 474:5-23; Garland Dec. Ex. 46, pgs. 16-17 of 27).

[19] Woolf's failure to demonstrate that he is "disabled" is fatal to both his discriminatory termination and failure to accommodate claims.  *See Rodal v. Anethesia Grp. of Onondaga, P.C.*, 369 F.3d 113, 118 (2d Cir. 2004) (reasonable accommodation claim); *Cameron v. Cmty. Aid for Retarded Children, Inc.*, 335 F.3d 60, 63 (2d Cir. 2003) (disability discrimination claim).

infrequent in nature (Woolf Dep. 160:17 to 161:6; Garland Dec. Ex. 27) and, according to Woolf, did not prevent him from adequately performing his job duties while working under a different supervisor (Citrin) in 2011 and 2012.  (Woolf Dep. 109:16-21, 115:4-15, 116:2-15, 117:19 to 118:10, 123:11 to 124:21; Garland Dec. Exs. 6 and 7).  In around May 2013 – only *after* Bowyer identified deficiencies with Woolf's work – did Woolf's condition allegedly deteriorate into what Woolf described as "complex migraines with neurological deficits." (Woolf Dep. 261:6-10).[20]  Woolf attributed this deterioration to the stress he felt as a result of his interactions with Bowyer in the workplace.  (Woolf Dep. 261:6-23; *see also* Garland Dec. Ex. 29 ("[I]t is apparent that the primary trigger of these most recent, intense and frequent migraines involving neurological deficits[ ] is *emotional stress at work* . . . .") (Emphasis added)).  Indeed, Woolf insists that he could have performed the *exact same job* under different supervisors – specifically, supervisors who "appreciated" his work and would not "subject[ him] to manufactured stress." (Woolf Dep. 269:22 to 270:3, 278:20 to 279:2, 281:4-9, 283:2-11).

It is well-settled that "'[j]ob-related stress – particularly that caused by working with a particular supervisor – is not considered a disability.'"  *Domenech*, 2016 U.S. Dist. LEXIS 61175, at *12-13 (ADA) (citation omitted); *see also Dearden v. Glaxosmithkline LLC*, No. 15 Civ. 7628, 2017 U.S. Dist. LEXIS 149408, at *36-37 (S.D.N.Y. Sept. 14, 2017) (finding that even if the plaintiff was diagnosed with "work-related stress or anxiety, such conditions have

---

[20] Woolf's assertion that "Defendants had knowledge of [his] disability, beginning in August of 2011, when [he] first e-mailed his supervisor, Steve Citrin" (Pl. Mem. at 14), is plainly wrong.  That August 2011 e-mail (Melamed Dec. Ex. B), merely said that Woolf had a "severe migraine" that morning and he would be in the office shortly. The mere fact that Woolf informed his supervisor that he would be late to work because he had a migraine did not put the Company on notice that he suffered from a disability.  Information provided by the Job Accommodation Network (JAN) (a third-party entity that provides employers with guidance on requests for disability accommodations), which was produced by Woolf during discovery, states that "an estimated 28 million Americans have migraine headaches," and that "some people with migraine headaches will have a disability under the ADA and some will not."  (Garland Dec. Ex. 47).  The only information that Bloomberg possessed regarding Woolf's condition between the commencement of Woolf's employment in June 2011 and its receipt of Dr. Hutchinson's May 29, 2013 letter was Woolf's certification that he was *not* disabled.  (Garland Dec. Ex. 26).

been recognized as not actionable to bring a NYSHRL disability discrimination claim.")
(citations omitted); *Lenhoff v. Getty*, No. 97 Civ. 9458, 2000 U.S. Dist. LEXIS 9835, at *19
(S.D.N.Y. July 13, 2000) ("[J]ob-induced stress cannot be considered a disability under the
NYSHRL or NYCHRL.") (citation omitted); *see also Raisley v. First Manhattan Co.*, 4 Misc. 3d
1022(A), 2004 N.Y. Misc. LEXIS 1494, at *13 n.2 (N.Y. Sup. Ct. N.Y. Cty.  2004) ("claims of
disability resulting from stress caused by a particular supervisor have not been well-received")
(citation omitted).  This is true even when the alleged stress that a plaintiff attributes to working
with a particular supervisor causes or exacerbates an existing medical condition.  *Chang v.
MetroPlus Health Plan*, No. 12 CV 3181, 2014 U.S. Dist. LEXIS 28318, at *17 (S.D.N.Y. Mar.
4, 2014) (finding depression caused by the plaintiff's work environment and relationship with a
supervisor was not a disability under the ADA), *aff'd*, 590 F. App'x 74 (2d Cir. 2015);
*Thompson v. FRB*, No. 01 CV 11640, 2004 U.S. Dist. LEXIS 2613, at *23 (S.D.N.Y. Feb. 20,
2004) (finding the plaintiff not disabled under the ADA when "her medical problems were
caused by her relationship with one supervisor"); *Potter v. Xerox Corp.*, 88 F. Supp. 2d 109, 112
(W.D.N.Y. 2000) ("[T]he record indicates that plaintiff's impairment is his inability to work
under the supervision of Danylyshyn [and] [t]hat does not rise to the level of a disability under
the statutory definition.") (collecting cases), *aff'd*, 1 F. App'x 34, 36 (2d Cir. 2001) ("[I]f Potter
can work any job provided he is assigned to a new supervisor, he is not disabled within the terms
of the ADA.").[21]

