UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
RONALD WOOLF,

                Plaintiff,                    16-cv-6953 (PKC)

        -against-                     OPINION
                                                    AND ORDER

BLOOMBERG L.P., ANDREW BOWYER,
MELISSA STRADA, MATHEW ASMAN,
MICHAEL MORRIS and JIM NIZIOLEK,

                Defendants.
-----------------------------------------------------------x

CASTEL, U.S.D.J.

        Plaintiff Ronald Woolf held a sales position at defendant Bloomberg L.P.

("Bloomberg") from 2011 until January 10, 2014.  Woolf has a history of complex migraine

headaches, which occurred with increasing frequency and severity over the course of 2013, and

were exacerbated, he contends, by job-related stress brought about by his supervisors' criticisms.

During the course of 2013, Woolf submitted requests for intermittent medical leave, all of which

were granted.  Separately, as a proposed reasonable accommodation, Woolf asked to be

transferred to different supervisors who would be less likely to cause him stress, specifically

including a proposed transfer to non-sales positions at Bloomberg offices located in Asia.

        It is undisputed that Woolf's managers and supervisors documented formal and

informal criticisms of his performance, including his purported difficulties with communication,

managing complicated negotiations and knowledge of Bloomberg's product lines.  These

criticisms began before Woolf engaged in any claimed protected activity and continued through

his termination in January 2014.

Woolf now brings claims of discrimination and retaliation under the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12112, et seq. ("ADA"); impairment and retaliation under the Family and Medical Leave Act, 29 U.S.C. §§ 2601, et seq. ("FMLA"); and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. ("Title VII"). He separately brings state law claims of discrimination and retaliation under the New York State Human Rights Law ("NYSHRL") and the New York City Human Rights Law ("NYCHRL").

Discovery in this case is now closed. Woolf moves for partial summary judgment as to his claims that defendants failed to provide a reasonable accommodation under the ADA, NYSHRL and NYCHRL. Defendants separately move for summary judgment in their favor as to all of Woolf's claims.

For the reasons that will be explained, Bloomberg's motion is granted as to all federal claims. Woolf's motion for partial summary judgment is denied. The Court declines to exercise supplemental jurisdiction over any remaining state law claims.

BACKGROUND.

A. Overview of the Parties.

Bloomberg has more than 19,000 employees and 192 offices. (Pl. 56.1 ¶ 77; Def. 56.1 Resp. ¶ 77.) Woolf began his employment at Bloomberg in 2011 as a sales representative, with his duties centered on negotiating commercial-data contracts with contributors. (Def. 56.1 ¶ 78; Pl. 56.1 Resp. ¶ 78.) While aspects of Bloomberg's products changed during his tenure, he worked in a sales capacity throughout his time at Bloomberg. (Def. 56.1 ¶¶ 79-80; Pl. 56.1 Resp. ¶¶ 79-80.) At the start of his employment in May 2011, Woolf signed a form stating that he had no disability and no history of impairments that limited his major life activities. (Def. 56.1 ¶ 161; Pl. 56.1 Resp. ¶ 161; Garland Dec. Ex. 26.)

Woolf reported to a succession of supervisors during his time at Bloomberg. From approximately January to November 2013, he reported to defendant Andrew Bowyer. (Def. 56.1 ¶¶ 81-82; Pl. 56.1 Resp. ¶¶ 81-82.) Bowyer, in turn, reported to defendant Michael Morris. (Def. 56.1 ¶ 84; Pl. 56.1 Resp. ¶ 84.) Among other things, Bowyer and Morris were responsible for Woolf's performance reviews.

Defendant Melissa Strada is an employee in Bloomberg's "professional development department." (Pl. 56.1 ¶ 9; Def. 56.1 Resp. ¶ 9.) During Woolf's employment at Bloomberg, he had several communications with Strada about his medical condition and his desire to transfer within the Company.

Defendant Mathew Asman is identified as "Employment Counsel for the Defendants." (Pl. 56.1 ¶ 23; Def. 56.1 Resp. ¶ 23.) During Woolf's employment at Bloomberg, Asman communicated with Woolf's attorney about issues related to Woolf's medical condition.

Defendant Jim Niziolek is an employee in Bloomberg's HR department. (Pl. 56.1 ¶ 11; Def. 56.1 Resp. ¶ 11.) During Woolf's employment at Bloomberg, he communicated with Niziolek on a variety of topics, including issues related to his medical condition, his desire to transfer within the Company and the performance reviews that he received from Bowyer, Morris and others.

B. <u>Woolf's History of Migraines.</u>

Woolf has experienced migraine and tension headaches since approximately 2000. (Pl. 56.1 ¶ 1; Def. 56.1 Resp. ¶ 1.) As noted, at the commencement of employment in 2011, Woolf stated that he had no disability and no history of impairment that limited his major life activity. (Garland Dec. Ex. 26.) According to Woolf, from 2011 to 2013, he suffered migraines that left him temporarily "incapacitated," which impaired his work ability and his life

activities more generally. (Pl. 56.1 ¶ 4; Def. 56.1 Resp. ¶ 4.) From time to time, Woolf e-mailed his managers at Bloomberg to alert them that his migraines would cause him to report late to work. (Pl. 56.1 ¶¶ 5-7; Def. 56.1 Resp. ¶¶ 5-7.) Defendants note that Woolf wrote to managers on August 15, 2011, May 23, 2012 and February 5, 2013 to inform them that he would be late to work due to migraines.[1] (Def. 56.1 ¶ 162; Pl. 56.1 Resp. ¶ 162.)

C. Woolf's Annual Performance Review for 2012.

In Woolf's annual performance review at the end of 2012, defendant Morris and non-party Steve Citrin, Woolf's then-supervisor, stated that they and others wanted "to see [Woolf] take on a greater leadership role," including improved communications, and rated Woolf as "Meets Expectations." (Def. 56.1 ¶¶ 86-88; Pl. 56.1 Resp. ¶¶ 86-88.) Three possible ratings were more positive than "Meet Expectations" and two were lower. (Def. 56.1 ¶ 89; Pl. 56.1 Resp. ¶ 89.) Under the "Distribution Guidelines" included in Woolf's written review, the "Meets Expectations" rating placed Woolf within the lower third of employees. (Garland Dec. Ex. 7.)

Woolf's written review explained that he "has struggled to provide a clear overview of where we stood with providers in various stages and this has caused additional work for others involved in the process." (Garland Dec. Ex. 7.) It also stated that Woolf's "ability to move fast and thoughtfully was hampered by his struggles with some basic Bloomberg competencies," and that "[t]his will need to improve for Ron to succeed in the year ahead and he should seek help from his peers." (Garland Dec. Ex. 7.) The review stated that Woolf "struggled to collaborate well with key [Bloomberg] business managers for various reasons," and

---

[1] Woolf's claims under the ADA, the FMLA and Title VII are brought against Bloomberg only, and his claims under the NYSHRL and NYCRHL encompass Bloomberg the individual defendants. For ease of reference, the Court uses the collective term "defendants" without regard to the claims asserted against any particular defendant.

that "someone with [Woolf's] experience" was expected to "show a greater sense of leadership . . . ." (Garland Dec. Ex. 7.)

As Woolf notes, the written review also praised aspects of his performance, observing that he "established strong relationships with key providers," "does a very good job at knowing the customer and anticipating issues/opportunities that may arise," and "successfully coordinated with various departments . . . ." (Garland Dec. Ex. 7.) It stated that Wool "close[d] several notable deals which led to strong performance on his Milestones Achieved in Q2 and Q3." (Garland Dec. Ex. 7.)

This 2012 year-end review contrasted somewhat with Woolf's review at the end of 2011 and his mid-year review in 2012, when he was reviewed as "Good" and "Meets Expectations." (Pl. 56.1 ¶¶ 208-10; Def. 56.1 Resp. ¶¶ 208-10.)

D. Woolf's Health Problems and Performance Issues at Bloomberg from January 2013 to July 17, 2013.

The summary judgment record extensively documents communications discussing Woolf's worsening, stress-related migraines and supervisors' views of his performance over the course of 2013. The Court first summarizes the evidence from the start of 2013 through July 17, 2013, the date when Woolf filed a complaint of discrimination with the Equal Employment Opportunity Commission.

1. In February 2013, Woolf Complains of Stress-Related Migraines and Begins to Inquire About Transferring to Asia.

On February 5, 2013, Woolf e-mailed defendants Bowyer and Morris to state that he woke up with a migraine and would be late to work. (Pl. 56.1 ¶ 7; Def. 56.1 Resp. ¶ 7.) Woolf states that beginning in February 2013, his migraines intensified due to work-related

stress, and specifically the "nitpicking" and "generally verbally assaulting" comments of his direct manager, defendant Bowyer. (Pl. 56.1 ¶ 8; Def. 56.1 Resp. ¶ 8.)

Around the same period of time, Woolf sent internal e-mails expressing interest in changing his position within Bloomberg to specifically focus on the Company's business in Asia. At the end of January 2013, Woolf had attended a Bloomberg networking program, where he inquired about the possibility of transferring to Asia, a move that he wanted based on his experience in the region and a belief that it would help him advance within the Company. (Def. 56.1 ¶¶ 94-96; Pl. 56.1 Resp. ¶¶ 94-96.) On January 31, 2013, he e-mailed two employees at Bloomberg, referencing a conversation the night before and describing at length why he was "interested in playing a larger role in developing our Asia business" and why his background could "significantly impact our business in Asia." (Garland Dec. Ex. 8.) On February 4, 2013, Woolf sent a follow-up e-mail "about possible opportunities in Asia if it makes sense to consider them at this time." (Garland Dec. Ex. 9.) He later sent follow-up e-mails about working in Asia on February 20 and 25. (Id.)

2. In March 2013, Bowyer Noted Ongoing Concerns with Woolf's Performance, as Woolf Continued to Seek a Transfer to Asia.

In an e-mail dated March 5, 2013, defendant Bowyer wrote to Bloomberg's HR department with "key points" about Woolf's performance, including specific concerns about Woolf's knowledge of Bloomberg products and contents of typical deals, "[l]ow" internal credibility and "[p]oor problem solving skills." (Bowyer Dec. Ex. 1.) In a March 7, 2013 follow-up e-mail to HR, Bowyer gave specific examples of Woolf's poor performance, and described incidents where Woolf's perceived deficiencies caused problems in transactions or led to additional work for other Bloomberg employees. (Id.) Woolf denies that Bowyer identified

"actual[ ] concerns," but he does not dispute the timing or existence of the e-mails. (Pl. 56.1 Resp. ¶ 102.)