---

[21] *See also Gaul v. Lucent Techs., Inc.*, 134 F.3d 576, 580 n.3 (3d Cir. 1998) ("[W]e strongly suspect that a plaintiff
who is unable to work with individuals who cause him 'prolonged and inordinate stress' cannot be said to be
incapable of performing a 'class of jobs or a broad range of jobs in various classes.'") (citation omitted); *Siemon v.
AT&T Corp.*, 117 F.3d 1173, 1176 (10th Cir. 1997) (the plaintiff's "mental impairment merely prevents him from
working under a few supervisors within the organizational structure of one major corporation," and so he was
therefore "not an individual with a disability under the ADA") (citation omitted); *Weiler v. Household Fin. Corp.*,
101 F.3d 519, 524 (7th Cir. 1996) ("Weiler's claim amounts to a charge that she is only unable to work if Skorupka
is her boss . . . Whatever Weiler's problem was with Skorupka, it is not recognized as a disability under the ADA").

Firm:46487251

In his motion papers, Woolf insists that he is disabled because he suffers from "complex migraines with neurological deficits."  (Pl. Mem. at 13-14).  As set forth above, however, he has admitted that these migraines were manageable at the commencement of his employment at Bloomberg and that, in his view, he adequately performed his job duties until the stress he felt while working under Bowyer and Morris triggered an exacerbation of his long-time migraine condition.[22]  Moreover, Woolf has maintained that he would have been able to perform the *exact same job duties* if he were allowed to work under another supervisor.  Under these circumstances, Woolf has failed to demonstrate that he suffered from a "disability" under federal, state, or city law, as he has admitted that his alleged condition did not limit any major life activities, even that of working.

Accordingly, because Woolf is not "disabled" as a matter of law under the ADA, NYSHRL, or NYCHRL, his discriminatory termination and failure to accommodate claims should be dismissed without further consideration.

### B.  Woolf's Discriminatory Termination Claims Should Be Dismissed.

The Court should also dismiss Woolf's claims in the First, Sixth, and Ninth Causes of Action that Bloomberg discriminatorily terminated his employment because of his disability, in violation of the ADA, NYSHRL, and NYCHRL.  *See Kinneary v. City of N.Y.*, 601 F.3d 151, 158 (2d Cir. 2010) (the same elements required "to establish an ADA claim must also be demonstrated to prove claims under NYSHRL and NYCHRL").  Here, Woolf carries the initial burden of establishing a *prima facie* case by showing that: (1) Bloomberg is subject to the statutes; (2) he suffered from a disability within the meaning of each; (3) he was otherwise qualified to perform his job functions with or without reasonable accommodation; and (4) he

---

[22] For that matter, and as is clear from his numerous written "rebuttals" to his managers' attempts to provide him with constructive criticism, Woolf maintains that  he continued to adequately perform his job duties for the duration of his employment.

23

suffered an adverse employment action because of his disability.  *Cameron*, 335 F.3d at 63 (citation omitted).

As noted above, Woolf cannot demonstrate that he was disabled under the ADA, NYSHRL, or NYCHRL.  In addition, Woolf cannot point to any evidence that would allow a reasonable factfinder to conclude that Bloomberg terminated his employment under circumstances giving rise to an inference of discrimination.  *See Flynn v. McCabe & Mack LLP*, No. 15 CV 5776, 2018 U.S. Dist. LEXIS 21346, at *28 (S.D.N.Y. Feb. 8, 2018) (granting summary judgment when the plaintiff failed to point to any connection between her disability and her termination).  Indeed, Woolf has done nothing more than claim to be disabled and point to his termination – which is insufficient as a matter of law to establish an inference of discrimination.  *See Grillo v. N.Y. City Transit Auth.*, 291 F.3d 231, 235 (2d Cir. 2002) ("[Plaintiff] has 'done little more than cite to [his alleged] mistreatment and ask the court to conclude that it must have been related to [his] [protected status].'") (citation omitted).

Even assuming, *arguendo*, that Woolf could establish a *prima facie* case, Bloomberg has met its burden to articulate a legitimate, non-discriminatory reason for its decision to terminate Woolf's employment: Woolf's inadequate work performance.  *See Wesley-Dickson v. Warwick Valley Cent. Sch. Dist.*, 586 F. App'x 739, 742 (2d Cir. 2014) (affirming summary judgment; finding employee's work performance constituted a legitimate, non-discriminatory reason for his termination); *Jain v. McGraw-Hill Cos.*, 827 F. Supp. 2d 272, 277-78 (S.D.N.Y. 2011) (granting summary judgment on the plaintiff's NYSHRL and NYCHRL claims where employee's history of poor work performance and related warnings established a legitimate, nondiscriminatory reason for employee's termination), *aff'd*, 506 F. App'x 47 (2d Cir. 2012).