Around March 15, 2013, Woolf met with defendant Strada, who worked in Bloomberg's professional development office. (Def. 56.1 ¶ 9; Pl. 56.1 Resp. ¶ 9.) Woolf states that he sought Strada's help in transferring to a new position within Bloomberg as a form of reasonable accommodation for his disability, but defendants maintain that Woolf discussed a desire to transfer to Asia for personal reasons only. (Pl. 56.1 ¶ 9; Def. 56.1 Resp. ¶ 9.)

On or around March 19, 2013, Woolf left a handwritten note on Strada's desk, stating in part, "I NEED to find a new job and quickly," that his "motivation to work for these people has been completely destroyed" and that his work environment was affecting his health; Strada asserts that she did not see the note. (Pl. 56.1 ¶ 10; Def. 56.1 Resp. ¶ 10.)

Woolf was issued a verbal warning on March 20, 2013, and Bowyer followed up with an e-mail that summarized the discussion. (Def. 56.1 ¶¶ 103-04; Pl. 56.1 Resp. ¶¶ 103-04.) Bowyer stated that Woolf had to show "immediate and sustained improvement . . . or you could be subject to further disciplinary action." (Def. 56.1 ¶ 105; Pl. 56.1 Resp. ¶ 105.)

Woolf responded with a 19-page memo rebutting Bowyer's review. (Def. 56.1 ¶¶ 106-07, Pl. 56.1 Resp. ¶¶ 106-07.) He also arranged a meeting with defendant Niziolek, asserting that defendants Bowyer and Morris had "retaliated" against him for attending an internal networking event and for requesting the "reasonable accommodation" of a departmental transfer. (Def. 56.1 ¶¶ 108-09; Pl. 56.1 Resp. ¶¶ 108-09.) Niziolek told Woolf that an employee must be in good standing to transfer internally. (Def. 56.1 ¶¶ 110-11; Pl. 56.1 Resp. ¶¶ 110-11.) In a March 27, 2013 e-mail, Strada confirmed to Woolf that he was not in good standing based

on the verbal warning he received; Woolf asserts that later communications led him to believe that he was in good standing.  (Def. 56.1 ¶ 114; Pl. 56.1 Resp. ¶ 114.)

In a letter of April 2, 2013, Woolf's attorney, Leonard Pack, Esq., wrote to his client's employer asserting that the verbal warning lacked a "rational basis," and hypothesized that it was retaliation for Woolf's attendance at a "Career Development Group Networking Event," or possibly on the basis of age or national-origin discrimination.  (Def. 56.1 ¶ 116; Pl. 56.1 Resp. ¶ 116; Garland Dec. Ex. 16.)  The letter also stated that the verbal warning had caused "stress and anxiety," resulting in "severe gastric problems . . . ."  (Def. 56.1 ¶ 117; Pl. 56.1 Resp. ¶ 117.)  Defendant Niziolek conducted an investigation as to whether Woolf's verbal warning was justified and concluded that it was; Woolf disputes that the investigation was thorough and fair.  (Def. 56.1 ¶¶ 118-21; Pl. 56.1 Resp. ¶¶ 118-21.)  Pack's letter made no mention of migraines.  (Garland Dec. Ex. 16.)

### 3.  In April 2013, Woolf's Migraines Continued and He Continued to Seek a Transfer.

On or about April 12, 2013, Woolf sent an e-mail to defendant Niziolek, who worked in Bloomberg's HR department.  (Pl. 56.1 ¶ 11; Def. 56.1 Resp. ¶ 11.)  Woolf stated that he was "practically incapacitated" by a headache, had been unable to complete a work task, was recuperating at home and would deliver copies of certain materials to Niziolek the following Monday.  (Pl. 56.1 ¶ 11; Def. 56.1 Resp. ¶ 11.)  That same date, Woolf e-mailed defendants Morris and Bowyer, stating that he had a severe migraine and would "be[] down 24 to 36 hours." (Pl. 56.1 ¶ 12; Def. 56.1 Resp. ¶ 12.)  He stated that he was unable to come into the office on the following day but intended to participate in an "extremely important" call from home.  (Pl. 56.1 ¶ 11; Def. 56.1 Resp. ¶ 12.)

Defendants Morris and Bowyer met Woolf on April 23 and 25, 2013; they assert that the meeting's purpose was to discuss issues he raised in response to his verbal warning, but Woolf asserts that the meeting's purpose was "to update on deals."  (Def. 56.1 ¶ 123; Pl. 56.1 Resp. ¶ 123.)  After the meeting, Woolf sent an e-mail thanking Morris and Bowyer for the "immensely helpful" and "detailed" explanations of his "job expectations."  (Def. 56.1 ¶ 124; Pl. 56.1 Resp. ¶ 124.)  Woolf then inquired to Strada about his options for transferring to a different department, and Strada replied that she did not have new information.  (Def. 56.1 ¶¶ 125-26; Pl. 56.1 Resp. ¶¶ 125-26.)

4.  <u>Woolf's Request for Medical Leave Was Granted.</u>

On or about May 2, 2013, Woolf wrote to defendant Bowyer via a Bloomberg internal messaging app stating that he would be out of the office for part of the afternoon in order to see a neurologist about his headaches.  (Pl. 56.1 ¶ 13; Def. 56.1 Resp. ¶ 13.)  On or about May 7, Woolf e-mailed defendant Morris stating that he had a "severe headache," was requesting a "P day," and would try to arrive to the office in the afternoon.  (Pl. 56.1 ¶ 14; Def. 56.1 Resp. ¶ 14.)

On May 14, 2013, Woolf e-mailed defendant Niziolek and stated that some of his weekly meetings with managers were "productive" while others felt like "witch hunts."  (Def. 56.1 ¶ 127; Pl. 56.1 Resp. ¶ 127.)  Niziolek suggested that Woolf follow up with defendants Morris and Bowyer.  (Def. 56.1 ¶ 128; Pl. 56.1 Resp. ¶ 128.)

On May 23, 2013, Woolf sent to Bowyer what defendants call an "update e-mail," which Woolf had originally sent to "a number of senior leaders at Bloomberg . . . ."  (Def. 56.1 ¶ 129; Pl. 56.1 Resp. ¶ 129.)  The e-mail set forth certain of Woolf's thoughts on Bloomberg's products and customers.  (Garland Dec. Ex. 20.)  In reply, Bowyer stated that Woolf had

previously been instructed not to send such e-mails and that he should only be contacting "senior people . . . with relevant, actionable information . . . ." (Id.)

On or around May 28, 2013, Woolf wrote a letter to defendant Niziolek with details about his migraines, stating that the condition was "complex with potentially very serious health consequences," including a heightened risk of stroke. (Pl. 56.1 ¶¶ 15-16; Def. 56.1 Resp. ¶¶ 15-16.) In a May 30, 2013 e-mail, Woolf e-mailed Niziolek with a copy of a letter written by his treating neurologist, which explained that Woolf's condition was deteriorating, required additional medication, and placed him at risk of a stroke or heart attack "simply from the stress he is currently experiencing at work." (Pl. 56.1 ¶¶ 17-20; Def. 56.1 Resp. ¶¶ 17-20.) The letter stated that workplace stress was "the primary trigger" for Woolf's condition, and that medical leave would be insufficient to resolve his health problems. (Pl. 56.1 ¶ 21; Def. 56.1 Resp. ¶ 21.)

Woolf's attorney also e-mailed the doctor's letter to defendant Asman, an employment attorney at Bloomberg, and requested that the HR department schedule a meeting with Woolf once he returned to work in order to discuss a reasonable accommodation. (Pl. 56.1 ¶¶ 23, 227; Def. 56.1 Resp. ¶¶ 23, 227.)

On or around May 30, 2013, Woolf requested FMLA leave to cope with his migraines, and the request was granted. (Def. 56.1 ¶ 171; Pl. 56.1 Resp. ¶ 171.) Bloomberg's leave program was outsourced and administered by the Reed Group; Woolf was granted intermittent FMLA leave from May 24, 2013 through November 23, 2013, with full pay. (Def. 56.1 ¶¶ 171-73; Pl. 56.1 Resp. ¶¶ 171-73.)

Woolf met with defendant Niziolek on May 31, 2013. (Pl. 56.1 ¶ 27; Def. 56.1 Resp. ¶ 27.) At the meeting, Woolf requested that he be permitted to change his work environment as a reasonable accommodation, and Niziolek asked what that meant. (Pl. 56.1 ¶¶

27-28; Def. 56.1 Resp. ¶¶ 27-28.)  Woolf replied that he could continue performing his same job without being managed by Bowyer and Morris, who were exacerbating his medical condition, and that he did not necessarily need to be transferred to a new position.  (Pl. 56.1 ¶ 29; Def. 56.1 Resp. ¶ 29.)  Niziolek asked who would supervise him, and Woolf gave the names of two other employees.  (Pl. 56.1 ¶¶ 31-32; Def. 56.1 Resp. ¶¶ 31-32.)  As phrased in Woolf's 56.1 Statement, he told Niziolek that "he feels like he has a gun to his head every day," that his migraines were "exacerbated" by the stress caused by defendants Bowyer and Morris and that his condition could lead to a heart attack or death.  (Pl. 56.1 ¶¶ 33-34; Def. 56.1 Resp. ¶¶ 33-34.) Defendants assert that Niziolek told Woolf that he was eligible to take medical leave, but Woolf denies that he was so informed.  (Def. 56.1 ¶ 175; Pl. 56.1 Resp. ¶ 175.)  Defendants also assert that Niziolek told Woolf that he was sympathetic to Woolf's medical problems but that Woolf's managers had managed him appropriately; Woolf denies that Niziolek made these comments. (Def. 56.1 ¶ 177; Pl. 56.1 Resp. ¶ 177.)