Firm:46487251

Here, Woolf does not dispute that, beginning in March 2013, he received a series of progressively more serious warnings and had been informed on multiple occasions that he was performing below expectations.  (Woolf Dep. 180:19-23, 186:6-16, 216:12-15, 218:2-17, 219:8-16, 220:17 to 221:23, 239:10-20 to 240:11).  Woolf also cannot dispute that in the weeks leading up to his termination, his managers informed him that he continued to make errors in judgment and failed to make sufficient progress on various projects.  (Woolf Dep. 243:4 to 246:24, 111:20-23, 247:18 to 248:12, 249:18 to 251:6).

Given that Bloomberg has established a legitimate, non-discriminatory reason for his termination, Woolf cannot avoid summary judgment because no evidence suggests that Bloomberg's stated reason is false, *and* that it is more likely than not that discrimination was the real reason.  *See Vinokur v. Sovereign Bank,* 701 F. Supp. 2d 276, 288-89, 292 (E.D.N.Y. 2010) (granting summary judgment where the plaintiff failed to offer any evidence that the employer's reason for terminating her was false and that it was more likely that a discriminatory reason motivated the termination); *Costello v. St. Francis Hosp.*, 258 F. Supp. 2d 144, 157 (E.D.N.Y. 2003) (summary judgment granted for employer where there was "no evidence in the record that [the] proffered reasons for terminating [employees] were intended as a mask for disability-based discrimination").  Woolf's disagreement with his performance warnings and critiques is simply not enough to avoid summary judgment because he cannot dispute that his managers did, in fact, have problems with the quality of his work.  *See Soderberg v. Gunther Int'l, Inc.*, 124 F. App'x 30, 32 (2d Cir. 2005) ("In short, although [Plaintiff] may consider [D]efendant's termination decision an over-reaction to her perceived mishaps, she can point to no evidence in the record indicating that her employer was not, in fact, displeased with her actions, much less that the real reason for her termination was [disability] discrimination.") (summary order) (citations omitted).

25

Moreover, none of the Individual Defendants made any statements that would evidence a discriminatory bias, or otherwise engaged in any conduct suggesting an animus against Woolf because of his alleged disability.  *See Flynn*, 2018 U.S. Dist. LEXIS 21346, at *34-35.  To the contrary, the record reflects that Woolf's supervisors were sympathetic to his migraine condition and encouraged him to take as much time off as he needed to get better.  (Woolf Dep. 270:14-18, 324:20 to 325:3, 401:10 to 402:3).  This case simply does not have any of the hallmarks of pretext since Woolf cannot point to any credible evidence that Bloomberg's explanation for his termination was not held in good faith, and he does not have direct evidence of discrimination. *See Flynn*, 2018 U.S. Dist. LEXIS 21346, at *37.  Woolf's "subjective belief that he was not treated fairly is simply not enough to demonstrate pretext."  *Silva v. Peninsula Hotel*, 509 F. Supp. 2d 364, 386 (S.D.N.Y. 2007) (citation omitted).  Accordingly, Woolf's discriminatory termination claims should be dismissed.[23]

### C.  Woolf's Failure to Accommodate Claims Should Be Dismissed.

To establish a *prima facie* case of failure to accommodate under the ADA, NYSHRL, and NYCHRL (also pleaded in the First, Sixth, and Ninth Causes of Action), Woolf must demonstrate that (1) he suffered from a disability; (2) Bloomberg had notice of his disability; (3)

---

[23] To the extent that Woolf has attempted to bootstrap a hostile work environment claim onto his NYSHRL and NYCHRL discrimination claims (*see* Am. Compl. ¶¶ 93, 103), such action is entirely improper.  *See Ben-Levy v. Bloomberg L.P.*, No. 11 Civ. 1154, 2012 U.S. Dist. LEXIS 90292, at *34 (S.D.N.Y. June 26, 2012) (finding the plaintiff's attempt to take "his discrete claims of discrimination and retaliation, string them together and call that a 'hostile work environment' is 'not sufficient'" to set forth a valid cause of action.), *aff'd*, 518 F. App'x 17 (2d Cir. 2017).  Even under the less exacting standard of the NYCHRL, Woolf cannot show that he suffered any hostile work environment.  *See Williams v. New York City Hous. Auth.*, 61 A.D.3d 62, 78 (1st Dep't 2009) (finding that a plaintiff must establish that he "has been treated less well than other employees because of" his protected characteristic).  Here, Woolf's "hostile work environment" allegations center around one conversation that he had with Bowyer in March 2013, during which Bowyer "said basically he disagreed with what I was doing on this one deal" in a manner that Woolf found to be "disrespectful," "rude," and "unprofessional."  (Woolf Dep. 164:14 to 167:3).  As this baseless allegation constitutes, at most, a petty slight or trivial inconvenience that bears no connection to his disability (or accommodation requests or alleged protected activity), Woolf's hostile work environment claims should be dismissed.  *See Short v. Deutsche Bank Sec., Inc.*, 79 A.D.3d 503, 505-506 (1st Dep't 2010) (affirming dismissal of hostile work environment claims on summary judgment and finding complained-of comments were petty slights and minor inconveniences that "may be viewed by a reasonable employee as a function of [the supervisor's] management style, unrelated to [unlawful] discrimination.").