Later that May, Bowyer e-mailed Woolf with an explanation of how he could meet performance objectives, specifically as to time management.  (Def. 56.1 ¶¶ 132-33; Pl. 56.1 Resp. ¶¶ 132-33.)

### 5.  The Negative Interim Review of June 2013.

On or about June 4, 2013, Niziolek e-mailed Woolf informing him that documentation was required explaining his disability and why he needed the specific accommodation requested.  (Pl. 56.1 ¶ 37; Def. 56.1 Resp. ¶ 37.)  Woolf responded the next day with an e-mail that quoted from his doctor's letter and explained his health circumstances.  (Pl. 56.1 ¶¶ 39-45; Def. 56.1 Resp. ¶¶ 39-45; Melamed Dec. Ex. S.)  This was the neurologist's letter of May 29 that described work-related stress as the "primary trigger" for Woolf's migraines.

(Melamed Dec. Ex. S; Garland Dec. Ex. 29.) Woolf asserted that his medical condition qualified as a disability under the ADA and that employers are required to make reasonable accommodations, and directed Niziolek to a Department of Labor program concerning employers' compliance obligations. (Pl. 56.1 ¶¶ 46-47; Def. 56.1 Resp. ¶¶ 46-47.)

According to defendants, Niziolek then called Woolf and said that he did not understand Woolf's accommodation request, particularly in light of Woolf's assertion that he was unable to work. (Def. 56.1 ¶ 181.) Woolf responded that he required a transfer to a different supervisor. (Def. 56.1 ¶ 182; Pl. 56.1 Resp. ¶ 182.)

On June 5, 2013, defendants Bowyer and Morris gave Woolf his interim 2013 performance review, where he was rated as "Needs Improvement" and "Unacceptable." (Def. 56.1 ¶ 134; Pl. 56.1 Resp. ¶ 134; Garland Dec. Ex. 21.) Woolf's written review highlighted poor management of time, internal relationships, and detail; failure to grasp key concepts or devise plans; and failure to "master[ ] the basics." (Def. 56.1 ¶ 135; Pl. 56.1 Resp. ¶ 135.) It also described problems with "low productivity" and a negotiation where Woolf failed to act and instead left managers to handle certain details. (Garland Dec. Ex. 21.) Woolf submitted a written rebuttal of his review on June 24, 2013, which was followed by an internal meeting with Niziolek, Bowyer and Morris on July 3. (Def. 56.1 ¶ 136; Pl. 56.1 Resp. ¶ 136.) At the meeting's conclusion, Niziolek told Woolf that he needed to improve or was at risk of receiving a written warning. (Def. 56.1 ¶ 137; Pl. 56.1 Resp. ¶ 137.)

On June 13, 2013, Woolf e-mailed Niziolek, stating that he met with an employee in "Professional Development to discuss opportunities abroad" and the "best ways" to find an "appropriate open job" within Bloomberg. (Pl. 56.1 ¶ 49; Def. 56.1 Resp. ¶ 49.) Niziolek responded the same day, stating that he would need to see the specific jobs referenced in order to

evaluate such a request. (Pl. 56.1 ¶ 50; Def. 56.1 Resp. ¶ 50.) On June 17, 2013, Woolf e-mailed Niziolek stating that he had identified nine jobs within Bloomberg that he "would have an interest in doing and feel I am relatively qualified to perform," and that also would constitute a reasonable accommodation under the ADA. (Pl. 56.1 ¶ 51; Def. 56.1 Resp. ¶ 51.) Nine of the jobs were in Asia, two were in New York, one was in Washington, D.C., and one was in San Francisco. (Pl. 56.1 ¶ 51; Def. 56.1 Resp. ¶ 51.) Woolf did not identify the specific job titles for any of those positions, and instead identified areas of the world in which the positions were located. (Def. 56.1 ¶ 185; Pl. 56.1 Resp. ¶ 185.) Niziolek replied that Woolf's e-mail was "very concerning to me as I don't believe you understood our last conversation based on what you have written." (Def. 56.1 ¶ 186; Pl. 56.1 Resp. ¶ 186.) According to defendants, Woolf and Niziolek spoke later that day, with Niziolek explaining that transfers were not automatic and that he needed details about the specific positions Woolf was requesting. (Def. 56.1 ¶ 187; Pl. 56.1 Resp. ¶ 187.)

Woolf and Niziolek held an in-person discussion on or about June 17, 2013; on June 24, Woolf e-mailed Niziolek an 18-page response to his interim negative performance review of June 5, and indicated that he had narrowed his job request to one position in Hong Kong and one in Singapore. (Pl. 56.1 ¶ 52; Def. 56.1 Resp. ¶ 52.) Those positions were for respectively for "BI Research Associate" and "Fixed Income Electronics Trading Specialist." (Def. 56.1 ¶ 190; Pl. 56.1 Resp. ¶ 190.) Defendants assert that Niziolek followed up with "appropriate managers," who responded that Woolf was not qualified for those positions based on lack of relevant skills and/or his prior difficulties with communication and cooperation. (Def. 56.1 ¶ 191.) In his deposition, Woolf testified that he did not know whether he was the "right fit" for either job. (Def. 56.1 ¶ 192; Pl. 56.1 Resp. ¶ 192.) In a later meeting, Niziolek told

Woolf that one of the positions was below his skill level, while the other was above it. (Def. 56.1 ¶ 196; Pl. 56.1 Resp. ¶ 196.)

On July 2, 2013, Woolf e-mailed Niziolek, stating that he had "not heard anything back regarding my request for a reasonable accommodation under the ADA." (Pl. 56.1 ¶ 53; Def. 56.1 Resp. ¶ 53.) Woolf asserted that he had provided all necessary medical information and asked HR to proceed with his request. (Pl. 56.1 ¶ 53; Def. 56.1 Resp. ¶ 53.) That same day, Niziolek replied that he would meet Woolf to discuss his response to his performance review, and that any requested accommodation could be discussed at a later date. (Pl. 56.1 ¶ 54; Def. 56.1 Resp. ¶ 54.)

E.  Woolf's EEOC Charge of July 17, 2013.

On or about July 17, 2013, Woolf filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), and e-mailed Niziolek and a non-party official in the HR department, Alison Trellis, to advise them of the charge. (Pl. 56.1 ¶ 56; Def. 56.1 Resp. ¶ 56.) Woolf's EEOC charge asserted that Bloomberg had discriminated against him on the basis of age, disability and national origin, and that it had committed acts of retaliation against him, as well as "possible violations of internal company policies such as Bloomberg's anti-nepotism policy." (Melamed Dec. Ex. ooo at 11.) The EEOC charge stated that Woolf's disability "condition" was "triggered by increased stress at work," and specifically by "deliberately manufactured and unnecessary stress created by my managers and Human Resources personnel . . . ." (Id. at 17.) With respect to discrimination on the basis of national origin, he asserted that as an American, he was treated less well than an employee of Russian origin, and alleged that because of that employee's Russian background, he enjoyed a "cozy and

friendly" relationship and "special treatment" from a more senior employee who also was of Russian origin. (Id. at 21.)

The day before Woolf filed his EEOC charge, Woolf had e-mailed Niziolek and Trellis with a second letter from his treating neurologist, who stated that Woolf "must immediately be allowed to change his work environment." (Pl. 56.1 ¶¶ 57-58; Def. 56.1 Resp. ¶¶ 57-58.) On July 19, Niziolek met with Woolf and stated that Bloomberg would offer Woolf "intermittent FMLA leave as an accommodation," but that a transfer to the positions sought by Woolf would not eliminate the workplace stress Woolf had described. (Pl. 56.1 ¶¶ 62-63; Def. 56.1 Resp. ¶¶ 62-63.)

F.  Woolf's Written Warning of September 2013, and Subsequent Events Preceding His Termination.

According to Woolf, throughout the remainder of his employment, he continued to seek a reasonable accommodation for his stress-induced migraines, but defendants would not "engage[] in an interactive dialogue with [him]" about his requests. (Pl. 56.1 ¶¶ 66-67.) Defendants dispute this characterization. (Def. 56.1 Resp. ¶¶ 66-67.)

On September 19, 2013, Woolf was issued a written warning by Morris, Bowyer and Niziolek. (Def. 56.1 ¶ 138; Pl. 56.1 Resp. ¶ 138.) According to the warning, Woolf needed to "make immediate progress" in negotiating quickly and effectively; improve productivity and communication; ensure that business deals were made in Bloomberg's best interest; and "[p]lay an active, central role in your deals." (Def. 56.1 ¶ 139; Pl. 56.1 Resp. ¶ 139.) The warning stated that if Woolf did not improve, he would be subject to further discipline, possibly including termination. (Def. 56.1 ¶ 140; Pl. 56.1 Resp. ¶ 140.)

About a week after the written warning, Woolf's managers learned that in a sales negotiation, Woolf had offered contractual concessions that he knew or should have known were

not acceptable to Bloomberg; Woolf denies this assertion. (Def. 56.1 ¶ 141; Pl. 56.1 Resp. ¶ 141.) Bowyer testified in his deposition that other employees continued to complain about Woolf's performance and client interactions, and Woolf new supervisor, non-party Laura Brown, began to hold periodic sessions with him about her expectations. (Def. 56.1 ¶¶ 142-43; Pl. 56.1 Resp. ¶¶ 142-43.)

In an e-mail of December 13, 2013, Woolf e-mailed Niziolek and others at Bloomberg with an attached letter from his treating neurologist, explaining that he was seeking to find an appropriate accommodation and was hoping for "a genuine interactive process" with Bloomberg. (Pl. 56.1 ¶¶ 67-68; Def. 56.1 Resp. ¶¶ 67-68.) The letter from Woolf's neurologist reiterated the recommendation that Woolf "reduce his stress levels . . . ." (Pl. 56.1 ¶ 69; Def. 56.1 Resp. ¶ 69.)

On December 18, 2013, Brown told Woolf that he would not be assigned additional work until he completed existing assignments, and e-mailed Morris and Niziolek stating that Woolf failed to meet expectations; Woolf strenuously denies certain details about the chronology of Brown's statements and the accuracy of her assessments but does not deny that they were made. (Def. 56.1 ¶¶ 146-47; Pl. 56.1 Resp. ¶¶ 146-47.) Brown sent Niziolek a summary of her observations, including that Woolf's supervisors had lost confidence in his ability to negotiate favorable deals and that he was affecting team morale; Woolf denies that Brown's statements were well-founded. (Def. 56.1 ¶¶ 148-49; Pl. 56.1 Resp. ¶¶ 148-49.)