with reasonable accommodation, he could have performed the essential functions of his position; and (4) Bloomberg refused to make such accommodation. *See McBride v. BIC Consumer Prods. Mfg. Co.*, 583 F.3d 92, 97 (2d Cir. 2009); *Missick v. City of N.Y.*, 707 F. Supp. 2d 336, 354 (E.D.N.Y. 2010).[24]  As an initial matter, for the reasons discussed above in Section I(A), Woolf cannot show that his desire not to report directly to Bowyer or indirectly to Morris is a "disability" within the meaning of the ADA, NYSHRL, and NYCHRL.  In any event, Woolf's accommodation claims cannot survive summary judgment because he has failed to meet his required burden to identify a reasonable accommodation. *See Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 139 (2d Cir. 1995).  Indeed, it is axiomatic that an employer is not obligated to provide an employee with a "completely stress-free environment," *Potter*, 88 F. Supp. 2d at 114 (collecting cases).[25]

Woolf contends that although Bloomberg (through Reed Group) granted him all of the sick and FMLA leave that he requested, the Company failed to engage in an interactive process with him and provide him with an "accommodation" that would "reduce [his] stress" – *i.e.*, permitting him to transfer into a different position that would allow him to perform his *same job duties* while working under a different supervisor.  (Woolf Dep. 269:4-11, 269:22 to 270:3, 278:14 to 279:2, 282:7 to 283:16).  The record demonstrates, however, that Bloomberg did

---

[24]  The NYSHRL makes it unlawful for an employer "to refuse to provide reasonable accommodations to the known disabilities of an employee . . . in connection with a job or occupation sought or held" and defines "reasonable accommodation" as actions taken "which permit an employee . . . with a disability . . . to perform in a reasonable manner the activities involved in the job or occupation sought or held . . . provided, however that such actions do not impose an undue hardship on the business." N.Y. Exec. Law §§ 292(21-e), 296(3)(a).  The NYCHRL requires employers to "make reasonable accommodation to enable a person with a disability to satisfy the essential requisites of a job[.]" N.Y.C. Admin. Code § 8-107(15)(a).  Under the NYCHRL, "[i]n any case where the need for reasonable accommodation is placed in issue, it shall be an affirmative defense that the person aggrieved . . . could not, with reasonable accommodation, satisfy the essential requisites of the job[.]" N.Y.C. Admin. Code § 8-107(15)(b).

[25]  *See also Gaul*, 134 F.3d at 581 ("The only certainty for [defendant] would be its obligation to transfer Gaul to another department whenever he becomes 'stressed out' by a coworker or supervisor.  It is difficult to imagine a more amorphous 'standard' to impose on an employer.").

engage in the interactive process with Woolf, and it was Woolf who stalled and delayed the process by not clearly articulating the accommodation sought from the beginning. When Woolf initially brought his accommodation request to Niziolek's attention in late May and early June 2013, he submitted documentation suggesting that he might be entirely unable to work – he certainly did not specify that he sought an internal transfer as an accommodation. (Garland Dec. Ex. 23). After Woolf finally clarified that he sought an internal transfer that would allow him to perform the same or similar job functions working under different supervisors, he failed to identify the specific positions that he sought. (Garland Dec. Ex. 35). Finally, on June 24, 2013, Woolf stated that the "accommodation" he sought was an internal transfer to one of two open positions in Asia – in order to "place[ ] him in a situation where [his] work was appreciated and [he] was not being subjected to manufactured stress," although Niziolek explained to him that no matter where in the world he worked at Bloomberg, he would have to be willing to receiving feedback from his managers. (Woolf Dep. 281:4-9, 293:22 to 294:2, 296:21-23).

Not surprisingly, under these circumstances, courts have recognized a well-settled "presumption [ ] that a request to change supervisors is unreasonable, and the burden of overcoming that presumption (*i.e.*, of demonstrating that, within the particular context of the plaintiff's workplace, the request was reasonable) therefore lies with the plaintiff." *Kennedy v. Dresser Rand Co.*, 193 F.3d 120, 122-23 (2d Cir. 1999) (finding that an employer need not undertake "excessive organizational costs" in order to grant an employee's "accommodation" request to transfer to work under a different supervisor) (citation omitted); *see also Potter*, 88 F. Supp. 2d at 114 ("[a]ssuming that the 'accommodation' requested here was a transfer to a different department under a different supervisor, that is not considered to be a 'reasonable' accommodation under the ADA"). Here, Woolf cannot overcome that presumption; Niziolek

had already concluded – after conducting a thorough review and inquiring with the relevant managers – that Woolf's supervisors had been appropriately managing him and that Woolf was not qualified for either of the roles he had identified in Asia.  (Niziolek Dec. ¶¶ 8 and 23).

On this record, Woolf has failed to demonstrate that his "accommodation" request to relocate to a position in Singapore or Hong Kong was reasonable.  *See Kennedy*, 193 F.3d at 123 (affirming grant of summary judgment when the plaintiff failed to demonstrate that request to change supervisors was a reasonable accommodation); *Barton v. Unity Health Sys.*, No. 14 CV 6658, 2018 U.S. Dist. LEXIS 44125, at *16-17 (W.D.N.Y. Mar. 19, 2018) (rejecting the plaintiff's argument "that she would have been able to perform her job if Defendant granted the requested 'reasonable accommodations' of having her work under a different supervisor and with different coworkers," and concluding that the ADA did not require the employer to grant plaintiff's transfer request because "[w]orking under an assigned supervisor . . . is an essential job function."); *Bento v. City of Milford*, 213 F. Supp. 3d 346, 363-64 (D.Conn. 2016) (granting summary judgment on ADA claims when the plaintiff could not overcome the presumption that her request to report to a different supervisor as an accommodation was unreasonable).  Indeed, under these circumstances, the cases make clear that the law has not evolved to the point where an employer must transfer an employee to another position on the other side of the world simply because the employee is "stressed" by his supervisor.