Morris then recommended to his supervisor that Woolf be terminated, and Niziolek prepared a summary of Woolf's performance shortcomings and the steps taken to address them. (Def. 56.1 ¶¶ 150-51; Pl. 56.1 Resp. ¶¶ 150-51; Niziolek Dec. Ex. 4.) The undated "Request for Termination" drafted by Niziolek summarized various performance

problems throughout 2013 and Woolf's evaluations and warnings, as well as his "limited progress" since the written warning of September 2013. (Niziolek Dec. ¶ 11 & Ex. 4.) Niziolek stated that Woolf failed to improve despite regular feedback from Brown and that Brown believed Woolf failed to meet "basic" job requirements. (Def. 56.1 ¶¶ 152-53; Pl. 56.1 Resp. ¶¶ 152-53.) Niziolek's summary stated that Woolf was "comfortable working on price negotiation" but was impeded by a failure to understand Bloomberg's "business priorities and goals." (Niziolek Dec. Ex. 4.) Woolf disputes the substance of Niziolek's written summary. (Pl. 56.1 Resp. ¶¶ 150-53.)

On January 10, 2014, Woolf met with Morris, Brown and Niziolek, and was informed that he was being terminated. (Def. 56.1 ¶ 155; Pl. 56.1 Resp. ¶ 155.) On Woolf's termination date of January 10, 2014, Woolf e-mailed defendants Niziolek, Morris and Bowyer with a series of observations. He noted that he had not received a written response to any of his concerns; that his migraine condition was a recognized disability under the ADA; that Bloomberg had a duty to provide a reasonable accommodation for an appropriately documented disability; and that none of his submissions or requests "resulted in any serious and genuine response or attempt to engage" in an interactive process. (Pl. 56.1 ¶ 71; Def. 56.1 Resp. ¶ 71.)

G. The EEOC's Findings of March 30, 2016.

On or around March 30, 2016, Kevin J. Berry, who has the title of District Director at New York District Office of the EEOC, issued a determination of the merits of Woolf's charge of discrimination. (Pl. 56.1 ¶ 72; Def. 56.1 Resp. ¶ 72 & Melamed Dec. Ex. HH.) It concluded that Bloomberg "did not engage in good faith communication" with Woolf concerning his transfer request and did not "attempt to understand or discuss" the recommendations of Woolf's physician. (Melamed Dec. Ex. HH.) As to providing Woolf with

medical leave as a reasonable accommodation, the EEOC noted that Bloomberg urged medical leave despite the statements of Woolf's physician's that leave alone was not an effective accommodation.  (Id.)  The EEOC stated that Bloomberg "stymied the process" and terminated Woolf "moments after" he was approved for FMLA leave in January 2014.  (Id.)  The EEOC concluded that there was reasonable cause to believe that Bloomberg discriminated against Woolf based on his disability, did not engage in a good-faith interactive process and retaliated against him with negative performance reviews and termination.  (Id.)

SUMMARY JUDGMENT STANDARD.

Summary judgment "shall" be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Rule 56(a), Fed. R. Civ. P.  A fact is material if it "might affect the outcome of the suit under the governing law. . . ."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  On a motion for summary judgment, the court must "construe the facts in the light most favorable to the non-moving party and resolve all ambiguities and draw all reasonable inferences against the movant."  Delaney v. Bank of Am. Corp., 766 F.3d 163, 167 (2d Cir. 2014) (quotation marks omitted).

It is the initial burden of the movant to come forward with evidence on each material element of his claim or defense, demonstrating that he is entitled to relief, and the evidence on each material element must be sufficient to entitle the movant to relief in its favor as a matter of law.  Vt. Teddy Bear Co. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004).  If the moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  Jaramillo v. Weyerhaeuser Co., 536 F.3d 140, 145 (2d Cir. 2008).  "A dispute regarding a

material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000) (quoting Anderson, 477 U.S. at 248).

In employment discrimination suits where the "merits turn on a dispute as to the employer's intent," courts exercise caution in granting summary judgment motions. Holcomb v. Iona College, 521 F.3d 130, 137 (2d Cir. 2008). Nonetheless, when a discrimination case lacks a genuine issue of material fact, summary judgment is appropriate. Schiano v. Quality Payroll Sys., Inc., 445 F.3d 597, 603 (2d Cir. 2006). Court "should examine the record as a whole" to determine whether a jury could reasonably find a discriminatory purpose by the employer. Walsh v. N.Y. City Housing Auth., 828 F.3d 70, 76 (2d Cir. 2016) (quotation marks omitted). "No one piece of evidence need be sufficient, standing alone, to permit a rational finder of fact to infer that defendant's employment decision was more likely than not motivated in part by discrimination." Id.

DISCUSSION.

I.    Because No Reasonable Finder of Fact Could Find that Woolf's Stress-Induced Condition Was a "Disability" under the ADA, Summary Judgment Is Granted to Defendants on Woolf's ADA Discrimination Claim, and Woolf's Motion for Partial Summary Judgment Is Denied.

A.  Defendants' Motion Is Granted as to the ADA Discrimination Claim.

Woolf asserts that Bloomberg violated the ADA by terminating him on the basis of disability, as well as failing to accommodate his disability. To make out a prima facie case of employment discrimination under the ADA, a plaintiff must demonstrate that 1.) the employer is subject to the ADA, 2.) the plaintiff was disabled within the meaning of the ADA, 3.) the plaintiff was otherwise qualified to perform the essential functions of the job, with or without a reasonable accommodation, and 4.) the plaintiff suffered an adverse employment action on the

basis of disability.  Sista v. CDC Ixis N. Am., Inc., 445 F.3d 161, 169 (2d Cir. 2006).  A failure-to-accommodate claim considers those first three factors, but for the fourth factor looks to whether the employer has refused to make a reasonable accommodation.  McMillan v. City of New York, 711 F.3d 120, 126 (2d Cir. 2013).

A "disability" under the ADA includes "a physical or mental impairment that substantially limits one or more major life activities . . . ."  42 U.S.C. § 12102(1)(A).  The definition is "construed in favor of broad coverage . . . ."  Id. § 12102(4)(A).  "Not every impairment is a 'disability' within the meaning of the ADA; rather, there are two requirements: the impairment must limit a major life activity and the limitation must be substantial."  Capobianco v. City of New York, 422 F.3d 47, 56 (2d Cir. 2005).  Major life activities include core physical functions like walking and breathing, and other common activities such as reading and working.  42 U.S.C. § 12102(2)(A); see also 29 C.F.R. § 1630.2(i).  "An impairment is a disability . . . if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population."  29 C.F.R. § 1630.2(j)(ii).  "[T]he determination of the existence of a substantial limitation on a major life activity must be determined on a case-by-case basis."  Capobianco, 422 F.3d at 56.

Periodic migraine headaches do not amount to a disability under the ADA unless the plaintiff demonstrates that they result in a substantial limitation to a major life activity.  See, e.g., Delgado v. Triborough Bridge & Tunnel Auth., 485 F. Supp. 2d 453, 460 (S.D.N.Y. 2007) (complaint's allegations of impairments, including migraines, did not allege an ADA violation because plaintiff failed to describe the impairments' effects) (Marrero, J.); Gaube v. Day Kimball Hosp., 2015 WL 1347000, at *8 (D. Conn. Mar. 24, 2015) (complaint failed to allege that migraines caused a substantial limitation on plaintiff's sleep and concentration).  Similarly,

impairments like bipolar disorder and arthritis may or may not qualify as a disability under the ADA, depending on whether a plaintiff can demonstrate a substantial limitation on one or more major life activity. Graham v. Macy's Inc., 2015 WL 1413643, at *3 (S.D.N.Y. Mar. 23, 2015) (dismissing ADA claims premised on arthritis and bipolar disorder at the motion to dismiss stage) (Engelmayer, J.).

Work is a major life activity within the meaning of the ADA. But where a plaintiff's condition leaves him unable to perform only a single, specific job, "he has failed to establish a substantial impairment to his major life activity of working." Muller v. Costello, 187 F.3d 298, 312 (2d Cir. 1999). Muller concluded that a plaintiff who claimed he was unable to work as a corrections officer due to the presence of prison cigarette smoke and other environmental irritants did not suffer from a substantial limitation on a major life activity because he was capable of working as a building guard, bank employee, salesman, substitute teacher or corrections officer in a smoke-free environment. Id. at 313. Because the plaintiff was capable of working in numerous similar, smoke-free jobs, he did not suffer a substantial limitation on the major life activity of work, and therefore was not disabled within the meaning of the ADA. Id.

The existence of an ADA-qualified disability is a separate inquiry from whether the employee can perform his job with a reasonable accommodation. Sista, 445 F.3d at 169. But an accommodation request acknowledging that the employee is able to continue in the same job under a new supervisor is strong evidence that the plaintiff is capable of the major life activity of working. In Potter v. Xerox Corp., 1 Fed. App'x 34, 35-37 (2d Cir. 2001) (summary order), the plaintiff claimed chest pains, panic attacks, anxiety attacks and severe depression that resulted from workplace stress, and asserted that his condition could be accommodated with reassignment

to a new supervisor. In a summary order, the Second Circuit affirmed the district court's conclusion that the plaintiff's ability to work was not substantially impaired if he was capable of working under a different supervisor. Id. at 37; see also Harrison v. New York City Housing Authority, 2001 WL 1658243, at *2 (S.D.N.Y. Dec. 26, 2001) (describing as "fatal" to plaintiff's ADA claim her request "for an administrative transfer under different supervisors . . . .") (Preska, J.).