Accordingly, the failure to accommodate claims should be dismissed and Woolf's motion for partial summary judgment should be denied.[26]

---

[26] Woolf's reliance on the EEOC's March 30, 2016 Determination (Melamed Dec. Ex. HH) is misplaced.  As the Second Circuit has recognized, the Court's decision whether or not to admit the EEOC's determination is discretionary.  *Paolitto v. Brown E.&C. Inc.*, 151 F.3d 60, 64 (2d Cir. 1998).  Where, as here, the record evidence undercuts factual findings made by the EEOC, and Woolf has a full opportunity to present to the Court all the evidence that he submitted to the EEOC, the Court need not consider the EEOC's determination.  *See id.* at 65 (finding trial court did not err in refusing to admit administrative agency determination).

## II.   WOOLF'S RETALIATION CLAIMS FAIL AS A MATTER OF LAW.

In the Second, Fifth, Seventh, and Tenth Causes of Action, Woolf claims that Bloomberg retaliated against him for filing an EEOC Charge in July 2013, in violation of the ADA, Title VII, the NYSHRL, and the NYCHRL.  Under any of these statutes,[27] Woolf must establish a *prima facie* case of retaliatory termination by showing: (1) he engaged in "protected activity" under the statutes, (2) Bloomberg was aware of that protected activity, (3) an adverse employment action occurred, and (4) a causal connection existed between the protected activity and the adverse employment action. *Weissman v. Dawn Joy Fashions, Inc.*, 214 F.3d 224, 234 (2d Cir. 2000).[28]

Here, Woolf cannot establish the fourth element of the *prima facie* case.  Woolf notified Bloomberg on July 15, 2013 that he had filed an EEOC Charge.  (Woolf Dep. 405:10-15, 407:6-10; Garland Dec. Ex. 48).  Almost six months passed, however, before Bloomberg terminated his employment.  While a plaintiff can sometimes rely on temporal proximity between the protected activity and adverse employment action to show a causal connection at the *prima facie* stage, courts within this Circuit have generally concluded that six months is too long a period to establish causation.  *See Hollander v. Am. Cyanamid Co.*, 895 F.2d 80, 85-86 (2d Cir. 1990) (passage of three months was too attenuated).

---

[27] Retaliation claims brought under the NYCHRL are analyzed separately, and require a plaintiff to "show that [he] took an action opposing [his] employer's discrimination, . . . and that, as a result, the employer engaged in conduct that was reasonably likely to deter a person from engaging in [protected activity]."  *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 112 (2d Cir. 2013) (citations omitted).  Because, however, Woolf complains only about his termination – an adverse employment action under any statute – the NYCHRL analysis is the same as under Title VII.  *See Chang*, 2014 U.S. Dist. LEXIS 28318, at *24 n.8.

[28] While the United States Supreme Court has held that Title VII retaliation claims "must be proved according to traditional principles of but-for causation, not the lessened [motivating-factor] causation test," *Univ. of Tex. Southwestern Med. Ctr. v. Nassar*, 570 U.S. 338, 360-61 (2013), the Second Circuit has not yet determined whether a plaintiff must show that retaliation was a "but for" cause of his termination (rather than merely a "motivating factor") in order to succeed on an ADA retaliation claim.  *See Eisner v. Cardozo*, 684 F. App'x 29, 30 (2d Cir. 2017).

Firm:46487251

Moreover, where, as here, "timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise." *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001). Here, Woolf received a verbal warning in March 2013 and a negative Interim Performance Evaluation in June 2013 – both *before* he filed the EEOC Charge. Woolf's subsequent written warning and ultimate discharge for performance reasons were merely "escalating disciplinary charges" that began *before* Bloomberg had any knowledge that Woolf intended to file the EEOC Charge, which "negates any inference of retaliation that might arise from the timing of the adverse employment actions." *Chang*, 2014 U.S. Dist. LEXIS 28318 at *26.

Even if Woolf could establish a *prima facie* case of retaliation, which he cannot, Bloomberg has articulated a legitimate, non-retaliatory reason for his termination – *i.e.*, his year-long, documented history of performance problems that did not improve despite multiple warnings. As a matter of law, temporal proximity alone is simply insufficient to establish pretext. *See El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010); *Slattery*, 248 F.3d at 95. Moreover, Woolf admitted during his deposition that after he filed the EEOC Charge, he only mentioned it to Niziolek, Morris, and Bowyer (Woolf Dep. 410:10-15), and none of them ever made any negative comments or otherwise engaged in any conduct evidencing a retaliatory animus (Woolf Dep. 415:21 to 416:2, 422:10 to 423:6, 429:5-11). Finally, Woolf cannot demonstrate that Bloomberg treated him any differently (or less favorably) than similarly-situated colleagues with the same history of performance problems. Accordingly, Woolf cannot show that Bloomberg's articulated reason for his discharge is pretextual, and his retaliation claims should therefore be dismissed.