The Court assumes that Woolf's complex migraines constituted a "physical or mental impairment." 42 U.S.C. § 12102(1)(A). However, based on Woolf's own evidence and statements, no reasonable trier of fact could conclude that the stress-related migraines substantially limited his major life activity of working. Id. Woolf has urged that his complex migraines were caused and exacerbated by the stress of specific supervisors. (Pl. 56.1 ¶¶ 46, 71; Def. 56.1 Resp. ¶¶ 46, 71.) He has asserted that the migraines became more frequent and complex "as a result of stress caused by work factors," specifically including the "nitpicking," "berating" and "generally verbally assaulting" behavior of defendant Bowyer, and the added everyday stress that he felt due to the actions and comments of Bowyer and Morris. (Pl. 56.1 ¶¶ 8, 33; Def. 56.1 Resp. ¶¶ 8, 33.)

Woolf's treating neurologist, Dr. Michael Hutchinson, explained in a letter of May 29, 2013 that the only way to control the migraines "is to reduce his stress levels," and that Woolf needed to "do what is necessary to change his current work environment" because "the primary trigger" of the migraines "is emotional stress at work . . . ." (Garland Dec. Ex. 29.) In a subsequent letter of July 15, 2013, Hutchinson similarly stated, "I strongly advise that accommodations be given to Mr. Woolf as soon as possible that will significantly lower his work stress as his work environment is obviously a major trigger to these more frequent and intense

migraines," and in a November 27, 2013 letter, stated that "I continue to strongly recommend

Mr. Woolf reduce his stress levels, particularly at work . . . ."  (Garland Dec. Exs. 37, 43.)

Woolf proposed that he be transferred to a position in one of Bloomberg's offices

in Asia, or, alternatively, continue in his same position under the management of different

supervisors.  According to Woolf, in March 15, 2013, he asked defendant Strada "for help in

seeking out transfer to a different position within Bloomberg as a reasonable accommodation for

his medical condition."  (Pl. 56.1 ¶ 9.)  As described by Woolf, on or about May 31, 2013, Woolf

told Niziolek that he could "transfer[] to other positions within Bloomberg," or that he "could

simply do the exact same job he had been doing until then, without being managed by

Defendants Bowyer and Morris, who were exacerbating Plaintiff's medical condition."  (Pl. 56.1

¶ 29.)  In his deposition, Woolf testified that he told Niziolek on or about June 5, 2013 that he

"wanted to be placed in a situation where my work was appreciated and I was not being

subjected to manufactured stress," which necessitated a "transfer."  (Woolf Dep. 281.)  Woolf

testified that this could have been accomplished with "a move from the fifth row to the eighth

row on my floor," a change that would have caused him to "report[] to different supervisors."

(Woolf Dep. 283.)  In a June 13, 2013 e-mail, Woolf wrote to Niziolek stating that he wished "to

discuss opportunities abroad" and "to transfer my current position" as "a reasonable

accommodation to assist me in managing the debilitating migraines I now often experience at

work."  (Pl. 56.1 ¶ 49.)  Four days later, Woolf proposed the transfer to nine unspecified

positions in Asia and four in the United States.  (Pl. 56.1 ¶ 51; Melamed Dec. Ex. V.)

Based on Woolf's own descriptions of his ability to work, no reasonable trier of

fact could conclude that he had a substantial limitation on a major life activity and therefore was

disabled under the ADA.  Woolf's own Local Rule 56.1 Statement asserts that he "could simply

do the exact same job he had been doing," provided that he was under new supervisors. (Pl. 56.1 ¶ 29.) In his deposition, he testified that he would have been capable of continuing his same job if he were assigned "from the fifth row to the eighth row" on his floor. (Woolf Dep. 283.) A plaintiff who is capable of working in a highly similar job does not suffer a substantial impairment of a major life activity. Muller, 187 F.3d at 312. Woolf's acknowledgement that he was capable of performing his identical job under the oversight of a different supervisor is an acknowledgment that his migraines did not substantially impair his major life activity of working.

Courts have repeatedly concluded that an ability to continue work under a different supervisor means that a plaintiff does not suffer a substantial impairment to the ability to work. Davitt v. Rockland Cnty. Dep't of Mental Health, 2013 WL 1091982, at *6 (S.D.N.Y. Mar. 15, 2013) ("an inability to work under a certain supervisor did not quality as a disability under the ADA because the plaintiff could work in the same position at another location.") (collecting cases); Lee v. Sony BMG Music Entm't, Inc., 557 F. Supp. 2d 418, 425 (S.D.N.Y. 2008) ("Plaintiff's inability to work under a particular supervisor does not give rise to an independent claim for disability discrimination.") (McMahon, J.); Schneiker v. Fortis Ins. Co., 200 F.3d 1055, 1062 (7th Cir. 2000) ("Standing alone, a personality conflict between an employee and a supervisor – even one that triggers the employee's depression – is not enough to establish that the employee is disabled, so long as the employee could still perform the job under a different supervisor.").

Separately, in his memorandum, Woolf states that his migraines caused him to suffer loss of sight, speech and concentration. (Pl. Mem. at 14.) Seeing, speaking and concentrating are major life activities under the ADA. 29 C.F.R. § 1630.2(i)(1)(i). Woolf notes

that Hutchinson's letter of May 29, 2013 mentioned that during migraine episodes, Woolf sometimes "suffered loss of vision" and "language difficulties." (Garland Dec. Ex. 29.) Separately, in his deposition, Woolf described an incident in May 2013 where he lost "half my vision" at work, at which point defendant Morris instructed him to immediately proceed to a doctor. (Woolf Dep. 401-02.) Woolf returned about three hours later and completed the work day. (Id.) Also during his deposition, Woolf claimed that he was having difficulty answering attorney questions due to a migraine, but confirmed that he was capable of responding to questions and giving truthful answers, and continued with the deposition. (Woolf Dep. 155.) Hutchinson's letter and Woolf's deposition testimony are some evidence that Woolf's migraines affected his major life activities of seeing and speaking, but they do not go toward whether those activities were "substantially limit[ed] . . . as compared to most people in the general population." 29 C.F.R. § 1630.2(j)(ii). Woolf has not directed the Court to evidence of how and to what extent his sight, speech and concentration were affected. Drawing every reasonable inference in favor of Woolf, he has demonstrated only that these categories of life activity were in some way affected by his migraines, but not that they were substantially limited.

Although Woolf has demonstrated that he is generally susceptible to stress-induced migraine headaches, his admission that he would be able to perform the same job functions if he were transferred to a different supervisor undermines his claim that he has a condition that substantially limits one or more major life activities. Measured by the standard under the ADA and its case law, Woolf has failed to come forward with evidence that, if believed, would enable a reasonable fact-finder to find that he has a disability within the meaning of the statute. Accordingly, Bloomberg's motion for summary judgment dismissing Woolf's claim of disability discrimination under the ADA is granted.

B.  Woolf's Motion for Partial Summary Judgment Is Denied.

Woolf's motion for partial summary judgment asserts that Bloomberg violated the ADA by refusing to provide him a reasonable accommodation under the ADA.  Because Woolf has not come forward with evidence to demonstrate that he was disabled within the meaning of the ADA, his motion for partial summary judgment is denied.

The Court notes that, as discussed, the EEOC issued findings on March 30, 2016, which concluded that defendants did not engage in a good-faith interactive process about providing a reasonable accommodation to Woolf.  (Melamed Dec. Ex. HH.)  EEOC proceedings are non-binding and non-adversarial, and courts are not bound by the views of the EEOC. Krasner v. HSH Nordbank AG, 680 F. Supp. 2d 502, 515 (S.D.N.Y. 2010) (Lynch, J.); Syrkin v. State Univ. of New York, 2005 WL 2387819, at *8 (E.D.N.Y. Sept. 29, 2005).  EEOC determinations "'are not homogeneous products; they vary greatly in quality and factual detail.'" Paolitto v. John Brown E. & C., Inc., 151 F.3d 60, 65 (2d Cir. 1998) (quoting Johnson v. Yellow Freight Sys., Inc., 734 F.2d 1304, 1309 (8th Cir. 1984)).  Here, the EEOC made no determination as to whether Woolf actually had a disability within the meaning of the ADA.  Further, the failure to engage in an interactive process does not provide a cause of action under the ADA. McBride v. BIC Consumer Prod. Mfg. Co., 583 F.3d 92, 100 (2d Cir. 2009) ("[T]he ADA imposes liability for, inter alia, discriminatory refusal to undertake a feasible accommodation, not mere refusal to explore possible accommodations where, in the end, no accommodation was possible.").  Any findings of the EEOC concerning defendants' role in the interactive process do not salvage Woolf's claim of disability discrimination or the assertion that he was denied a reasonable accommodation.

II.     Defendants' Motion for Summary Judgment Is Granted as to Woolf's Claim of ADA Retaliation.

A.   The Standard for Demonstrating Retaliation.

Claims for retaliation under the ADA are analyzed using the McDonnell-Douglas burden-shifting framework. Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002). A plaintiff has an initial burden to establish a prima facie case of retaliation, after which, the burden shifts to the defendant to articulate a legitimate, non-retaliatory basis for the challenged employment decision. Id. at 720-21. The plaintiff must then point to evidence that would permit a rational finder of fact to conclude that the employer's explanation was pretextual. Id. at 721. To make out a prima facie case of retaliation, a plaintiff must "show that: (1) he engaged in an activity protected by the ADA; (2) the employer was aware of this activity; (3) the employer took adverse employment action against him; and (4) a causal connection exists between the alleged adverse action and the protected activity." Id. at 719. Protected activities include informal complaints to management, id. at 720, and the request for a reasonable accommodation is a protected activity under the ADA. Weixel v. Bd. of Educ. of City of New York, 287 F.3d 138, 149 (2d Cir. 2002).

In moving for summary judgment, Bloomberg urges that Woolf cannot demonstrate a causal connection between an adverse action and a protected activity, and therefore cannot make out a prima facie case of retaliation. To demonstrate a causal connection, a plaintiff "must show that the allegedly adverse actions occurred in circumstances from which a reasonable jury could infer retaliatory intent." Treglia, 313 F.3d at 720. "'[P]roof of causation can be shown either: (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of

retaliatory animus directed against the plaintiff by the defendant.'" Hicks v. Baines, 593 F.3d

159, 170 (2d Cir. 2010) (quoting Gordon v. N.Y. City Bd. of Educ., 232 F.3d 111, 117 (2d Cir.