31

### III.    THE INDIVIDUAL DEFENDANTS CANNOT BE HELD LIABLE UNDER THE NYSHRL AND NYCHRL.

Woolf cannot sustain any of his claims against the Individual Defendants under the NYSHRL and NYCHRL.

First, Woolf's "aiding and abetting" claims against the Individual Defendants, brought under Section 296(6) of the NYSHRL and Section 8-107(6) of the NYCHRL, fail because they are based on the same factual predicates as his federal discrimination, failure to accommodate, and retaliation claims, and Woolf cannot point to any evidence that would permit those claims to survive summary judgment. *See Turowski v. Triarc Cos.*, 761 F. Supp. 2d 107, 113-114 (S.D.N.Y. 2011) (granting summary judgment and dismissing claims against individual defendants "[b]ecause individual liability under NYSHRL and NYCHRL is dependent upon the liability of the corporate or institutional employer").[29]

Second, Woolf cannot establish that any of the Individual Defendants are liable as aiders and abettors under either the NYSHRL or NYCHRL because he cannot point to any evidence that they "actually participated" in any alleged failure to accommodate, or in discrimination or retaliation.  As an initial matter, Bowyer, Morris, and Strada were entirely unaware of Woolf ever requesting a job transfer in 2013 as a reasonable accommodation for a disability.  (Bowyer Dep. 131:21-24, 136:12-21; Morris Dep. 56:18 to 57:4, 59:3-10; Strada Dep. 48:9-19).  Asman's only involvement in Woolf's accommodation request was to communicate with Woolf's attorney in his role as Bloomberg's in-house counsel, and to provide Bloomberg's Human Resources department with legal advice after receipt of the April 1, 2013 letter from Woof's counsel.  (Asman Dec. ¶ 9).  Indeed, Bowyer, Morris, Strada, and Asman did not have the authority to

---

[29] For the same reasons, Woolf's claim in the Twelfth Cause of Action under Section 8-107(13) for vicarious liability against Bloomberg must also fail. *See O'Neill v. Swiss Post Solutions, Inc.*, Index No. 154976.12, 2013 N.Y. Misc. LEXIS 2766, at *8 (N.Y. Sup. Ct. N.Y. Cty. July 1, 2013) (finding no vicarious liability to impute to the employer when the plaintiff failed to demonstrate that an employee committed any acts of discrimination).

Firm:46487251

engage in an interactive dialogue or pass any judgment on any accommodation request made by Woolf.  (Bowyer Dec. ¶ 5; Strada Dec. ¶ 6; Morris Dec. ¶ 14; Asman Dec. ¶ 9).  Moreover, neither Strada nor Bowyer played any role in the decision to terminate Woolf's employment, and Asman's only role was to provide legal advice.  (Bowyer Dec. ¶ 7; Strada Dec. ¶ 5; Asman Dec. ¶ 11).  As for Niziolek, as discussed above, he engaged in the interactive process with Woolf by repeatedly meeting with him throughout May, June and July 2013, reviewing the medical documentation submitted by his neurologist, and seeking more information from Woolf to clarify the exact nature of his accommodation request.  (Niziolek Dec. ¶¶ 14-24).  Moreover, Niziolek merely provided Human Resources support to Kotovets and Morris in connection with the decision to terminate Woolf's employment.  (Niziolek Dec. ¶ 12).

Third, Woolf cannot show that the Individual Defendants are liable as "employers" under Section 296(1) of the NYSHRL – none of them had any ownership interest in Bloomberg, or had the authority to hire or fire employees on his or her own.  (Asman Dec. ¶ 13; Niziolek Dec. ¶ 26; Strada Dec. ¶ 7; Morris Dec. ¶ 16; Bowyer Dec. ¶ 8).  *See Patrowich v. Chem. Bank*, 63 N.Y.2d 541, 542 (1984) (holding that a corporate employee, even a "manager" or "supervisor" may not be individually liable under the NYSHRL "if he is not shown to have any ownership interest or any power to do more than carry out personnel decision made by others");

Finally, Woolf cannot demonstrate that the Individual Defendants are directly liable under Section 8-107(1) of the NYCHRL because individual liability under that provision is limited to cases where "an individual defendant . . . 'actually participates in the conduct giving rise to' the plaintiff's [discrimination or] retaliation claim."  *Hozer v. Pratt Indus. (USA)*, No. 10 CV 3874, 2012 U.S. Dist. LEXIS 78811, at *2 n.1 (E.D.N.Y. June 6, 2012).  As described above,

Firm:46487251

none of the Individual Defendants "actually participated" in any discriminatory or retaliatory conduct, and therefore cannot be directly liable under the NYCHRL.