2000)). Causation may be shown through timing, but the "[t]emporal proximity between the

protected activity and the adverse employment action must be very close." Meyer v. Shulkin,

722 Fed. App'x 26, 28 (2d Cir. 2018) (summary order) (quotation marks omitted). "Where

timing is the only basis for a claim of retaliation, and gradual adverse job actions began well

before the plaintiff had ever engaged in any protected activity, an inference of retaliation does

not arise." Slattery v. Swiss Reinsurance Am. Corp., 248 F.3d 87, 95 (2d Cir. 2001).

      B.  Woolf Has Not Pointed to Evidence Supporting a Causal Connection Between
His EEOC Charge and His Termination Six Months Later.

Bloomberg points out that that nearly six months elapsed between Bloomberg's

knowledge that Woolf filed an EEOC charge and his eventual termination, a time gap that,

standing alone, does not raise the inference of a causal connection. There is also evidence of

management's negative view of Woolf's performance that pre-dates the filing of his EEOC

charge. In light of the attenuated temporal connection between Woolf's protected activity and

his discharge, and the record demonstrating performance-based criticisms in advance of his

protected activity, the Court concludes that no reasonable trier of fact could find a causal

connection between Woolf's EEOC charge and his termination. Woolf has therefore failed to

make out a prima facie case of retaliation.

Woolf filed the discrimination charge with the EEOC on or about July 17, 2013.

(Pl. 56.1 ¶ 56; Def. 56.1 Resp. ¶ 56.) The filing of an EEOC complaint is a protected activity

under the ADA. Lovejoy-Wilson v. NOCO Motor Fuel, Inc., 263 F.3d 208, 223 (2d Cir. 2001).

Woolf was terminated nearly six months later, on January 10, 2014. (Def. 56.1 ¶ 155; Pl. 56.1

Resp. ¶ 155.)

The summary judgment record includes evidence that Woolf received some negative feedback in his year-end review for 2012, including comments that he needed to take a greater leadership role, had communications problems and needed to improve his knowledge of Bloomberg terminals and client needs. (Def. 56.1 ¶¶ 88-92; Pl. 56.1 Resp. ¶¶ 88-92.) Woolf received a verbal warning on March 20, 2013 and was instructed to show "immediate and sustained improvement . . . or you could be subject to further disciplinary action." (Def. 56.1 ¶ 105; Pl. 56.1 Resp. ¶ 105.) On or around May 23, 2013, Bowyer admonished Woolf for sending an e-mail to senior leaders at the Company, which did not contain "relevant, actionable information . . . ." (Def. 56.1 ¶ 129; Pl. 56.1 Resp. ¶ 129; Garland Dec. Ex. 20.) Later in May, Bowyer e-mailed Woolf with guidance on meeting performance objectives, specifically related to time management. (Def. 56.1 ¶¶ 132-33; Pl. 56.1 Resp. ¶¶ 132-33.) On June 5, 2013, Woolf received an interim performance review, where he received a number of specific, performance-related criticisms, and was rated as "Needs Improvement" and "Unacceptable." (Def. 56.1 ¶ 134; Pl. 56.1 Resp. ¶ 134.) At a meeting of July 3, defendant Niziolek warned Woolf that he was at risk of receiving a written warning if his performance did not improve. (Def. 56.1 ¶ 137; Pl. 56.1 Resp. ¶ 137.)

Thus, by the time that Woolf filed his EEOC charge on July 17, 2013, he had already received a middling performance review at the end of 2012; a verbal warning that explained the risk of further disciplinary actions; guidance and admonitions in response to his perceived missteps; a negative interim review; and was warned that he was at risk of a future written warning. This is an extensive record of formal and informal communications of problems that managers perceived with Woolf's performance.

Based on this record, no reasonable finder of fact could conclude that there was a causal connection between Woolf's EEOC charge and his termination six months later. Temporally, the six-month gap between the EEOC charge and Woolf's ultimate termination does not demonstrate a causal connection. See, e.g., Stoddard v. Eastman Kodak Co., 309 Fed. App'x 475, 480 (2d Cir. 2009) ("[I]n the instant case, where the protected activity took place two months prior to the alleged adverse action, and where there is nothing other than that temporal proximity invoked to establish a retaliatory intent, the causal relationship is not established.") (summary order); Chamberlin v. Principi, 247 Fed. App'x 251, 254 (2d Cir. 2007) (affirming district court's conclusion that a five-month gap between EEOC filing and adverse employment action was not "close" enough to demonstrate a causal connection) (summary order).

In addition, as discussed, the parties have submitted an extensive record of negative reviews and feedback that predate and postdate the EEOC filing. The Court concludes that no reasonable trier of could infer a causal connection between the EEOC filing and Woolf's termination. See Slattery, 248 F.3d at 295 (causal connection not shown when "the adverse employment actions were both part, and the ultimate product, of 'an extensive period of progressive discipline' which began when [defendant] diminished [plaintiff's] job responsibilities a full five months prior to his filing of the EEOC charges."); Chamberlin, 247 Fed. App'x at 254 (affirming grant of summary judgment to employer based in part on the "pattern of attempts to undermine and exclude [plaintiff] that began well before the filing of the first EEOC complaint and that continued after the complaint was filed."); Hernandez v. New York City Dep't of Sanitation, 2018 WL 5447540, at *4 (S.D.N.Y. Oct. 29, 2018) ("This negative treatment, all of which occurred before the alleged protected activity, is sufficiently

significant to sever the causal link between Plaintiff's March 11 complaint and his negative performance evaluation, the transfer slips, and the stolen boots incident.") (Schofield, J.).

Because a reasonable trier of fact could not find a causal connection between Woolf's EEOC complaint and his termination, defendants' motion for summary judgment is granted as to his claim for retaliation under the ADA.

### C. Woolf Has Not Pointed to Evidence Supporting a Causal Connection Between Any Other Protected Activity and an Adverse Employment Action.

In opposition to the motion, Woolf urges that his protected activity was not limited filing the EEOC charge. He points out that requests for a reasonable accommodation are a protected activity, as are informal complaints of discrimination, and he asserts that management "fabricated" reasons for criticizing his performance. He points to a March 15, 2013 conversation with Strada where he requested transfer to a new position as a reasonable accommodation, and the handwritten note he claims to have left her on March 19, 2013, which raised his "NEED to find a new job" and lack of motivation "to work for these people." (Pl. 56.1 ¶¶ 9-10.) Woolf also points out that adverse employment actions need not rise to the level of termination, and may include less severe measures like reprimands or diminished work responsibilities.

At the summary judgment stage, the Court assumes the truth of Woolf's assertions about the contents of his communications with Strada in March 2013, which the defendants dispute.[2] Separately, the Court assumes for the sake of argument that Woolf's requests to be transferred to Asia, or to a different supervisor more broadly, can be treated as a request for a reasonable accommodation that was made with an objective, good-faith basis – a

---

[2] Strada testified at her deposition that Woolf expressed a desire to transfer to Asia for personal reasons and testified that she did not see Woolf's handwritten letter. (Def. 56.1 Resp. ¶¶ 9-10.)

proposition that is doubtful.  See, e.g., Kennedy v. Dresser Rand Co., 193 F.3d 120, 122-23 (2d Cir. 1999) ("There is a presumption . . . that a request to change supervisors is unreasonable, and the burden of overcoming that presumption (i.e., of demonstrating that, within the particular context of the plaintiff's workplace, the request was reasonable) therefore lies with the plaintiff."); Wernick v. Fed. Reserve Bank of New York, 91 F.3d 379, 384 (2d Cir. 1996) ("Indeed, nothing in the law leads us to conclude that in enacting the disability acts, Congress intended to interfere with personnel decisions within an organizational hierarchy.").

It remains the case that management began providing negative feedback about Woolf's performance prior to his March 15 and 19 communications with Strada.  Those criticisms were consistent with concerns raised in the annual performance review of January 10, as well as subsequent warnings and less-formal criticisms about Woolf's deficiencies in communications, leadership and product knowledge, all of which preceded his termination in January 2014.

In an e-mail dated March 5, 2013, defendant Bowyer wrote to Bloomberg's HR department with "key points" about Woolf's performance, including "limited knowledge of the Bloomberg product/audience overall;" "limited understanding of technical aspects," which made it difficult for him to close negotiations; "limited knowledge" of the mechanics and contents of typical deals; "Low credibility internally" with other departments; and "Poor problem solving skills" that required him to pass along work to his managers and caused an inability "to build consensus among groups . . . ."  (Bowyer Dec. Ex. 1.)

In a March 7, 2013 follow-up e-mail to HR, Bowyer gave specific examples of Woolf's poor performance.  He described Woolf's attempted proposal for a product line that was inconsistent with "Bloomberg's product range which reflects poor product knowledge," and

noted Woolf's failure to research or consider the issue. (Id.) In another incident, Woolf had responsibility for a "high profile deal" that fell through, then "blamed other personalities for holding it up." (Id.) In that instance, Bowyer stated that Woolf was unable to find a solution to a "complex" negotiation and had "shown an inability to manage these more sophisticated issues that arise." (Id.) A different employee was thereafter put in charge of the deal. (Id.) In a third incident, Woolf was informed that the counterparty to an agreement had submitted poor or incorrect data, but Woolf declined to act on the problem, concluding that it was not "an issue related to business . . . ." (Id.) Others at Bloomberg were left to resolve the matter. (Id.)

Woolf denies that Bowyer identified "actual[ ] concerns," just as he disputes the merits of management's other performance critiques, but he does not dispute the timing or existence of the e-mails. (Pl. 56.1 Resp. ¶ 102.)

Bowyer's e-mails of March 5 and 7 predated requests or conversations that Woolf has identified as a protected activity. At the earliest, and drawing every reasonable inference in Woolf's favor, he first discussed the possibility of transferring to Asia with Strada on March 15. Viewed along with Woolf's annual review for 2012, management raised concerns about Woolf's performance that predated any arguably protected activity that he pursued. In light of this record, no reasonable trier of fact could conclude that any adverse action by Bloomberg had a causal connection to a protected activity under the ADA. See Chamberlin, 247 Fed. App'x at 254 (summary judgment was appropriate where "attempts to undermine and exclude" plaintiff both predated and postdated EEOC filing).