## IV.   THE FMLA CLAIMS ALSO FAIL AS A MATTER OF LAW.

The FMLA allows an eligible employee to take up to twelve weeks of unpaid leave annually, including on an intermittent basis, to care for his own or his family member's serious health condition.  29 U.S.C. § 2612(a)(1).  The FMLA prohibits employers from interfering with, restraining, or denying an employee's rights under the FMLA.  29 U.S.C. § 2615(a).  In addition, an employer is prohibited "from discriminating or retaliating against an employee or prospective employee for having exercised or attempted to exercise FMLA rights."  29 C.F.R. § 825.220(c); *see also Potenza v. City of N.*Y., 365 F.3d 165, 167 (2d Cir. 2004) (per curiam).  In the Third and Fourth Causes of Action in the Complaint, Woolf pleads that Bloomberg failed to provide him with "appropriate leave," interfered with his rights under the FMLA, and retaliated against him for taking FMLA leave.  Each of these claims fails as a matter of law.

### A.   Woolf's FMLA Claims Are Time-Barred.

As an initial matter, Woolf's FMLA claims are time-barred.  In general, an FMLA action must be brought within two years after the date of the "last event constituting the alleged violation . . . ."  29 U.S.C. § 2617(c).  FMLA claims based upon "willful" violations of the statute, however, are subject to a three-year statute of limitations.  29 U.S.C. § 2617(c)(2); *Riddle v. Citigroup*, 449 F. App'x 66, 70 (2d Cir. 2011) (summary order).  Here, the latest possible FMLA violation would have occurred on January 10, 2014 (the date of Woolf's termination) – more than two years before he filed the Complaint on September 6, 2016.

The Second Circuit has found that an employer acts "willfully" in the FMLA context only when it '"knew or showed reckless disregard'" for its violation of an employee's FMLA rights.  *See Porter v. N.Y.U. Sch. of Law*, 392 F.3d 530, 531-32 (2d Cir. 2004) (per curiam)

(citation omitted).  Woolf cannot establish that Bloomberg engaged in any "willful" misconduct that would subject it to the three-year statute of limitations, as it is undisputed that each of Woolf's three FMLA leave requests was granted.  Moreover, as discussed below, no evidence suggests that Woolf's request of or use of FMLA leave played any role in Bloomberg's decision to terminate his employment.  *See Yetman v. Capital Dist. Transp. Auth.*, 669 F. App'x 594, 595 (2d Cir. 2016) (applying two-year limitations period to FMLA claims; finding that the employer's "mere knowledge [of the plaintiff's FMLA leaves] does not give rise to an inference of discrimination or retaliation").

Accordingly, each of Woolf's FMLA claims in the Third and Fourth Causes of Action should be dismissed as time-barred.

**B.  No Evidence Supports A FMLA Interference Claim.**

To establish a *prima facie* claim of FMLA interference, Woolf must establish by a preponderance of evidence that (1) he was an eligible employee under the FMLA, (2) Bloomberg was an employer under the FMLA, (3) Woolf was entitled to take leave under the FMLA, (4) Woolf gave notice to Bloomberg of his intention to take leave, and (5) Bloomberg denied him benefits to which he was entitled under the FMLA.  *See Di Giovanna v. Beth Israel Med. Ctr.*, 651 F. Supp. 2d 193, 198 (S.D.N.Y. 2009).

Here, each of the three FMLA leaves for which Woolf applied was granted.  (Woolf Dep. 326:12-16; 330:11-18; 331:6-12; 334:6-16; 340:16-24; 344:12 to 345:2; Garland Dec. Exs. 31, 39-41, 45).  Further, Woolf concedes that none of his managers – or any other Bloomberg employees – ever took any action or made any comments that discouraged him from applying for FMLA leave or using it once it was approved.  (Woolf Dep. 439:23 to 440:8).  Indeed, Niziolek and Morris actually *encouraged* Woolf to apply for FMLA leave and to use it whenever he felt it was necessary.  (Woolf Dep. 435:14-24, 437:5-17; Niziolek Dec. Exs. 5, 6, 8).

35

Moreover, as discussed above, Bloomberg terminated Woolf's employment for poor job performance – the concerns about which began well *before* he submitted his first FMLA leave request in May 2013.  Even after Woolf received a verbal warning, an Interim Performance Evaluation with an overall "Needs Improvement" rating, and then a written warning, he continued to exhibit the same performance deficiencies.  The fact that Woolf's third FMLA leave request was granted on the same day of his termination does not defeat summary judgment. *Hockenjos v. Metro. Transp. Auth.*, No. 14 CV 1679 (PKC), 2016 U.S. Dist. LEXIS 65341, at *20 (S.D.N.Y. May 18, 2016) (refusing to infer that the plaintiff's use of FMLA leave contributed to the employer's decision to terminate him, even when he was terminated on the day he returned from continuous FMLA leave to begin intermittent leave, because the record evidence showed the plaintiff's history of poor job performance beginning before his request for FMLA and continuing despite the employer's attempts to remediate him), *aff'd*, 695 F. App'x 15 (2d Cir. 2017).

Because there is no dispute that each of Woolf's three FMLA leave requests was granted, and because Woolf can point to no evidence that any of his managers or other Bloomberg employees took any actions that would have dissuaded a similarly situated person of ordinary resolve from exercising his FMLA rights, or any evidence that his requests for or use of FMLA played any role in Bloomberg's decision to terminate his employment, Woolf's claims that Bloomberg failed to provide him with "appropriate leave" and interfered with his FMLA rights in the Third and Fourth Causes of Action should be dismissed.  *See Hockenjos*, 2016 U.S. Dist. LEXIS 65341 at *20-29; *Di Giovanna*, 651 F. Supp. 2d at 203.