Considering the totality of the record, including the EEOC complaint and all other communications and requests made to Strada and others, no reasonable trier of fact could find a

causal connection between Woolf's purported protected activity and an adverse employment action.  Summary judgment is therefore granted to defendants on Woolf's ADA retaliation claim.

D.  Even if Woolf Could Make Out a Prima Facie Case of Retaliation, Bloomberg Has Come Forward with a Legitimate, Non-Retaliatory Explanation for Its Actions, and Woolf Has Not Pointed to Evidence that Shows Pretext.

The Court separately concludes that even if Woolf could make out a prima facie case of retaliation, Bloomberg's motion would be granted because it has come forward with evidence that its concern about Woolf's deficient performance were legitimate, non-retaliatory reasons for Woolf's negative reviews and ultimate termination.  In response, Woolf has not come forward with evidence that would permit a rational trier of fact to conclude that the defendants' explanation is pretextual.  Because Woolf has not satisfied his burden on the final step of the burden-shifting framework, defendants' summary judgment motion is granted as to the claim of ADA retaliation.

Under the burden-shifting framework of McDonnell-Douglas, if a plaintiff makes out a prima facie case of retaliation, the burden shifts to the employer to articulate a legitimate, non-retaliatory explanation for its actions, which the plaintiff may then rebut through evidence that would permit a rational finder of fact to conclude that the employer's explanation was pretextual.  Treglia, 313 F.3d at 721.  "[O]nce the employer has offered legitimate, nondiscriminatory reasons for its actions . . . tenuous circumstantial evidence will rarely be sufficient to allow a rational factfinder to infer that the employer's reasons were mere pretext for intentional discrimination."  Nuchman v. City of New York, 639 Fed. App'x 48, 49 (2d Cir. 2016) (summary order).  "[I]ncidents of conflict" and evidence of being "disliked" are not evidence of retaliation, and "attacks on the [defendant's] credibility are insufficient to constitute

circumstantial evidence of pretext." Lomotey v. Connecticut-Dep't of Transp., 355 Fed. App'x 478, 482 (2d Cir. 2009).

Here, Bloomberg has articulated a legitimate, non-retaliatory reason for Woolf's termination, warnings and critical feedback: specific performance problems that were contemporaneously documented, and which predate and postdate any protected activity by Woolf. (Def. Mem. at 31.)

In response, Woolf has not pointed to evidence that supports an inference that retaliatory animus motivated Bloomberg. He has filed a declaration that describes what he considers to have been managerial missteps and explains why he believes his supervisors had a poor understanding of his performance and the industry generally. (Docket # 101.) In his memorandum, Woolf repeatedly refers to his manager's critiques and warnings as "fabricated" and "retaliatory." (Opp. Mem. 30-31.) He vigorously disputes that his job performance was inadequate, notes instances where his managers did not contemporaneously object to certain decisions he made, defends his knowledge about the functions of Bloomberg terminals, and notes that he was tasked with training a new employee. He urges that Niziolek lacked a full understanding of his performance because he did not follow up on Woolf's suggestion to seek out the views of supervisors who no longer managed him, and observes that "Defendants did not object to much of Plaintiff's work with respect to the precise details that they accused him of mishandling." Woolf points out that he sold five terminals while employed at Bloomberg, which he contends is inconsistent with the criticism that he did not adequately understand the terminals' functions. Woolf also explains in detail an incident from December 2013 involving management's concerns that he had not timely updated "26 DRQS tickets," and a directive not to assign him further work until "existing DRQs were demonstrably under control." (Opp. Mem.

39-41.)  At some point during this period, his immediate supervisor, non-party Laura Brown, indicated that Woolf was eligible to receive more assignments, which Woolf seems to urge is evidence that he met his DRQS obligations and thus was performing adequately.  Woolf also suggests, in a lengthy footnote, that three individual defendants lied in their depositions.

Woolf's evidence is not sufficient to permit a reasonable factfinder to conclude that any adverse employment action was based on pretext.  He does not offer direct evidence of retaliatory animus, such as remarks that could be construed as indicating a retaliatory intent, or relevant circumstantial evidence, such as treatment that differed from similarly situated colleagues with a similar work history.  See Hicks, 593 F.3d at 170.  While Woolf believes management's reviews were unfair or inaccurate, he has not identified inconsistent explanations from management about its performance concerns.  Kwan v. Andalex Grp. LLC, 737 F.3d 834, 847 (2d Cir. 2013) (employer's inconsistent explanations may defeat an employer's summary judgment motion on pretext).  Moreover, the negative feedback of managers and supervisors was consistent with comments that pre-dated any protected activities.  Shah v. Consol. Edison Corp. of N.Y., 175 Fed. App'x 436, 438 (2d Cir. 2006) (pretext was not demonstrated through a performance-based warning that "reflected a continuation of negative assessments" pre-dating the claimed protected activity) (summary order).  And although Woolf has described a history of his disagreements with managers and supervisors, and urges that some individuals were untruthful in their depositions, this is not evidence of retaliatory motive or pretext.  Lomotey, 355 Fed. App'x at 482.

Because defendants have come forward with a legitimate non-retaliatory explanation for Woolf's termination and Woolf has not come forward with evidence that

supports a finding of pretext, defendants' summary judgment motion is granted as to Woolf's claim of retaliation under the ADA.

III.     Defendants' Summary Judgment Motion Is Granted as to Woolf's Claim of FMLA
         Interference.

Woolf brings a claim of FMLA interference, and urges that Bloomberg denied or otherwise interfered with his right to take FMLA leave.  See 29 U.S.C. § 2615(a)(1).  The summary judgment record contains undisputed evidence that Bloomberg granted every request that Woolf made for medical leave, and that his managers and supervisors encouraged him to take such leave.  However, according to Woolf, on January 9, 2014, he was granted leave to care for his wife, and the following day, he was terminated in order to prevent him from lawfully taking such leave.  He urges that a jury should decide whether he was terminated in order to unlawfully prevent him from taking leave.

An employer may not interfere with an employee's right to take FMLA leave by discouraging the use of such leave or refusing to authorize appropriate use.  Potenza v. City of New York, 365 F.3d 165, 167 (2d Cir. 2004) (citing 29 CFR § 825.220(b)).  "[T]o prevail on a claim of interference with her FMLA rights, a plaintiff must establish: 1) that she is an eligible employee under the FMLA; 2) that the defendant is an employer as defined by the FMLA; 3) that she was entitled to take leave under the FMLA; 4) that she gave notice to the defendant of her intention to take leave; and 5) that she was denied benefits to which she was entitled under the FMLA."  Graziadio v. Culinary Inst. of Am., 817 F.3d 415, 424 (2d Cir. 2016).  In moving for summary judgment, defendants urge that there is no evidence that Woolf was denied benefits guaranteed to him under the FMLA.

The summary judgment record includes evidence that each of Woolf's three leave requests was granted, and that he was encouraged by his supervisors to take leave in order to

manage his health problems. It is undisputed that all of Woolf's requests for leave were granted. (Def. 56.1 ¶ 204; Pl. 56.1 Resp. ¶ 204.)

First, around late May 2013, Woolf requested intermittent FMLA leave. (Def. 56.1 ¶ 171; Pl. 56.1 Resp. ¶ 171.) The Reed Group, which administered Bloomberg's leave program, granted Woolf's request for intermittent leave for a period of May 24 to November 23, 2013, and he was paid with full salary throughout this time. (Def. 56.1 ¶¶ 172-73; Pl. 56.1 Resp. ¶¶ 172-73.) The Reed Group later approved Woolf's request to extend intermittent leave for his migraine condition, through May 23, 2014. (Def. 56.1 ¶¶ 199-200; Pl. 56.1 Resp. ¶¶ 199-200.)

Second, on October 24, 2013, Woolf informed Morris and Niziolek that he required cardiac surgery; the Reed Group approved intermittent leave based on Woolf's cardiac condition, to run from October 18, 2013 to April 15, 2014. (Def. 56.1 ¶¶ 197-98; Pl. 56.1 Resp. ¶ 197-98.)

Finally, on December 13, 2013, Woolf applied to the Reed Group for intermittent family leave in order to care for his ailing wife. (Def. 56.1 ¶ 202; Pl. 56.1 Resp. ¶ 202; Garland Dec. Ex. 44.) The Reed Group, acting for Bloomberg, confirmed the request for a "Family Serious Health Condition Leave." (Garland Dec. Ex. 44.) The Reed Group granted the request on either January 9 or 10, 2014. (Def. 56.1 ¶ 203; Pl. 56.1 Resp. ¶ 203; Garland Dec. Ex. 45.) The written approval of paid leave is dated January 10, 2014, which is the same date as Woolf's termination. (Garland Dec. Ex. 45.) The Court is aware of no evidence in the record that the Reed Group had knowledge about Woolf's potential termination, or that Woolf's managers had knowledge of the leave request.

There is also evidence that individual defendants encouraged Woolf to take medical leave. In an e-mail to defendant Morris of July 9, 2013, Woolf described his migraines

and asked Morris whether he could "make something happen."  (Melamed Dec. Ex. sss.)  Morris

replied in part, "I strongly encourage you to take as much leave time as possible to get better

because that is most important.  I will pass along your e-mail to HR and encourage you to reach

out to Jim when you feel better to discuss.  Please let me know if there is any work you need us

to follow up on so you can take the time off you need to heal."  (Melamed Dec. Ex. sss.)

Separately, or around July 9, 2013, Niziolek offered Woolf intermittent FMLA leave as a

medical accommodation for his migraines.  (Pl. 56.1 ¶ 62; Def. 56.1 Resp. ¶ 62.)

        According to Woolf, defendants' principal attempt to accommodate his migraines

and stress was to encourage him to take intermittent FMLA leave.  (Pl. 56.1 ¶ 66.)  At the same

time, Woolf's treating neurologist stated in letters to Bloomberg that medical leave was not

enough to "significantly mitigate" Woolf's conditions, which could only be treated by a change

in work environment.  (Pl. 56.1 ¶¶ 21, 44: Def. 56.1 Resp. ¶¶ 21, 44.)