### C.  There Is No Record Support For A FMLA Retaliation Claim.

Woolf's FMLA retaliation claim in the Fourth Cause of Action is analyzed under the *McDonnell Douglas* burden-shifting framework.  *See Potenza*, 365 F.3d at 167-68.  To sustain

Firm:46487251

his initial burden of establishing a *prima facie* case of FMLA retaliation, Woolf must

demonstrate that: "1) he exercised rights protected under the FMLA; 2) he was qualified for his

position; 3) he suffered an adverse employment action; and 4) the adverse employment action

occurred under circumstances giving rise to an inference of retaliation." *See id.* at 168.

Assuming, *arguendo*, that Woolf can establish a *prima facie* case of retaliation,[30]

Bloomberg has offered a legitimate, non-retaliatory reason for his termination: Woolf's poor

work performance, which he failed to correct despite being warned that failure to improve could

result in disciplinary action up to and including termination of employment. *See Hockenjos*,

2016 U.S. Dist. LEXIS 65341 at \*32 (finding employer met its burden by asserting that the

"plaintiff was terminated for various instances of poor job performance, many of which predate

his request for FMLA leave); *Sutherland v. N.Y. State Dep't of Law*, 216 F.3d 1073, 2000 WL

730413, at \*7 (2d Cir. June 2, 2000) (holding that poor job performance is 'no doubt' a

legitimate, non-retaliatory reason for termination); *see also Di Giovanna*, 651 F. Supp. 2d at 204

(finding employer established its burden by asserting that the plaintiff "was terminated for

various, documented instances of poor performance, many of which predated his FMLA

application") (footnote omitted).

Because Bloomberg has come forward with a non-retaliatory reason for Woolf's

termination, the burden shifts back to Woolf to point to record evidence that would permit a

reasonable jury to conclude that Bloomberg's articulated reason is pretextual. *Hockenjos*, 2016

U.S. Dist. LEXIS 65341, at \*33-34.  It is well-settled that a plaintiff may not rely solely on

temporal proximity between his FMLA leave and an adverse employment action to create a

---

[30] As this Court has noted in another case, an "uncontested record of plaintiff's performance issues raises serious doubts about his ability to perform his job" so as to establish that he was qualified for his position. *See Hockenjos*, 2016 U.S. Dist. LEXIS 65341 at \*31-32 (assuming, without deciding, that the plaintiff established a *prima facie* case).

Firm:46487251

triable issue of fact as to pretext.  *See id.* at *34-35; *Brown v. Northrop Grumman Corp.*, No. 14-CV-1488, 2014 U.S. Dist. LEXIS 116188, at *44 (E.D.N.Y. Aug. 19, 2014).  Indeed, any attempt by Woolf to rely on temporal proximity is "undercut" by the undisputed evidence that he was already having performance problems (including a verbal warning in March 2013) *before* he made his first FMLA leave request in May 2013.  *See Hockenjos*, 2016 U.S. Dist. LEXIS 65341 at *36-37 ("The fact that these warnings predate plaintiff's request for leave also weakens the inference of a causal connection between the two events.") (citation omitted); *Di Giovanna*, 651 F. Supp. 2d at 206 (finding no evidence of pretext where there was "a largely unchallenged record that [the plaintiff] was failing at various basic aspects of his job well before his FMLA application, that he continued to have problems after he applied, and that defendants explicitly warned him to improve or face termination.").  Moreover, Woolf was approved for (and used) two prior FMLA leaves several months prior to his termination, which also undermines any impact of temporal proximity between his third FMLA leave approval and his termination.  *See Hockenjos*, 2016 U.S. Dist. LEXIS 65341, at *37 ("Defendant's willingness to allow plaintiff to take FMLA leave prior to his termination also leaves little room to infer that the temporal proximity of plaintiff's termination to his FMLA leave support his retaliation claim.") (citation omitted)  Finally, a review of Woolf's leave history does not support any conclusion that Bloomberg acted with retaliatory animus.  While Woolf used 22 days of leave between May and October 2013, he only used two days in the two months prior to his termination.  (Niziolek Dec. ¶ 25 & Ex. 9).  *See Di Giovanna*, 651 F. Supp. 2d at 207-08 (finding that the plaintiff's record of FMLA leave days taken did not support a finding of pretext; while plaintiff took 27 days of leave when he initially received approval, in the six months leading up to his termination, plaintiff took only seven days off).

Firm:46487251

Accordingly, Woolf's FMLA retaliation claim in his Fourth Cause of Action should be dismissed.

## **<u>CONCLUSION</u>**

For all the foregoing reasons, the Court should deny Woolf's motion for partial summary judgment, grant summary judgment in favor of Bloomberg and the Individual Defendants, and dismiss the Amended Complaint in its entirety.

Dated: July 9, 2018
New York, New York

EPSTEIN BECKER & GREEN, P.C.

By:  */s David W. Garland*
     David W. Garland
     Laura Monaco
250 Park Avenue
New York, New York 10177
(212) 351-4500
*Attorneys for Defendants*