        On this record, no reasonable trier of fact could conclude that Bloomberg

interfered with Woolf's right to take FMLA leave.  Every request that Woolf made for FMLA

leave was granted, and there is no evidence that he was discouraged or penalized for taking such

leave.  See, e.g., Simmons v. Woodycrest Ctr. for Human Dev., Inc., 2011 WL 855942, at *4

(S.D.N.Y. Mar. 9, 2011) (granting motion to dismiss FMLA interference claim when plaintiff

alleged no interference other than her eventual termination and "the record clearly demonstrates

that, prior to [plaintiff's] termination, she was offered an opportunity to take a leave of absence

pursuant to the FMLA, but neglected to do so.") (Rakoff, J.).  Further, Woolf's right to take

FMLA leave ended with his termination.  See, e.g., McFarlane v. Chao, 2007 WL 1017604, at

*29 (S.D.N.Y. Mar. 30, 2007) ("it is undisputed that plaintiff was granted and received FMLA

leave until the expiration of her appointment, at which time her right to any further leave was

extinguished.") (Daniels, J.).  Nor has Woolf pointed to any evidence that Bloomberg "considered his FMLA leave and request to return a negative factor in its decision to terminate him."  Sista, 445 F.3d at 176.  Finally, for the reasons previously discussed concerning Woolf's claim of ADA retaliation, the record includes extensive evidence that Woolf was terminated for performance-based, non-pretextual reasons, and no evidence that his termination was motivated by his requests for, and use of, family or medical leave.  See, e.g., Hockenjos v. Metro. Transportation Auth., 2016 WL 2903269, at *8 (S.D.N.Y. May 18, 2016) (granting summary judgment to employer based on "overwhelming evidence" of plaintiff's poor performance and absence of evidence that FMLA leave was a factor in termination).

Summary judgment is therefore granted to defendants on Woolf's claim of FLMA interference.

IV.    Summary Judgment Is Granted as to Woolf's Claim of FMLA Retaliation.

Woolf separately brings a claim of FMLA retaliation.  Defendants urge that there is no evidence to support Woolf's claim that he suffered retaliation as a result of engaging in protected activity under the FMLA, and that summary judgment therefore should be granted in their favor.

The FMLA makes it "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter."  29 U.S.C. § 2615(a)(2).   A claim of retaliation under the FMLA is analyzed using the McDonnell-Douglas burden-shifting framework.  Graziadio, 817 F.3d at 429.  "To establish a prima faci[e] case of FMLA retaliation, a plaintiff must establish that 1) he exercised rights protected under the FMLA; 2) he was qualified for his position; 3) he suffered an adverse employment action; and 4) the adverse employment action occurred under circumstances giving

rise to an inference of retaliatory intent." Id. (quoting Donnelly v. Greenburgh Cent. Sch. Dist. No. 7, 691 F.3d 134, 147 (2d Cir. 2012)). If the plaintiff makes out a prima facie case, the defendant must come forward with a legitimate, non-retaliatory reason for its actions, upon which the burden shifts back to the plaintiff to show that the explanation is pretextual. Id.

Defendants urge that, for the reasons already explained as to the claim of ADA retaliation, Bloomberg's legitimate, non-retaliatory reason for his termination was his deficient or substandard job performance, and that the summary judgment record does not include evidence to show that this explanation was pretextual. Thus, assuming that Woolf can make out a prima facie case, defendants urge that summary judgment should be granted in their favor on Woolf's claim of FMLA retaliation. In response, Woolf points to the close timing between the grant of FMLA leave on January 9 or 10, 2014, and his termination of January 10, 2014, as well as his negative performance reviews during a broader time period in which he was taking medical leave.

For the reasons largely discussed, the Court concludes that Bloomberg has proffered a legitimate, non-retaliatory reason for Woolf's termination, and Woolf has not come forward with evidence showing that the explanation is pretextual. There is a well-documented record of management's criticisms and concerns about Woolf's performance. That feedback predates Woolf's request for leave in late May 2013, continued for the remainder of his tenure at Bloomberg and were directed toward the same performance-based issues throughout this period. While Woolf urges that the criticisms of his performance were inaccurate and unfair, the substance of the criticisms was consistent. See, e.g., Kwan, 737 F.3d at 847.

It is true that, as Woolf notes, his termination was close in time with the grant of his request to take leave in order to care for his wife, which is some circumstantial evidence of

retaliatory motive.  However, given the particular facts in the summary judgment record, including management's history of granting all of Woolf's requests and encouraging him to take leave to deal with his condition, as well as the documented history of performance-related concerns, the issue of timing alone does not raise an inference of causal connection between the request for family leave and Woolf's termination.  See Slattery, 248 F.3d at 95 ("Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise."). The record also does not include evidence of retaliatory animus, or evidence that Woolf was treated differently than similarly situated individuals with a history of negative performance reviews.  See Hicks, 593 F.3d at 170.

The Court therefore concludes that defendants have come forward with a legitimate, non-retaliatory explanation for Woolf's termination, as well as for any negative performance reviews that were given to him during his tenure at Bloomberg.  In response, Woolf has not come forward with evidence showing that these explanations were pretextual.  Summary judgment therefore is granted to Bloomberg on Woolf's claim of FMLA retaliation.

V.  Summary Judgment Is Granted as to Woolf's Claim of Retaliation Under Title VII.

Defendants move for summary judgment on Woolf's claim of retaliation under Title VII of the Civil Rights Act of 1964, urging that he cannot make out a prima facie case of retaliation because there is no evidence showing a causal connection between a protected activity and his eventual termination.  For the reasons largely explained concerning Woolf's claim of ADA retaliation, defendants' summary judgment motion is granted.

In his EEOC charge of July 15, 2013, Woolf asserted that Bloomberg discriminated against him on the basis of national origin due to his status as an American, and

that he was treated less favorably than a similarly-situated employee of Russian national origin. (Melamed Dec. Ex. ooo at 11, 21.)  The EEOC charge asserted that in January 2013, Woolf was instructed to train a person of Russian national origin.  (Id. at 21.)  Woolf asserted that "the most senior manager in our group (4 levels above me)" was also of Russian origin, which led to a "cozy and friendly" relationship between the manager and the individual who Woolf trained. (Id. at 21.)

Woolf asserts that Bloomberg retaliated against him under Title VII for making a good-faith complaint of national-origin discrimination in the EEOC charge.  (Id. at 21.)  He explains that "he possessed a good faith belief that he was being discriminated against based on his national origin, by having Plaintiff train in an unqualified replacement of Russian National Origin, in order to terminate Plaintiff, who is American, when Plaintiff complained to the Defendants and filed a charge of discrimination with the EEOC."  (Pl. Opp. Mem. at 28 n.6.)

A claim of retaliation under Title VII is reviewed using the McDonnell-Douglas burden-shifting framework, as previously set forth.  Defendants urge that Woolf cannot show a causal connection between his complaint of national origin discrimination in the EEOC charge of July 15, 2013 and his termination on January 10, 2014.  As discussed, managers and supervisor had issued assorted performance-based criticisms and reviews that pre-dated his participation in any protected activity.  See Slattery, 248 F.3d at 95.  Nearly six months elapsed between the EEOC charge and Woolf's termination, a duration too lengthy to demonstrate a causal connection alone.  Meyer, 722 Fed. App'x at 28.  In opposition, Woolf does not point to evidence that would permit a reasonable trier of fact to conclude that there was a causal connection between Woolf's complaint of national origin discrimination and his termination,

such as statements reflecting animus or treatment that different from a similarly situated employee. Hicks, 593 F.3d at 170.

Because no reasonable trier of fact could conclude that there was a causal connection between the complaint of national origin discrimination contained in Woolf's EEOC charge and a subsequent adverse employment action, summary judgment is granted to defendants on Woolf's claim of Title VII retaliation.

VI.    The Court Declines to Exercise Supplemental Jurisdiction Over Woolf's Claims under the NYSHRL and NYCHRL.

Woolf's remaining claims are brought under the NYSHRL and NYCHRL. In their memoranda, no party has addressed the appropriateness of the exercise of supplemental jurisdiction over the remaining state law claims in the event that Woolf's federal claims do not survive summary judgment. Thus, both sides have had an opportunity to be heard, and neither has urged that economy, convenience, fairness or comity weigh in favor of exercising supplemental jurisdiction. Catzin v. Thank You & Good Luck Corp., 899 F.3d 77, 82-83 (2d Cir. 2018).

A district court may decline to exercise supplemental jurisdiction if it "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). A district court has discretion as to whether it should exercise supplemental jurisdiction over state law claims when all federal claims have been dismissed. Catzin, 899 F.3d at 83. "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine – judicial economy, convenience, fairness, and comity – will point toward declining to exercise jurisdiction over the remaining state-law claims." Valencia ex rel. Franco v. Lee, 316 F.3d 299, 305 (2d Cir. 2003) (quoting Carnegie-Mellon University v. Cohill, 484 U.S. 343, 349-50 (1988)).

Here, the Court has dismissed all federal claims. Certain of Woolf's remaining claims involve issues unique to the NYSHRL and NYCHRL, such as whether any individual defendants aided and abetted discrimination and retaliation, and Bloomberg's purported vicarious liability under the NYCHRL. (Def. Mem. 32-33.) Woolf urges that the NYSHRL and NYCHRL allow for liability where an employer does not engage in good-faith interactions as to an accommodation request (Pl. Reply at 17), whereas the ADA recognizes no such claim, as discussed. See McBride, 583 F.3d at 100. Woolf also urges that the NYCHRL adopts a broader definition of "disability" than the ADA, uses a "more liberal standard" than federal law for defining retaliation and that the individual defendants are all "employers" within the meaning of New York law. (Pl. Reply at 17, 28.)

Because the remaining claims are brought under New York law and turn on New York-specific requirements, principles of judicial economy, fairness, convenience and comity will be served best by declining to exercise supplemental jurisdiction over the remaining state law claims and, accordingly, all such claims are dismissed.

CONCLUSION.

Defendants' motion is granted in its entirety as to plaintiff's claims brought under federal law. Plaintiff's motion for partial summary judgment is denied. The Court declines to exercise supplemental jurisdiction over plaintiff's remaining state law claims.

The Clerk is directed to terminate the motions (Docket # 82, 87), enter judgment for Bloomberg as to Woolf's claims under the ADA, the FMLA and Title VII, and close the case.

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
       March 5, 2019